IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HALLWOOD PLAZA, INC. , | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-589C |
| | ) | (Judge Christine O.C. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h) of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States submits its proposed findings of uncontroverted fact.

1. Plaintiff, Hallwood Plaza ("Hallwood") is the owner of the retail shopping center commonly known as Hallwood Plaza, located in Flint, Michigan.

2. On November 1, 2004, the General Services Administration ("GSA") issued Solicitation For Offers No. GS-05B-17564 ("SFO") for a four year/two year firm term lease, for commercial office space to serve as a Social Security office. Appendix ("App.") 1. The SFO request package included all general and shell space requirements of both GSA and SSA including, "Attachment No. 2 to SFO," which was a chart specifying the requirements of the building shell, both for the base building and the tenant areas. App. 6-7, 41; 145-146.

3. Section 1.9 of the SFO stated that the Government intended "to lease a full serviced "warm lit shell" with a tenant improvement allowance for the specified lease term. . ." App. 6. In the context of this lease, "warm lit shell" meant a weatherproof, enclosed building supplied with heating, air conditioning, and ventilation, as well as electric wiring and lighting, meeting the standards for base building and tenant areas as

set out in the SFO. App. 6-7, 145-146.

4. The shell rental rate was to include "all basic building systems and common area build out including: base building lobbies, common areas, and core areas, etc exclusive of the BOMA Office Usable space offered as required in this solicitation." Id.

5. SFO Section 1.9(B)(1)(b) provided, "Demolition of any existing conditions in the proposed Government demised space or any common core areas will be done as part of the shell base rate." Id.

6. The SFO required the lessor to provide a "base building structure and building enclosure components (windows, with exterior finishes) are complete. (No window treatments, i.e. blinds, draperies, etc.). Id.

7. SFO section 1.9(B)(1)(c) provided that "The base building electrical and mechanical systems are complete and functional (central fire alarm, chiller plant, cooling towers, etc.)." Id.

8. SFO Section 1.9(B)(1)(c) required "a designated connection point to the central fire alarm system, for extension to tenant demised area(s). Id.

9. Among other requirements, the tenant areas section of the warm lit shell required

> A full installed 2x2 foot suspended acoustical ceiling, with 2x2 parabolic fluorescent (or other building standard such as 2'0" x 4'0") fixtures installed in the ceiling grid for an open office plan at the rate of 1 fixture per 80 BOMA office usable (100 rentable) square feet, is provided.

And,

> Central heating, ventilation and air conditioning systems are installed and operational, including as appropriate, main and

> branch lines, VAV boxes, dampers, flex ducts and diffusers, for an open office layout. Conditioned air through medium pressure ductwork at a rate of.75 cfm/square foot of BOMA office area is provided.

App. 7.

10. As part of providing the warm lit shell, SFO Section 1.9(B)(1)(d) stated:

> All Offeror's administrative, overhead, design costs, and other associated project fees necessary to prepare construction documents to complete all tenant improvements contemplated by the Government shall be included as part of the shell base rental rate. It is the successful Offeror's responsibility to prepare all documentation (working drawings, etc.) required to receive construction permits.

Id.

11. The Tenant Improvement Allowance was defined in section 1.09(B)(2)(a) of the SFO as "all alterations for the Government demised area over and above the warm lit shell buildout." Id.

12. Section 1.10(B) of the SFO,

> The Tenant Improvement Allowance shall include all the Offeror's administrative costs, general contractor fees, subcontractor's profits and overhead costs, Offeror's profit and overhead, design costs, and other associated project fees necessary to prepare construction documents to complete the Tenant Improvements. It is the successful Offeror's responsibility to prepare all documentation (working drawings, etc.) required to receive construction permits. NO COSTS ASSOCIATED WITH THE BUILDING SHELL SHALL BE INCLUDED IN THE TENANT IMPROVEMENT PRICING.

Id. (emphasis in original).

13. Hallwood Plaza submitted its final offer on January 18, 2005. App. 90.

14. On or about January 24, 2005, the General Services Administration

("GSA") awarded a lease for 9,821 square feet to Hallwood for commercial space located on the southeast corner of Pierson Road and Clio Road, ("the premises"), to be used by GSA for a Social Security Administration office for the city of Flint and surrounding community. App. 91. This location was later clarified as 4909 Clio Road, Flint, Michigan. App. 124.

15. GSA considered this a "performance lease" which meant that the lease specified the result that the GSA wanted in terms of building systems such as climate control, lighting, electrical capacity, and the like, but did not provide detailed technical specifications as to how to achieve those results. App. 147-149.

16. GSA provided Hallwood with Design Intent Drawings ("DI") dated November 19, 2004, and a narrative document, dated December 7, 2004, setting forth GSA's "Special Requirements" for the leased space. App. 95-111, 150.

17. In response, Hallwood submitted a cost listing from its contractor, Excel Construction, dated February 20, 2005. App. 112-114. Hallwood's total bid for TI costs was $217,245.00. Id. After review by the contracting officer, GSA determined that Hallwood had not included the 7 percent interest rate of the final offer to amortize the TI's, and afforded Hallwood the opportunity to correct its TI bid which Hallwood did in a letter dated February 24, 2004. App. 115.

18. On February 23, 2005, the parties executed Lease No. GS-05B-17564 for the premises. Hallwood's final bid for actual TI's was $232,452.15, as reflected in the Notice to proceed issued on February 28, 2005. App. 116.

19. A pre-construction meeting was held at Hallwood's offices on March 16, 2005. App. 150. Representatives from Hallwood, Hallwood's construction team, GSA,

SSA, and FPS were present. Id.

20. As a result of the meeting, GSA clarified and added to its requirements for the premises and consequently issued a revised DI drawing. App. 150-154, 163-164. The changes included adding a vestibule at the front entrance, adding a second public restroom near the public waiting area, adding ballards to the sidewalk in front of the premises, adding two offices for managers, and minor changes to the electrical system and the heating, ventilation, air conditioning system to the computer room. Id.

21. On March 31, 2005, Hallwood submitted its proposed additional TI costs through a cost list from its contractor, Excel Construction. App. 117-120. Excel's cost list stated that it was proposing additional costs that were discussed at the March 16, 1995 pre-construction meeting, as well as "more additional cost items based on SSA special requirements, and the Solicitation for offers." Id.

22. In all, the cost list contained the following 21 items totaling $227,199.00:

1. $21,550 Vestibule, including a set of power assist double doors with push button;
2. $10,659 Second public bathroom (at front space);
3. $ 3,440 Privacy wall in front of the public bathrooms;
4. $ 5,680 Ballards installed on the sidewalk in front of lease premises to prevent vehicles from crashing into the storefront;
5. $ 4,260 Wire mesh installation: wall in corridor at back of the leased space leading to the real emergency/delivery exit;
6. $ 9,380 Two offices for manager and assistant manager;
7. $ 3,400 Storefront sign work;
8. $ 240 Extra electrical outlets; rear break room/multi purpose room;
9. $ 4,680 HVAC system for computer room temperatures;
10. $ 1,490 Push button door opener;
11. $ 480 Handicap sign on parking space;
12. $ 1,200 Rear entrance door replacement;
13. $24,040 Install submersible sewage pump system;
14. $22,700 Ceiling demolition work and installation of new drop ceiling;
15. $ 6,400 Replace electrical light fixtures;
16. $55,000 Complete new duct work for individual zone control system;

17. $ 4,000 Fire alarm system, including pull stations and strobes;
18. $20,000 Additional drawings required by the city of Flint government for permits;
19. $ 7,600 Roofing, new electrical supply to HVAC unit at front of building;
20. $11,000 Electrical system deficiencies, moving transformer;
21. $10,000 Contingency.

Id.

23. On April 5, 2005, Hallwood submitted a letter to GSA requesting approval of certain items on the cost list items submitted by Excel Construction, totaling $140,106.00. App. at 121-122.

24. Gerald Kosman, GSA contracting officer, responded to Hallwood via electronic mail, explaining that only some of the items for which Hallwood sought additional compensation were legitimate additional TI costs resulting from GSA changes. The rest reflected work required by the SFO that Hallwood should have accounted for in its initial TI cost proposal, and GSA could not agree that additional compensation was appropriate for work clearly required by the SFO for the shell building. App. 123.

25. Of the items listed in paragraph 22, GSA ultimately approved item numbers 1-11 and number 13 as legitimate costs for additional tenant improvements totaling $98,228.90. This additional work was formally incorporated into the lease terms in Supplemental Lease Agreement number 2 which was executed and agreed to by both parties on April 20, 2005. App. 125-126.

26. On September 15, 2005, Hallwood submitted a certified claim for $142,926.86, to the contracting officer, requesting payment for items 12, and items 14-19 from paragraph 22, and including three additional items as follows:

21. $10,000.26 Extra work requested by GSA Inspector Dan Fenner;
22. $18,340.00 Additional work for city requirement as a result of changes requested by GSA;
23. $15,069.60 Contract administration costs at 10 percent of costs of work.

App. 128-141.

27. In its certified claim letter, Hallwood explained that "[t]here were a number of items contained within the SFO Lease Agreement which were uncharacteristic of a retail tenant space of which we are used to dealing with in our daily activities. As such certain features required by the lease were not interpreted by us and therefore <u>not included in the contractor's original cost estimates.</u>" App. 128 (emphasis in original).

28. In support of its claim, Hallwood attached a letter from the City of Flint, supporting the requirement that additional drawings were necessary to meet city building code requirements. App. at 133.

29. Hallwood also attached a letter from Design Engineering Group, Hallwood's architectural designer, stating that the Hallwood Plaza building was a retail sales building and therefore was designed to meet typical retail space needs. Hallwood should have realized that the SSA premises were office space, not retail space, and as such, the SFO issued by the SSA required different standards for lighting, electrical, heating and cooling, and primary and emergency access/egress systems. App. 134.

30. In support of its claim for increased permit costs, Hallwood submitted an invoice from Design Engineering in the amount of $19,875.00 to "Provide additional services to comply with City of Flint building official's request for complete design documentation for the renovation of existing retail space." App. 139.

31. In support of its claim for increased HVAC costs, Hallwood submitted a

copy of the proposal from its HVAC subcontractor, Liberty Total Comfort ("Liberty"). In the proposal, Liberty stated that the existing HVAC system at the SSA premises was adequate for a retail environment, but not for the office environment required by the SFO issued by GSA. App. 135-137. Liberty stated that in order to meet the Government's standards it would be necessary to install three roof top units, two of which would replace the existing units in the premises, and one entirely new unit. Id. This would allow for temperature control in multiple zones in the space, including a dedicated cooling zone for the space specified to be the LAN computer room. Id. Liberty further stated that the new HVAC units would require new ductwork to distribute the air. Id.

32. In support of its claim for increased HVAC costs, Hallwood submitted a cost list from its general contractor, Excel Construction as follows:

| | |
|---|---|
| $1,000 | Roof curb work for two new roof top HVAC units; |
| $ 680 | Glass replacement work; |
| $6,891 | Electrical work associated with the three roof top HVAC units; |
| $ 250 | Drainage sewer line clean up to connect to the main sewer line. |

App. 138.

33. On October 13, 2005, GSA's contracting officer, Gerald Kosman, issued his final decision rejecting Hallwood's claim in its entirety. App. 142-144.

34. The following chart sets out, item by item, Hallwood's claim and rationale, and GSA's rejection and the Government's rationale for rejecting each part of Hallwood's claim. App. 128-144.

| AMOUNT | HALLWOOD'S CLAIM | BASIS FOR GSA CONTRACTING OFFICER'S REJECTION |
|---|---|---|
| $ 1,200 | **Rear entrance door replacement.** Hallwood claimed that Department of Homeland Security required rear door to be replaced for increased security. | Basic requirements for exterior rear door were spelled out in SFO section 5.10. The existing door was noted as not meeting the basic requirements, and DHS did not require anything other than what was specified in the SFO. |
| $22,700 | **Ceiling demolition and replacement.** Hallwood claimed that it was required to install a new HVAC system, including new duct work system. For aesthetic reasons, Hallwood removed the entire ceiling, and installed a new ceiling after the extensive HVAC work was completed. | Any demolition work needed to provide a warm lit shell is the cost of the lessor as stated in SFO section 1.09. The SFO also provided that the ceiling grid was to be part of the shell rate in Hallwood's initial offer, and not a TI cost. The changes to the ceiling grid were caused by the changes to the HVAC system in the space which is also a shell item, as specified in section 6.7 of the SFO. |
| $ 6,400 | **Replace electrical light fixtures** Existing light fixtures were placed to suit a retail environment. They were not appropriate for GSA's office space requirements. Hallwood therefore replaced the lights to provide brighter illumination and energy savings. | GSA approved the existing light fixtures. The shell cost included one fixture per 80 usable square feet, or 123 fixtures for this space. Any additional fixtures should have been included in Hallwood's original bid for TI costs. |

| | | |
|---|---|---|
| $43,763 | **Complete new duct work for individual zone system.** The existing HVAC system was not sufficient for an office environment, therefore Hallwood installed an entirely new HVAC system including fresh air and multiple zones for even temperature control. | All HVAC climate control specifications of the SFO are requirements of the shell space, and were Hallwood's responsibility under the original terms of the SFO. Only the unit servicing the SSA data equipment room ("ADP") was considered an extra TI cost as stated in section 5.1 of the Special Requirements. GSA did pay an additional $4,680 for the cost of providing a dedicated HVAC unit to the ADP room. |
| $ 4,300 | **Fire Alarm System.** Hallwood claimed that it was unclear, at first whether new fire alarm system would have to be installed. After Hallwood consulted with the local building code officials a new fire alarm system was required, Hallwood installed it. | The fire alarm requirements are stated in SFO section 8.4. |
| $13,263 | **City requirement of additional drawings for issuance of building permit.** Hallwood claimed that it relied on the original design drawings as sufficient for bidding, construction, and permitting. After review, city of Flint officials required more extensive plans before it would issue a building permit. Hallwood did not include the cost of additional drawings in its original cost proposal. | Hallwood was responsible for all construction drawings required to obtain an occupancy permit. (SFO 1.9B(d)). All changes to the TI costs resulting from the pre-construction meeting were included in SLA number 2, and Hallwood should have included whatever revised drawing costs were necessary in its cost proposal to complete the TI work in SLA number 2. |

| | | |
|---|---|---|
| $ 7,891 | **Roofing, new electrical supply to HVAC unit at the front of the building.** Hallwood installed three rooftop HVAC units, two replacement units, and one entirely new unit. The new unit required new wiring, new flashing, and new roof penetrations. Hallwood had not contemplated these costs in its original cost proposal. | The SFO provided that Hallwood had the responsibility to include the costs of producing adequate climate control as part of the shell building rate. GSA did include $4,680, which was the cost of providing the separate system to cool the ADP room and was a legitimate TI cost for which Hallwood was compensated. |
| $10,000.26 | **Extra work requested by Dan Fenner, the GSA inspector.** | Dan Fenner was a property manager for GSA. On one of his visits to the premises, he discovered conditions that did not meet the requirements of the lease. Specifically, conduit to bring phone service to the space is Hallwood's responsibility as stated in SFO Attachment Number 2, incorporated into the lease. There is no added cost to improve the janitor closet because that room was not part of the leased space, but was required to supply necessary janitorial service to the space. Data wiring, electrical wiring and door hardware are all TI costs that were included in the special requirements and noted on the Government drawings. |
| $18,340 | **Additional Work to meet requirements of local building code.** During construction, Hallwood found a lack of adequate fire resistance above the acoustical ceiling which was unacceptable to the City of Flint Building Inspector. Hallwood remedied this situation, and seeks the cost of doing so. | The SFO assigned the cost of all work required to obtain a building or occupancy permit to Hallwood, as the lessor. SFO Section 1.9B(d). |

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director

/s/ Joan M. Stentiford
JOAN M. STENTIFORD
Trial Attorney
Commercial Litigation Branch
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0341
Fax: (202) 514-8624
Attorneys for Defendant

November 13, 2007

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this _13th__ day of November, 2007, the foregoing "DEFENDANT'S UNOPPOSED MOTION FOR AN ENLARGEMENT OF TIME", was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

__/s/ Joan M. Stentiford___
JOAN M. STENTIFORD