I. As stated above, work demanded by the city in order to obtain a building or occupancy permit is the responsibility of the lessor not the government as stated above.

In the claim letter, it is apparent that the basis of this claim is not justifiable construction change order items, required by the government, over the original requirements of the SFO or documented Tenant Improvements but that of the lessor's error in making the rent determination in his offer to lease space. The argument that "items contained within the SFO Lease Agreement which were uncharacteristic of a retail tenant space of which we are used to dealing with in our daily activities" is not valid. The SFO is clear in a request for office space. No misrepresentation through out the process was ever given to representatives of Hallwood Plaza Inc. regarding what was expected. All questions asked during negotiations were answered in good faith. Mr. Kashat made the statement on several occasions that his offer was based on taking bad advice from others. Needing to modify the lessor's scope to include "items not apparent to us upon first reading of the SFO Lease Agreement" should have been done prior to the best and final offer given at the close of negotiations and not after the contract was awarded upon obtaining funding.

It is unfortunate that the lessor incurred added build out costs due to his negligence, however granting added funds for construction cost over-runs as a result of mistaken understanding of the requirements is denied. Negotiations and clarifications with Hallwood Plaza, Inc. prior to the submittal of their final offer were done in a good faith.

Pursuant to Section 33.211 of the Federal Acquisition Regulation (FAR), this is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 U.S. C. 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

Please call me at 312-353-8754 if you have any questions.

Sincerely,

Gerald K. Kosman
Contracting Officer
Client Services Team

Attachment

form 3518, representations and certifications, consisting of four pages. Exhibit 4 is the attachment to SFO, GSO 5B 17564, lease cost breakdown summary page.

Exhibit No. 5, attachment to the SFO, number 2. And that is typical tenant improvements versus typical shell aspects of the lease, filled out. Attachment number 3 to the SFO, it's called "General requirements." And this is page 1 through 8.

Attachment number 4 to the SFO is the document security form, consisting of four pages. And Exhibit No. 8 is a standard form number 2, lease for real property, U.S. Government, standard form number 2, consisting of -- I think there might be some missing there.

Q. How many pages would it --

A. According to this, paragraphs 12 through 5 on pages 3 through 4 is missing. And that is part of this Exhibit 8.

Q. We were talking about Exhibit 5, which is the attachment No. 2 to the SFO when we started numbering these. Just so I can -- it's my understanding that page 2 relates to what the shell

building should be. Is that correct? That is what we were discussing.

A. It's examples of what shell building aspects would be, yes.

Q. Those aspects of the building shell are contained in detail in the SFO, which is Exhibit 1. Is that correct?

A. Yes.

Q. So this attachment 2 is simply a summary or clarification of the SFO?

A. It's just an exhibit to better explain it in one spot.

Q. The typical tenant improvements on the first page of Exhibit 5, these are what? Tell me what these are examples of.

A. Those are items that may be needed by the tenant agency that will be paid for as part of the tenant improvement portion of the rent.

Q. And the tenant improvement portion of the rent is something that is negotiated after an offer or a bid is made. Is that correct?

A. Yes. It's after award.

Q. It's after an award. Right?

A. Yes.

There was no documentation to it because items weren't that major.

Q. The issues that Dan may have been having with construction had nothing -- had no bearing on your decision to deny the additional claim here?

A. No, that's -- no.

MR. MIZEROWSKI: I don't have any other questions.

MS. STENTIFORD: I have a couple.

EXAMINATION

BY MS. STENTIFORD:

Q. You stated a few times that this was a performance lease?

A. Yes.

Q. What does that mean?

A. Performance lease means that instead of giving very detailed specifications, as far as technical specifications, that it just gives things like the space should be normal office climate requirement between 68 and 75 degrees. You know, it basically -- it doesn't go in to say what kind of air-conditioner is going to produce that range. It just says that's the range we want. Again, we -- it calls for foot candles of so much during the

work space. It doesn't say what kind of light fixture it is that's going to produce that. So basically, all we're looking for is a result. If we don't get the result, that we can measure, then we can later on go and try to correct something.

Q. So when you receive bids on -- solicitation for offers for a performance lease, does it matter to you as a matter of contracting how any particular offer intends to meet the performance requirements set out in the solicitation for offers?

A. No. Obviously -- no.

Q. You were asked a series of questions about this six-zone heating and ventilation air-conditioning system, is that -- and I believe you stated in your direct testimony that you didn't know what Mr. Kashat intended to use or whether he used six zones or something else; is that what you stated?

A. Right.

Q. Because it's a performance lease, you don't have to know; am I correct?

A. Right.

Q. I'm going to show you Exhibit No. 1 which



McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

is a solicitation for offer and page 6 of Exhibit 1, Section 1.9 talks about the rental rate determination; do you see that?

A. Yes.

Q. And Subsection A and Subsection B give the requirement, these are the performance requirements that you were referring to, is that correct, for the shell of the building?

A. Yes.

Q. And so anything over and above what's set out in Subsections A and B in Section 1.9 of the lease would constitute tenant improvements; is that correct?

A. The tenant improvements are adjusted to real numbers, yes.

Q. The only other thing, at the bottom of each page of this Exhibit No. 1 we have the initials G.K.; am I correct it's on every page?

A. They're on every page.

Q. It's confusing here because your initials are G.K. and --

A. I noticed that.

MR. MIZEROWSKI: So did I.

BY MS. STENTIFORD

A. There was a meeting, what's known as a preconstruction meeting. I believe the date was March 16th, 2005, where all interested parties basically sit around a table and make sure that the design intent drawings of the government and the wishes of the government match what the lessor needs to buildout, his construction drawings.

The government never approves construction drawings per se but obviously we check them to make sure.

At that meeting it was found out that there were some items that needed to be changed as a matter of course to the shell that weren't addressed to this point. For example, the rear door of the space was not up to the standards of the SFO requirement. So there were items that should have been addressed as part of the shell, and there were new items that SSA requested that were later approved and funded for that were added into the TI amount. Items such as a vestibule at the entry door for the public, a couple extra -- two extra offices for management with walls, not going to the top, not going to the drop ceiling.

I don't know if there's -- SSA took on the

cost of putting in an extra bathroom for the public that was required by the city, apparently, because of the volume of people that were visiting the space. We couldn't get by with the original design to put in one little public bathroom in the public seating area. That had to be added and the trenching to that and the plumbing, et cetera. So there was an expense that was added as part of the TI's for that.

And there was a -- at that point I guess we -- well, bollards out in front to make sure that nobody would mistakenly drive their car through the front window, a separate, small, $4600 for an HVAC stand-alone in the computer room, an HVAC unit to keep that 24/7 constant temperature, a couple outlets here, things like that.

Q. And you're basically referring to the second page of Exhibit 11?

A. Yes.

Q. Who was involved in this meeting on March 16th?

A. Myself, GSA project manager, property managers.

Q. Who is the GSA manager, was that

Dan Fenner?

A. Dan Fenner was there from the field office. My counterpart with SSA regional office, Chris Coleman is her name. I remember her first name now.

Q. Okay.

A. The manager and assistant manager and their computer setup person for SSA. There's various three or four people from the local SSA office there, quite a few. There was George Kashat, his wife, his son. It was done at his offices in Fairfield.

Q. Southfield.

A. Southfield, Michigan. Representatives of Federal Protective Service were there to go over, you know, the security aspects of the project which is a side issue to everything. That's done separately. George Kashat's general contractor, electrician, plumber, several tradesmen there from his end of it. So there were quite a few people involved.

Q. Is this a typical meeting?

A. Yes.

Q. So it didn't surprise you by the number of

people or anything along those lines?

A. No. You know, these typically run anywhere from 5 to 15 people depending upon who wants to put their nose in the door and find out what's going on.

Q. Now, the list of expenses here, the cost, how were those arrived at?

A. After we have a list -- every time we do a preconstruction meeting, the first and foremost thing that happens in that meeting is myself or any other realty specialists makes the point clear that all tenant improvements to be paid by the government from this point forward are considered changes and those changes must be agreed to, not only in theory, but the costs have to be approved or else there's a deficiency. It's called The Anti-Deficiency Act which means any contracting officer that agrees to spending money by the government without it being funded can go to jail basically.

So it's -- that's the first thing that happens during that meeting. Everyone knows who's responsible for making those decisions on what's approved and what's not and what has to take place

before those approvals before additional costs can be done.

During that process we said we need 12 bollards out in front, we need an air-conditioner. Later on George submitted those numbers to me and that's how -- these are his numbers.

Q. And those came to you and you approved those numbers based upon the government's request?

A. Yes.

Q. And those requests came at the -- at that preconstruction meeting?

A. Yes.

Q. After this preconstruction meeting, were there any other meetings that you attended?

A. No.

Q. Did you have any other contact with Mr. Kashat?

A. Various phone calls, I believe. I assume there was some phone calls made.

Q. Any correspondence with him?

A. No.

Q. Any correspondence or any discussions with Mr. Kashat regarding any additional costs or changes that may be made during the construction of

the building?

A. He had -- other than the ones approved on the attachment of SLA No. 2, there were several other items that come up to -- I believe that included these, what was on here, Exhibit No. 12.

Q. Right.

A. That were put in at the same time and those were denied right off the -- so these were originally part of a listing that included the approved and not approved list of improvements.

Q. So the -- really the --

A. I should say funded. Let me correct that. We still needed the work to be done as part of the SFO requirement or whatever. I'm just saying we weren't going to fund them again or pay for them again.

Q. So what we're looking at is Exhibit 12 just so that I'm clear then.

The total cost of items in Exhibit 12 is 165,138.86, correct?

A. That's what it says.

Q. That's what it says. And I know you didn't provide that, but assuming that's the right number.

# SOCIAL SECURITY ADMINISTRATION

## FLINT, MICHIGAN

MEKUS | STUDIOS
Architecture Interior Design
401 East Illinois Street Suite 401
Chicago, Illinois

ARCHITECTURAL DRAWING INDEX


A-100 COVER SHEET
A-101 PARTITION PLAN
A-102 POWER/SIGNAL PLAN
A-103 FURNITURE PLAN
A-201 ELEVATIONS
A-103 FURNITURE PLAN
A-201 ELEVATIONS
A-301 SECTIONS
A-601 DOOR/HARDWARE SCHEDULE


GENERAL SERVICES ADMIN.
230 SOUTH DEARBORN
CHICAGO, ILLINOIS

NOTE: THESE DRAWINGS ARE NOT TO BE USED FOR CONSTRUCTION.

IT IS THE RESPONSIBILITY OF THE LESSOR TO MEET THE MINIMUM CONSTRUCTION REQUIREMENTS FOR THIS TENANT AS SET FORTH IN THE SFO.

IF FINISHES ARE SPECIFIED WITHIN THESE DRAWINGS, IT IS THE RESPONSIBILITY OF THE LESSOR TO CONFIRM THAT THE FINISHES SPECIFIED ON THESE DRAWINGS ARE THE FINISHES APPROVED BY THE TENANT. THE LESSOR SHALL OBTAIN THE TENANT'S APPROVAL OF PHYSICAL SAMPLES AND THE TENANT'S APPROVAL OF THE LOCATIONS OF FINISHES AS SHOWN ON THESE DRAWINGS PRIOR TO CONSTRUCTION.

IT IS THE LESSOR'S RESPONSIBILITY TO PROVIDE CODE AND ADAAG COMPLIANT ARCHITECTURAL CONSTRUCTION DOCUMENTS, INCLUDING MEPFP DOCUMENTS.

IF A REFLECTED CEILING PLAN IS A PART OF THIS DRAWING SET, THE LESSOR'S MEP ENGINEER SHALL CONFIRM THAT THE LIGHTING LAYOUT SHOWN ON THE DRAWINGS PROVIDES A LIGHTING LEVEL THAT MEETS CURRENT GOVERNMENT STANDARDS. THE MEP ENGINEER SHALL CORRECT ANY DEFICIENCIES. ADDITIONALLY, THE MEP ENGINEER SHALL PROVIDE A CONFORMING LIGHTING LAYOUT FOR SPACES NOT SUPPLIED WITH A LAYOUT ON THESE DRAWINGS.

A. GENERAL REQUIREMENTS

1. The Drawings and Specifications indicate the scope of the project, in terms of architectural design concept, but do not necessarily indicate or describe all work required for the full performance and completion of the work. The Contractor's bid shall be based on the Lessor's construction documents with the understanding that the Contractor and each Subcontractor is to furnish and install all items required for the proper completion of the work. The Contractor shall make provisions for the necessary execution all the work. This includes, but is not limited to, such items such as demolition, new construction, hoisting, storage, freight access, debris removal, and other items required for a complete project.

B. SPECIAL CONDITIONS

1. All work shall comply with the requirements of Local Building Codes, the Michigan State Bldg. Code and the National Fire Protection Association (NFPA) Standard No. 101, Life Safety Code, 1997 Ed.
2. All work shall comply with ADAAG.
3. a. Stairways, Lobbies, and Public Corridors: Class A Interior Wall and Ceiling Finish: Flame Spread 0-25 and Smoke development 0-450.
b. Interior Offices and Spaces: Class B Interior Wall and Ceiling Finish: Flame Spread 26-75 and Smoke Development 0-450.
c. Interior Floor Finish shall be Class I for all spaces.
4. Doors shall be arranged to be opened readily from the egress side whenever the building is occupied. Locks shall not require the use of a key, a tool, or special knowledge or effort for operation from the inside of the building. All locking arrangements are required to meet the requirements of NFPA No. 101, Life Safety Code, 2000 ed.
5. Where new work adjoins existing, such new work shall be properly integrated with the existing to insure uniform appearance.
6. New work required within existing construction shall be patched and finished as required to accommodate the new work. Any exposed demolition of defective work in existing construction shall be patched to insure a uniform appearance.
7. Omit manufacturer's names, label and designations from exposed faces on all accessories, glass, and fixtures.
8. All work shall be of the highest quality following the manufacturer's specifications, along with the best trade practices and standards.

C. DIMENSIONS

1. Contractor shall verify dimensions at site for built-in work, and for work adjoining that of other trades and for dimensions shown to structures or installations. Notify Government C. O. of any discrepancies.
2. Do not scale drawings. Use given dimensions only.
3. Large scale plans, elevations and details shall govern over small detail plans.

D. ROUGH CARPENTRY

1. All wood (e.g., plywood, etc.) being installed shall be treated with fire-retardant chemicals by a pressure-impregnation process or other methods which treats the material throughout (as opposed to a surface treatment) to make it fire safe.
2. Provide seasoned lumber with 15% maximum moisture content at time of dressing.
3. Provide blocking in all partitions where required to anchor wall standards, cabinetry, equipment, or other items.

E. FINISH CARPENTRY

1. Provide finish carpentry as shown on the drawings and in accordance with AWI premium grade quality standards established by the Architectural Woodwork Institute.
2. All plywood shall have particle core.
3. The Millwork Contractor shall obtain and verify all measurements and conditions at the building affecting his work and shall be responsible for all details and dimensions assuring precision fitting and proper assembly of his products.
4. All work shall be accurately set plumb, level and square, scribed tightly and accurately to adjacent surfaces, securely anchored in the position indicated on drawings.
5. Coordinate installation of in-wall steel anchorages and miscellaneous blocking with other Contractors for precise location.
6. Make all necessary modifications in the field to accommodate conduit, piping, ductwork, outlets, boxes, sprinkler pipes, or other miscellaneous items.
7. Seal all door edges after fitting and undercutting.

F. INTERIOR ARCHITECTURAL MILLWORK

1. Provide Architectural millwork as shown on drawings.
2. Comply with applicable requirements of "Architectural Woodwork Quality Standards" published by the Architectural Woodwork Institute (AWI), except as otherwise indicated.
3. Plastic Laminate: High Pressure Laminate (HPL) comply with NEMA LD-3; type, color, pattern and finish as indicated for each application, or if not indicated, as selected by the Tenant from manufacturer's standard.
4. Fabricate Architectural woodwork and pre-cut openings, where possible, to receive plumbing fixtures and similar items. Locate openings accurately and use templates or roughing-in diagrams for proper size and shape. Smooth edges of cutoffs and, where located in countertops and similar exposures, seal edges of cutouts with a water-resistant coating.
5. Before proceeding with fabrication of woodwork required to be fitted to other construction, obtain field measurements and verify dimensions and shop drawing details as required for accurate fit.
6. Shop-assemble all millwork in units as large as can be delivered into area of installation. Provide shop-prepared attachment devices for field connections which are necessary. Design attachment devices so that field connections will comply with fastening and joinery construction requirements and tolerances for the specified grade.
7. Coordinate finishing of millwork with the painting sections of these specifications and shop-apply specified finishes. Clean and prepare surfaces. Fill exposed nail holes. Use matching wood filler for millwork receiving transparent finish.
8. Shop Finishing: To the greatest extent possible, finish Architectural woodwork at shop or factory. Defer only final touch-up, cleaning and polishing for time after delivery and installation.
9. Install the work plumb, level, true and straight with no distortions. Shim as required using concealed shims. Install to a tolerance of 1/8" in 8'-0" for plumb and level (including countertops); and with 1/16" maximum offset in flush adjoining surfaces, 1/8" maximum offsets in revealed adjoining surfaces.
10. Scribe and cut work to fit adjoining work, and refinish cut surfaces or repair finish damage at cuts.
11. Anchor cabinetwork/millwork by means of concealed blocking; direct fastening/exposed fasteners will not be accepted.
12. Countertops: Anchor securely to base units and other support systems as indicated.
13. Damaged and defective woodwork will not be accepted; damaged or defective millwork shall be replaced by Lessor/G.C.
14. Adjust joinery for uniform appearance.
15. Installer of Architectural woodwork shall advise Contractor of procedures required to protect Architectural woodwork during remainder of construction period to ensure that work will be without damage or deterioration at time of acceptance. Protect finished surfaces with heavy-duty canvas or polyethylene sheets. Secure loose components, such as adjustable shelving and sliding and hinged elements from damage during delivery. If such items are to be delivered separately from main body of millwork, wrap each piece separately to protect finish and clearly mark to show proper location in completed millwork.
16. All millwork worksurfaces, unless otherwise noted, to have 1/2" reveals on edges adjacent to drywall partitions.
17. The Contractor is responsible to insure uniform elevation across file cabinet enclosures so that the reveal is maintained as a constant. Any additional leveling of the floor is the responsibility of the Contractor.
18. All millwork worksurface tops, file cabinet tops, etc., to be installed after file cabinets are installed.
19. All millwork worksurfaces shall not have any shop or field joints unless approved by Owner on the shop drawings.

G. ELECTRICAL

1. Furnish all labor services, materials and equipment to perform all work as necessary and required for the proper completion of all electrical work. The design of all electrical systems shall be the responsibility of the Contractor.
2. Where work covered by this section connects to other work, this Contractor shall take measurements to insure the proper connection to such equipment.
3. All work shall be in accordance with all applicable codes and ordinances. All materials and equipment shall be new and shall also conform to the NEMA, Underwriter's Laboratory, NFPCA standards and where other applicable standards have been established.
4. The Contractor shall be responsible to familiarize himself with the existing conditions.
5. Furnish and install complete systems with all outlets, junction boxes, conduit, couplings, connectors and all other devices necessary to provide a complete installation.
6. Conduit shall be installed concealed in all walls.
7. All light switches shall be recessed and centerline mounted to match the mounting height of the door handle or lever, unless noted otherwise.
8. All wall outlets shall be mounted at 15" above finish floor, unless otherwise noted.
9. All conduit installed in ceiling plenum shall be located to permit future installation of light fixtures if required. In addition, this work shall be coordinated with other trades to avoid interference. Do not fasten conduit to ceiling grid.
10. Provide supports for material and equipment as required for the project.
11. All wiring devices shall be UL and Local Ordinance approved and shall be building standard, unless otherwise indicated.
12. The Contractor shall provide the necessary disconnect switches for any mechanical equipment. Switches shall be UL approved and installed in accordance with UL #93. Mounting height of switches to match existing.
13. Contractor to coordinate locations of electric outlets and light switches with other trades, millwork and furniture.
14. All electrical wall outlets shall be flush and plumb.
15. Receptacles shall be grounded.
16. All outlet coverplates to be off-white, unless noted otherwise.
17. Where floor receptacles are provided, floor receptacles for power, telephone and data shall be flush mounted and shall be provided with flush closing caps to keep out dirt & fluids when not in use.
18. Where access floor is provided, the contractor shall provide a service module for each workstation, flush mounted and centred in a quadrant of the floor panel. The service module shall be capable of housing: one (1) NEMA 5-20R duplex receptacle-IG-type; two (2) NEMA 20-R duplex receptacles; one (1) duplex receptacle containing outlets for voice and data jacks; and one (1) outlet for a fiber-optic connector jack.

H. INTERIOR LIGHTING FIXTURES/EMERGENCY LIGHTING

1. All lighting fixtures shall be UL approved and meet applicable codes and standards for this application. Fixtures shall be building standard of type and size as described on the Drawings, unless otherwise noted.
2. Provide new lamps and ballasts for all lighting fixtures that are reused. Incandescent lamps shall be frosted type except where the fixture design requires another lamp type (i.e. reflector, clear, point source, etc.).
3. All exit and directional signs shall meet the requirements of the National Fire Protection Association, Standard No. 101, Life Safety Code, 2000 ed.
4. All emergency lighting units shall meet the requirements of the National Fire Protection Association, Standard No. 101, Life Safety Code, 2000 ed.

I. FIRE EXTINGUISHERS, CABINETS AND ACCESSORIES

1. Provide building standard fire extinguishers, cabinets, hose valves and or hoses as required by applicable Building Code.

J. ACOUSTICAL TILE CEILINGS

1. Provide and install scheduled acoustical tile ceiling system with scheduled grid at all locations.
2. Ceiling suspension system shall comply with ASTM C-635 as applicable to type of suspension system required for type of ceiling units indicated on drawings. Coordinate all work supported by or penetrating through ceilings including light fixtures, HVAC equipment and partition systems. The structural class shall be intermediate duty system with attachment devices for five (5) times design load indicated in ASTM C-635.
3. Provide edge molding of manufactured standard channel molding for edges and penetrations of ceiling with baked enamel finish. Provide all other necessary miscellaneous items required to complete this work.
4. Install ceiling system in accordance with manufacturer's recommendations.

FINISHES

K. GYPSUM DRYWALL

1. Provide gypsum drywall and associated work as shown on the Drawings.
2. General Standard: GA-216 by Gypsum Association, and manufacturer's instructions (whichever is more stringent).
3. Fire Resistance Ratings: Provide gypsum drywall systems which have passed a test by a recognized testing agency for the fire resistance rating indicated.
4. Sound Attenuation Construction: Provide gypsum drywall systems which have passed a test by a recognized testing agency for the sound transmission class indicated.
5. Provide building standard steel studs lengths required at 24" O.C. Provide steel runners for studs, metal furring channels, clips, 1- furring channels, 1-1/2" cold rolled channels, wire hangers, ties and other incidentals necessary for the work. Studs shall be ASTM C-645, 25 gage C-shaped studs with associate runner channels.
6. Provide ASTM C36, Type x 5/8" thick 48" wide gypsum drywall, regular, fire code C, or other board as required or as shown by the plans.
7. Trim Accessories: Provide manufacturer's standard metal trim accessories, of the beaded type with face flanges for concealment in joint compound except where semi-finishing or exposed type is indicated. Provide metal corner beads, L-type edges trim beads, U-type trim beads, special L-kerf-type edge trim-beads, and one piece control beads.
8. Gypsum Board Fasteners: Type recommended by gypsum board manufacturer except as otherwise indicated.
9. Sound Attenuation Blankets: Semi-rigid mineral fiber without membrane, FS HH-I-521, Type I, thickness as shown.
10. Frame door and other openings with studs, runners, gage, number and arrangement to comply with manufacturer's recommendation for size of opening, weight of doors and height and stud size, unless otherwise indicated.
11. Install gypsum boards in lengths and directions which will minimize number of end joints, and avoid end joints in central areas. Install walls and partitions with exposed gypsum boards vertical, with joints offset on opposite sides of partitions. Otherwise, install boards with edges perpendicular to supports, with end joint staggered over supports, except where recommended in a different arrangement by manufacturer.
12. Low Height Partitions: building standard metal studs on 16" centers as shown on Drawings. With metal tube bracing at partition ends and at 48" O.C. and corners 5/8" gypsum board on each side, taped and sanded, ready for paint.
13. For any partition exceeding 15' in length without being braced by another partition, provide metal stud kickers above finished ceiling to the structure above at a maximum space of 15" on center or as indicated on the drawings.
14. Provide flush hinged metal access panels as required for appropriate mechanical, electrical and plumbing systems in gypsum board ceilings and soffits. Submit proposed locations and access panel product information for the Tenant's review. Coordinate locations with Tenant's Furniture layout.
15. Provide water resistant "greenboard" gypsum board at all locations where plumbing fixtures (sinks, water heaters, toilets, etc.) are located.

L. RESILIENT BASE & ACCESSORIES

1. Provide base in shapes, height, and color as specified by Government and installed in accordance with manufacturer's recommendations.
2. Base shall be straight at carpet and coved at tile floor unless otherwise specified.
3. Clean substrate, fill cracks, holes and depressions, and level with in 1/8" in 10' before installing resilient base.
4. Adhesive: As recommended by manufacturer.

M. CARPETING

1. The extent of carpeting is indicated on the finish schedule and finish specification sheet.
2. Work includes, but is not limited to, the following:
a. Installation
b. Attachment Accessories
c. Carpet
3. Provide accessory items, moldings and other components for a complete installation.
4. Confirm that the junction where concrete and other floor materials meet is smooth and level.
5. The floor must be free of all foreign matter, grease, oil, paint, wax, dirt, old adhesives, etc.
6. Where ramping, fixing, and shimming are necessary, latex underlayment shall be applied.
7. Before ordering materials or fabricating work, verify measurements and conditions at the site for work which must be accurately fitted to other construction, including wall-to-wall, offset, door, and other dimensions controlled by other trades. No extra charges or compensation will be allowed on account of difference between the actual measurements and dimensions on the Drawings.
8. Any damage done to paint, walls, woodwork, doors and other finished surfaces shall be corrected by this Contractor. Workmanship shall be in keeping with the highest standard of carpet installations.
9. Protect carpeting and rugs against damage of every kind. Cover with 6 mil thick polyethylene sheeting during the construction period, wherever protection is required, so that installation will be without any indication of deterioration, wear, or damage at the time of acceptance by the Owner. Damaged materials will be rejected.

N. PAINTING

1. Provide painting and related work as shown on the finish plan and finish schedule.
2. Apply one (1) primer coat and two (2) finish coats of building standard paint, unless indicated otherwise. Finish coats to be as follows:
a. Walls: Refer to tenant for wall finishes.
b. Ceilings: Latex Flat Finish
c. Hollow Metal Door Frames: Alkyd Satin Finish
d. Wood Trim: Alkyd Semi Gloss
3. Protect all hardware, lighting fixtures etc. before painting. Protect all finish surfaces in areas where paint is being applied.
4. Workmanship shall be first class in every respect with all materials evenly spread and smooth without runs or sags.
5. Paint all scheduled hardwood trim first coat primer, second and third coats alkyd enamel.
6. Protection: Protect work of other trades. Correct any painting related damages by cleaning, repairing or replacing, and refinishing, as directed by Owner.
7. Apply painting and finishing materials in accordance with manufacturer's directions. Use applicators, and techniques best suited for materials and surfaces to which applied.
8. All fire extinguishers cabinets shall be finished to match the adjacent wall or be stainless steel finish.
9. All exposed or visible ductwork, conduit, pipes, raceways, etc. shall be painted per the Finish Schedule.

MATERIALS & SYMBOLS

| MATERIAL | PLANS OR SECTIONS AND SMALL SCALE DETAILS | LARGE SCALE DETAILS | MATERIAL | PLANS OR SECTIONS AND SMALL SCALE DETAILS | DETAILS LARGE SCALE |
|---|---|---|---|---|---|
| WOOD | | | STEEL | | |
| MORTAR/GROUT/PLASTER | | | BATT INSULATION | | |

| ITEMS | SYMBOLS FOR REFERENCE |
|---|---|
| BUILDING SECTION SYMBOL (plans and elevations) | DETAIL NUMBER (TYP.) DRAWING NUMBER (TYP.) |
| ELEVATION SYMBOL (plans) | |
| WALL SECTION SYMBOL (plans and elevations) | |
| WALL SECTION DETAIL OR PLAN DETAIL CROSS REFERENCE | |
| LARGE SCALE DETAIL SECTION SYMBOL (elevations) | |
| DATUM ELEVATION SYMBOL (elevations and building and wall sections) | TOP OF WALL ELEV. +19'-4" |
| SECTION OR DETAIL NUMBER FOR TITLES | 1 PLAN SCALE : 1/8" = 1'-0" |

ABBREVIATIONS

| ABBREVIATION | ABBREVIATION ITEM | ABBREVIATION | ABBREVIATION ITEM |
|---|---|---|---|
| A.C.T | acoustical ceiling tile | MAT. | material |
| ADJ. | adjustable | MAX. | maximum |
| ALT. | alternate | MDP BD. | medium density particle board |
| ALUM. | aluminum | MECH. | mechanical |
| AND. | anodized | MIN. | minimum |
| BD. | board | MISC. | miscellaneous |
| BLDG. | building | M.O. | masonry opening |
| BLK. | block | N.I.C. | not in contract |
| BR. | brick | MTL. | metal |
| CAR.; C.P.T. | carpet | NO. | number |
| CER. TILE; C.T. | ceramic tile | O.C. | on center |
| CLG. | ceiling | O.D. | outside diameter |
| CLR. | clear | OPNG. | opening |
| COL. | column | PLAS. | plaster |
| CONC. | concrete | PLYWD. | plywood |
| CONC. BLK; C.B. | concrete block | POL. PL. GL. | polished plate glass |
| CONST. | construction | PR. | pair |
| CONT. | continuous | PT. | paint |
| CORR. | corridor | P.T.D. | paper towel dispenser |
| CTSNK. | countersunk | R. | risers |
| DET. | detail | R.B. | rubber base |
| DIA. | diameter | R.D. | roof drain |
| DIM | dimension | REFG. | refrigerator |
| DN. | down | REINF. | reinforced |
| D.S. | downspout | REQD. | required |
| DWG. | drawing | REV. | revision |
| D.W. | dishwasher | RM. | room |
| EA. | each | S. | seal |
| ELECT. | electrical | S.D. | soap dispenser |
| EL; ELEV. | elevation | SHT. | sheet |
| EQ. | equal | SIM. | similar |
| EQUIP. | equipment | SPECS. | specifications |
| EWC | electric water cooler | SQ. | square |
| EXIST. | existing | ST. | stone |
| EXP. | exposed | STD. | standard |
| EXP. JT. | expansion joint | STL. | steel |
| F | fabric | S.S. | stainless steel |
| F.D. | floor drain | STOR. | storage |
| FDN. | foundation | STRUCT. | structure |
| F.E.C. | fire extinguisher cabinet | SUSP. | suspended |
| FIN. | finish | SV | seal & varnish |
| FL. | floor | T. | treads |
| FT. | foot | T.C.D. | towel & cup dispenser |
| F.W.C. | fabric wallcovering | TEMP. PL. GL. | tempered plate glass |
| GA. | gauge | THRU. | through |
| GALV. | galvanized | T.T.D. | toilet tissue dispenser |
| GEN. CONTR.; G.C. | general contractor | TYP. | typical |
| GL. | glass | V.B. | vinyl base |
| GYP. | gypsum | V.C.T. | vinyl composition tile |
| HDWD. | hardwood | VERT. | vertical |
| H.M. | hollow metal | VIF | verify in field |
| H.P. | high point | VOL. | volume |
| H.P.L. | high pressure laminate | V.W.C. | vinyl wallcovering |
| HORIZ. | horizontal | W/ | with |
| HRDW. | hardware | W.C. | water closet |
| HT. | height | W.B. | wood base |
| HTG. | heating | WD. | wood |
| I.D. | inside diameter | W.P. | working point |
| INSUL. | insulation | WT. | weight |
| JT. | joint | | |
| LAV. | lavatory | | |
| L.P. | low point | | |

NOT FOR CONSTRUCTION

PROPERTY OF THE UNITED STATES GOVERNMENT – FOR OFFICIAL USE ONLY. Do not remove this notice. Properly destroy documents when no longer needed.

GSA GENERAL SERVICES ADMINISTRATION
REGION 5
PBS, REALTY SERVICES DIVISION
230 S DEARBORN ST
CHICAGO, IL 60604

MEKUS | STUDIOS
401 EAST ILLINOIS STREET
SUITE 401
CHICAGO, ILLINOIS 60611
(312) 661-0778
ARCHITECTURE INTERIOR DESIGN

CERTIFICATIONS

KEY PLAN

REVISION NOTES

| MARK | DATE | DESCRIPTION |
|---|---|---|
| 3 | 11.19.04 | DESIGN INTENT |
| 2 | 10.28.04 | SPACE PLAN |
| 1 | 10.21.04 | SPACE PLAN OPTIONS A & B |

GRAPHIC SCALE

| | | |
|---|---|---|
| CONTRACTORS | A/E CON. NO. | GS-05P-01-GAD-0204 |
| | A/E TASK NO. | P-05-04-FB-0028 |
| | CONS. CONTR. | |
| | CONS. WORK | |
| | PRIME A/E | MEKUS STUDIOS LTD. |
| | SUB A/E | |
| | CONSTR. CON. | |
| BUILDING | NAME | |
| | STREET | |
| | CITY/ST./ZIP | Flint MI 00000-0000 |
| | BUILDING NO. | |
| | OTHER | |
| | BUILDING NOs. | |
| | FACILITY CODE | |
| PROJECT | PROJECT TITLE | SOCIAL SECURITY ADMINISTRATION |
| | PROJECT DESCRIPTION | DESIGN INTENT |
| | PROJECT NO. | 20401-66 |
| | GSA PM | |
| | SUBMISSION | |
| | SUB. DATE | 10/28/04 |
| DRAWING | DRAWING TITLE | COVER SHEET/SPECIFICATIONS |
| | FILE NAME | A_100.DWG |
| | FLOOR NO. | 01 |
| | DRAWN BY | VB — DATE DRAFTED: 10/27/04 |
| | CHECKED BY | RH — SHEET SIZE: 24 X 36 |
| | DRAWING NO. | A 1 00 (DISCIPLINE, SHEET TYPE, SEQUENCE) — SHEET 01 OF 07 |


DEMOLITION PLAN
PARTITION PLAN
NOT FOR CONSTRUCTION
401 EAST ILLINOIS STREET
SUITE 401
CHICAGO, ILLINOIS 60611
(312) 661-0778
A 101


POWER/SIGNAL PLAN
SCALE: 1/8" = 1'-0"
NOT FOR CONSTRUCTION
KEY NOTE
LEGEND
GENERAL NOTE
401 EAST ILLINOIS STREET
SUITE 401
CHICAGO, ILLINOIS 60611
(312) 661-0778
GSA
A 102


FURNITURE PLAN
SCALE: 1/8" = 1'-0"
NOT FOR CONSTRUCTION
GSA
401 EAST ILLINOIS STREET
SUITE 401
CHICAGO, ILLINOIS 60611
(312) 661-0778
A 103


1 ELEVATION
SCALE: 1/2" = 1'-0"
2 ELEVATION
SCALE: 1/2" = 1'-0"
NOT FOR CONSTRUCTION
GSA
401 EAST ILLINOIS STREET
SUITE 401
CHICAGO, ILLINOIS 60611
(312) 661-0778
A 201


SECTION
SCALE: 1 1/2" = 1'-0"
SECTION
SCALE: 1 1/2" = 1'-0"
SECTION
SCALE: 1 1/2" = 1'-0"
TYPE A-PARTITION
SCALE: 3"=1'-0"
NOT FOR CONSTRUCTION
GSA
401 EAST ILLINOIS STREET
SUITE 401
CHICAGO, ILLINOIS 60611
(312) 661-0778
A 301




(1) TYPE A-DOOR ELEVATION
NO SCALE

## DOOR SCHEDULE

| DOOR NO. | TYPE | DOOR OPENING | DOOR MAT. | DOOR FIN. | FRAME MAT. | FRAME FIN. | HDWE SET | REMARKS |
|---|---|---|---|---|---|---|---|---|
| 100 | B. BLDG. | BASE BUILDING | B. BLDG. | B. BLDG. | B. BLDG. | B. BLDG. | D | |
| 101 | A | 3'-0" x 7'-0" x 1 3/4" | S.C. WOOD | STAIN | H.M. | PAINT | E | |
| 102 | B. BLDG. | BASE BUILDING | B. BLDG. | B. BLDG. | B. BLDG. | B. BLDG. | B | |
| 107 | B. BLDG. | BASE BUILDING | B. BLDG. | B. BLDG. | B. BLDG. | B. BLDG. | B | |
| 108 | B. BLDG. | BASE BUILDING | B. BLDG. | B. BLDG. | B. BLDG. | B. BLDG. | C | |
| 109 | A | 3'-0" x 7'-0" x 1 3/4" | S.C. WOOD | STAIN | H.M. | PAINT | C | |
| 110 | B. BLDG. | BASE BUILDING | B. BLDG. | B. BLDG. | B. BLDG. | B. BLDG. | C | |
| 111 | A | 3'-0" x 7'-0" x 1 3/4" | S.C. WOOD | STAIN | H.M. | PAINT | A | |
| 112 | A | 3'-0" x 7'-0" x 1 3/4" | S.C. WOOD | STAIN | H.M. | PAINT | C | |
| 113 | A | 3'-0" x 7'-0" x 1 3/4" | S.C. WOOD | STAIN | H.M. | PAINT | E | |
| 114 | B. BLDG. | BASE BUILDING | B. BLDG. | B. BLDG. | B. BLDG. | B. BLDG. | F | |

## HARDWARE DESCRIPTION MASTER KEY ALL LOCKS

**A**
- (1) 1 1/2 PAIR, HEAVY DUTY BALLBEARING BUTT HINGES
- (1) COMMERCIAL GRADE, MORTISED LOCKSET; LATCHSET; LEVER PULL
- (1) FLOORSTOP

**B**
BASE BUILDING HARDWARE TO INCLUDE, BUT NOT LIMITED TO THE FOLLOWING CRITERIA:
- (1) 1 1/2 PAIR, HEAVY DUTY, NON-REMOVABLE, BALLBEARING BUTT HINGES
- (1) COMMERCIAL GRADE, 5-PIN, MORTISED LOCKSET W/1" MIN. LATCHBOLT; FUNCTION: STOREROOM LOCK, LEVER PULL
- (1) CLOSER

**C**
- (1) 1 1/2 PAIR, HEAVY DUTY, BALLBEARING BUTT HINGES;
- (1) PUSHPLATE
- (1) PULL BAR
- (1) 18" KICKPLATE
- (1) SURFACE MOUNTED CLOSER
- (1) FLOORSTOP

**D**
BASE BUILDING HARDWARE TO INCLUDE, BUT NOT LIMITED TO THE FOLLOWING CRITERIA:
- (2) HEAVY DUTY, NON-REMOVABLE, BALLBEARING BUTT HINGES
- (2) AUTOMATIC DOOR OPERATOR (ONE EACH LEAF)
- (2) PANIC HARDWARE W/KEY OVERRIDE FOR EACH LEAF
- (1) COMMERCIAL GRADE, 5-PIN, MORTISED LOCKSET W/1" MIN. LATCHBOLT
- (1) TOP AND BOTTOM FLUSH BOLT RETRACTABLE W/PANIC DEVICE
- (1) CLOSER

**E**
- (1) 1 1/2 PAIR, HEAVY DUTY BALLBEARING BUTT HINGES
- (1) MANUAL CYPHER LOCK
- (1) COMMERCIAL GRADE, MORTISED LOCKSET; FUNCTION: STOREROOM LOCK;
- (1) CLOSER
- (1) FLOOR STOP

**F**
- (1) 1 1/2 PAIR, HEAVY DUTY BALLBEARING BUTT HINGES
- (1) COMMERCIAL GRADE, MORTISE LOCKSET; FUNCTION: BATHROOM/PRIVACY LOCK; LEVER PULL
- (1) FLOORSTOP
- (1) SURFACE MOUNTED CLOSER
- (1) 18" KICKPLATE

**G**
- (1) 1 1/2 PAIR, HEAVY DUTY, NON-REMOVABLE, BALLBEARING BUTT HINGES
- (1) COMMERCIAL GRADE, 5-PIN, MORTISED LOCKSET W/1" MIN. LATCHBOLT; FUNCTION: STOREROOM LOCK, LEVER PULL

NOT FOR CONSTRUCTION

PROPERTY OF THE UNITED STATES GOVERNMENT – FOR OFFICIAL USE ONLY. Do not remove this notice. Properly destroy documents when no longer needed.

GSA GENERAL SERVICES ADMINISTRATION
REGION 5
PBS, REALTY SERVICES DIVISION
230 S DEARBORN ST
CHICAGO, IL 60604

NEXUS | STUDIOS
401 EAST ILLINOIS STREET
SUITE 401
CHICAGO, ILLINOIS 60611
(312) 661-0778
ARCHITECTURE INTERIOR DESIGN

CERTIFICATIONS

KEY PLAN

REVISION NOTES

| MARK | DATE | DESCRIPTION |
|---|---|---|
| 3 | 11.18.04 | DESIGN INTENT |
| 2 | 10.28.04 | SPACE PLAN |
| 1 | 10.21.04 | SPACE PLAN OPTIONS A & B |

GRAPHIC SCALE

| | |
|---|---|
| CONTRACTORS: A/E CON. NO. | GS-05P-01-CAD-0204 |
| A/E TASK NO. | |
| CONS. CONTR. | |
| CONS. WORK | |
| PRIME A/E | NEXUS STUDIOS LTD. |
| SUB A/E | |
| CONSTR. CON. | |
| BUILDING: NAME | Hollywood Plaza |
| STREET | |
| CITY/ST./ZIP | Flint MI |
| BUILDING NO. | |
| OTHER BUILDING NOs. | |
| FACILITY CODE | |
| PROJECT: PROJECT TITLE | SOCIAL SECURITY ADMINISTRATION |
| PROJECT DESCRIPTION | |
| PROJECT NO. | |
| GSA PM | Danielle Kroeger |
| SUBMISSION | |
| SUB. DATE | 10/28/04 |
| DRAWING: DRAWING TITLE | Design Intent Drawing |
| FILE NAME | A_103 |
| FLOOR NO. | Ground |
| DRAWN BY | VB DATE DRAFTED: 10/27/04 |
| CHECKED BY | RH SHEET SIZE: 30 X 42 |
| DRAWING NO. | A 601 (DISCIPLINE SHEET TYPE SEQUENCE) |
| | SHEET 7 OF 7 |



1 A_101 DEMOLITION PLAN
3/32" = 1'-0"




2 PARTITION PLAN
A_101 3/32" = 1'-0"

## GENERAL NOTES

1. WINDOWS SHOWN ON PLAN ARE NOT APPROVED BY LESSOR AND ARE SHOWN FOR DISPLAY PURPOSES ONLY. LESSOR TO PROVIDE AN UPDATED PLAN REFLECTING WINDOW SFO REQUIREMENTS, WINDOW ACTUAL SIZES AND LOCATIONS. MEKUS STUDIOS DOES NOT HAVE AN OPINION REGARDING WINDOW PLACEMENT AND SIZE. QUANTITY OF EXTERIOR DOORS IS BASED ON PROGRAMMATIC NEEDS AND MAY HAVE CHANGED FROM THE QUANTITY STATED BY THE LEASE.

## KEYNOTES

1. ADA COMPLIANT INTERVIEW WINDOW
2. PROVIDE A WALL MOUNTED BULLETIN BOARD WITH SOLID OAK FRAME AND 2 WINDOWED DOORS WITH TOTAL DIMENSIONS OF 36" AND 48" WIDE
3. PROVIDE 3/4", 4' X 8'-1/2" THICK FIRE TREATED PLYWOOD SURFACE MOUNTED TO WALL; PAINTED TO MATCH WALL
4. LAN RACK
5. EXISTING ELECTRICAL PANELS
6. INTERVIEW WINDOW
7. ADA COMPLIANT WASHROOM TOILET, GRAB BARS WALL MOUNTED LAVATORY, HOT AND COLD WATER FAUCET SET, MIRROR HAND TOWEL DISPENSER. ALL HOT WATER PLUMBING TO BE INSULATED.
8. EXISTING BUILT IN SHELVING
9. DRY MARKER BOARD AT 36" OFF THE FLOOR CONSTRUCTED OF 3/4" PARTICLEBOARD WITH 22 GAUGE FACE SHEET AND PORCELAIN WRITING SURFACE. BUT JOINTS ARE TO BE SPLINED. COLOR DMB 7 (WHITE) WITH BLACK PLASTIC TEE EDGE HOLDING (#5517). THE BOARD MUST HAVE AN ERASER SELF.
10. POWER ASSISTED DOOR OPERATOR SIMILAR TO HORTON 7000 SERIES. INCLUDES ADA PUSH BUTTON & CONTROLS.

## LEGEND

- VALL TYPE
- DOOR NUMBER
- OFFICE 101 — ROOM NAME/NUMBER
- NEW PARTITION
- EXISTING PARTITION TO REMAIN
- EXISTING PARTITION TO DEMOLISH
- ELEVATION TARGET

GSA
GENERAL SERVICES ADMINISTRATION
REGION 5
PBS, REALTY SERVICES DIVISION
230 S. DEARBORN ST.
CHICAGO, IL 60604

Design ENGINEERING GROUP
architectural ∘ interior ∘ graphic
4908 MAC STREET
MIDLAND, MICHIGAN 48640
TEL.: 989*832*5210
FAX: 989*832*5220

CERTIFICATIONS

KEY PLAN

REVISION NOTES

| MARK | DATE | DESCRIPTION |
|---|---|---|
| 5 | 03.24.05 | CHANGES PER 03.16.05 MEETING |
| 4 | 03.15.05 | DESIGN CHANGE |
| 3 | 11.19.04 | DESIGN INTENT |
| 2 | 10.28.04 | SPACE PLAN |
| 1 | 10.21.04 | SPACE PLAN OPTIONS A & B |

GRAPHIC SCALE

| | | |
|---|---|---|
| CONTRACTORS | A/E CON. NO. | GS-05P-01-GAD-0204 |
| | A/E TASK NO. | P0505FB0006 |
| | CONS. CONTR. | EXCEL CONSTRUCTION |
| | CONS. WORK | |
| | PRIME A/E | DESIGN ENGINEERING GROUP LLC. |
| | SUB A/E | |
| | CONSTR. CON. | |
| BUILDING | NAME | |
| | STREET | |
| | CITY/ST./ZIP | FLINT MI. 00000-0000 |
| | BUILDING NO. | |
| | OTHER BUILDING NOs. | |
| | FACILITY CODE | |
| PROJECT | PROJECT TITLE | SOCIAL SECURITY ADMINISTRATION |
| | PROJECT DESCRIPTION | DESIGN CHANGE |
| | PROJECT NO. | 20401-66 |
| | GSA PM | Danielle Kroeger |
| | SUBMISSION | |
| | SUB. DATE | 10/28/04 |
| DRAWING | DRAWING TITLE | DESIGN INTENT DRAWING |
| | FILE NAME | A_101.DWG |
| | FLOOR NO. | GROUND |
| | DRAWN BY | RO — DATE DRAFTED: 03/15/05 |
| | CHECKED BY | RS — SHEET SIZE: 24 X 36 |
| | DRAWING NO. | A_101 (DISCIPLINE / SHEET TYPE / SEQUENCE) — SHEET 02 OF 09 |



PROPERTY OF THE UNITED STATES GOVERNMENT – FOR OFFICIAL USE ONLY. Do not remove this notice. Properly destroy documents when no longer needed.