IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HALLWOOD PLAZA, INC., )
Plaintiff, )
-vs- ) No. 06-589-C
THE UNITED STATES, )
Defendant. )

ORIGINAL

The deposition of GERALD KOSMAN, called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Randall J. Young, a notary public within and for the County of Cook and State of Illinois, at 230 South Dearborn Street, Chicago, Illinois, on the 25th day of July, 2007, at the hour of 4:10 p.m.

APPEARANCES:

MIZEROWSKI & ASSOCIATES, P.C.
BY: TIMOTHY W. MIZEROWSKI, ESQ.
131 Ferland Street
Walled Lake, Michigan 48390
(248) 926-9205
Representing the Claimant;

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
COMMERCIAL LITIGATION BRANCH
BY: JOAN STENTIFORD, ESQ.
1100 L Street N.W., 8th floor
Washington D.C. 20530
Representing the Defendant.
and
GSA OFFICE OF GENERAL COUNSEL
ASSISTANT GENERAL COUNSEL
BY: ROBERT M. NOTIGAN, ESQ,
1800 F Street, N.W., Room 4131
Washington, D.C. 20405
(202) 501-0500

I N D E X

| WITNESS | EXAMINATION |
| --- | --- |
| GERALD KOSMAN | |
| By Mr. Mizerowski | 4 |

E X H I B I T S

| NUMBER | MARKED FOR ID |
| --- | --- |
| Kosman Deposition Exhibit | |
| Nos. 1 - 8 | 37 |

MR. MIZEROWSKI: The record should reflect that this is the deposition of Gerald Kosman, who is the contracting officer for the General Services Administration for the Social Security Administration.

GERALD KOSMAN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MIZEROWSKI:

Q. Mr. Kosman, have you had your deposition taken before?

A. No.

Q. What I am going to be doing is asking you a series of questions this afternoon. You have attorneys here representing you. My questions are going to be out loud, oral. If you could answer to make sure that your voice is heard.

Everything you and I are saying is being transcribed by the court reporter. Try not to shake your head or say uh-huh or um-hum. Try to say yes or no.

A. Okay.

Q. If at any point in time during my

questioning of you this afternoon you do not understand the question I am asking you, ask me to repeat or rephrase it. Tell me you don't know what I mean. I want to make sure that you and I are on the same wavelength and we are talking about the same thing. Fair enough?

A. Okay.

Q. If at any point in time you need to take a break or a recess, let me know. This is not a marathon to see how long we can make you sit here. And I understand that we are going to end the deposition in probably an hour, hour and 15 minutes or so.

I doubt that I'm going to be able to get through all my questioning this afternoon of you. So it's my understanding that you will make yourself available tomorrow morning. Why don't you give us your full name for the record.

A. Gerald K., for Kenneth, Kosman.

Q. And by whom are you employed?

A. General Services Administration.

Q. What is the business address of your employer?

A. 230 South Dearborn, Suite 3300, Chicago,

Illinois.

Q. And how long have you been employed by the GSA?

A. I have been here seven years last May.

Q. Prior to that, where were you employed?

A. I was with a company called Newark Electronics doing their realty leasing. It's a Chicago company in the private sector. I leased office space that they used for sales offices.

Q. How long were you employed there?

A. I was with them 13 years.

Q. What is your educational background? Did you graduate from high school?

A. I graduated from high school in Chicago and I graduated from Northern Illinois University.

Q. When did you graduate from Northern Illinois?

A. 1972.

Q. What was your degree in?

A. Psychology.

Q. Your current position with GSA is what?

A. I'm a realty specialist on a team that handles just space needs for Social Security administration in Region 5. I try to fulfill their

office needs either leased or in Federal buildings.

Q. When you say Region 5, what states does that include?

A. Region 5 is made up of Ohio, Indiana, Michigan, Illinois, Wisconsin, and Minnesota.

Q. Is there anyone else that is a realty specialist that has a similar job as you for Region 5?

A. Yes.

Q. Who is that?

A. There are some six teams of five to ten people all doing this.

Q. Does your team have a specific number or not?

A. Number of?

Q. You said you have six teams. Are the teams labeled 1 through 6?

A. C-1 through C-6. C-100 through C-600 hundred, actually.

Q. What is your team number?

A. 600.

Q. How many team members are there?

A. Ten.

Q. Is there a supervisor of the team?

A. Yes.
Q. Who is that?
A. Paul Schmidt.
Q. And do you supervise any team members?
A. No.
Q. So your direct supervisor is Paul Schmidt. Is that correct?
A. That's right.
Q. You said you have been working for the GSA for seven years. Is that correct?
A. Yes.
Q. Were you hired in as a realty specialist?
A. Yes.
Q. So you have been in the same position for the last seven years?
A. Correct.
Q. The team members, are there other realty specialists on the C-600 team?
A. Yes. There are five besides myself.
Q. So there is six total?
A. Correct. We are split up basically with the state designations.
Q. What is your state designation?
A. Currently Ohio.

Q. And do you rotate that? When did you get Ohio?

A. We reorganized about two years ago.

Q. I am assuming that when this project was bid and let, you were the realty specialist for Michigan. Is that correct?

A. Yes.

Q. Back in October of '04?

A. Yes. It started in October of '04. I think the lease was dated in the spring of '05.

Q. I am just looking at the SFO offering dated October 13th, '04. But back in '04, you were the realty specialist for the State of Michigan?

A. Yes.

Q. As a realty specialist, what do you do? What are your specific duties?

A. We make sure we have the requirements from SSA. In this particular case our team does strictly SSA requirements. So we make sure we get their long-range requirements for any lease space needs.

We make sure we do a procurement where anyone in the general public can offer up a lease to the government. We make sure there is

procurement integrity. We make sure everything is done fair and equitable amongst those offerers, and that the leases are signed and the space is furnished according to the requirements of the SFO, meaning solicitation for offers.

Q. Do you visit the sites?

A. Typically after they are running, after SSA occupies, no. There is a field office that usually handles the day-to-day property management.

Q. In this case, do you know who the property manager was?

A. That would be Dan Fenner.

Q. Was Dan on site during the renovation and build-out for this office?

A. He made several visits, yes, during construction.

Q. During construction he would have been the on-site person for the GSA there. Correct?

A. Yes.

Q. Did you ever visit the site prior to its completion?

A. Only at the beginning, before we even awarded the lease. I saw it, but after we awarded the lease I did not visit the site.

Q. Do you normally do that?
A. No.
Q. Why did you do that in this case?
A. I didn't.
Q. You said you went to this site before --
A. During a market survey process to determine who won the award, or who would be getting the lease. But after we leased the space to be built out, I did not go there.
Q. Until after the SSA was in there?
A. I have never been there since the award.
Q. Tell me then how the award process works and how you operate. It sounds like you get a bid and then you go visit the site, and then the award is made?
A. Yes. You advertise for interest. Typically you go out with members of the SSA team and if there happens to be brokers involved and what have you. You review all sites that anybody wants to be considered for lease.
During the process, SSA, according to their vision and according to standards of what they are looking for as far as office space, you weed it out, and those ones that kind of pass the

test, they get a package to make offers for lease.

So at that point, there are some people that do not get a package to make an offer and there are some that do.

Q. The solicitation for offers would have been the first document sent out to that general area up in Flint or to the State of Michigan? Where does this SFO go?

A. In this case, Hallwood Plaza, the space in Hallwood Plaza was deemed to be an acceptable site. So the SFO package, which is more than just that one document, is given to the owner, with the instructions to read it, and there are instructions on how to make the offer, and that comes back about a month later.

Q. So I understand this, the SFO isn't given out to the general public. The general public can't get the SFO. Correct?

A. They can. At some point we can't keep them from getting the SFO. We market very clearly that it's just for display purposes only. But the actual SFO, the solicitation goes to those pre-approved sites.

Q. How do the people that get pre-approved

find out about the offering?
A. We are required to put all space needs on a web site. But more so, we put it in the newspaper occasionally, an ad in the paper. On space over 10,000 feet, I think you are required to put it in the newspaper.
In this particular case, this need was as a result of a current office being burnt to the ground. So locally, everybody in Flint was calling us, trying to find out if they could give us new office space for the SSA office.
Q. The SFO, that was ultimately provided to Hallwood Plaza. How many other SFOs were given out? Do you know?
A. Yes.
Q. How many?
A. None.
Q. Why was there only one SFO given out?
A. It was determined that there was no other site capable of fulfilling the need as quickly as we could do it.
Q. Because of the exigent circumstances of the fire, you needed a quick building?
A. The idea was to get them up and running as

soon as possible. In the meantime they were co-habitating with another SSA office in Flint, and that was a bad situation. They were overcrowded; the sooner the better. The idea was to try to find something that we could use as soon as we could.

Q. As I understand it, this was on the north side of Flint. Is that correct?

A. Yes.

Q. So you visited this site prior to handing out the SFO. Correct?

A. Yes.

Q. You went into the plaza out there. Is that correct?

A. Yes.

Q. And you walked the building. Is that correct?

A. It's a shopping center, so it's 40 by 100 or whatever. The leasing agent for the shopping center opened the door and showed us the site.

Q. Was Mr. Kashat there?

A. No.

Q. You have met Mr. Kashat?

A. I have.

Q. He wasn't there when you walked around the

site. Is that correct?

A. That's correct.

Q. Do you recall viewing the space?

A. Yes.

Q. Do you recall when you viewed the space?

A. It would have been somewhere late September or early October of '04.

Q. Before the date on this solicitation for offers?

A. Yes.

Q. Who else was there with you when you went through the space?

A. An employee for Social Security who has since retired, and her name was -- last name is Coleman, but I don't remember her first name. Eric Olsen was the leasing agent for the shopping center.

The local manager of the SSA office that burnt down was there, and I believe the assistant manager was there for SSA also, local. And I think that was it.

Q. Do you know who the local manager was or the assistant manager, the names?

A. I don't remember.

Q. Did you make any notes while you were viewing the property?
A. I would assume so. If they are, they are in a lease file somewhere. There is a form that could have been filled out. I know we looked at several sites. Obviously there is notes somewhere in a lease folder stored away somewhere.
Q. What was the form the notes would have been made on? Is there a specific form number or something?
A. No. It's just a market survey report form. I think in this case, there was probably more informal notes. If I recall, there was only four places to look at that point.
Q. The lease folder that you have, do you know where it is stored?
A. I am assuming it's upstairs in the storeroom.
Q. Is there a specific number or something that this lease folder would be referred as?
A. That SFO number there.
Q. GS 05 B 17564?
A. Yes. The resulting lease would be LMI for leased, Michigan, and then the last digits.

Q. The 17564?

A. Correct. And there is a particular tab in a lease file that has to do with where this information on the market survey would be.

Q. What else would be in this lease folder?

A. Pretty much just about all the documents, there is a source file. That is just the legal documents. And then there is a lot of duplicate information, but it's basically the SFO, the cover letters that accompany the solicitation packages that went out, the requests for the offers and final offers and whatever discrepancies.

It's just your normal correspondence back and forth during the course of the negotiations.

Q. And is this the only file that the GSA would maintain for this property?

A. Here, yes. The field office may have some.

Q. That is the field office that is located where?

A. In this case it would be Grand Rapids.

Q. Would the field office folder have the same designation, be stored under the same number?

A. I am not familiar with their files. I

don't know.

Q. Do you have access to that file?

A. In the field?

Q. No. The one here.

A. Yes.

Q. The one stored here?

A. Yes.

Q. Would it be possible tomorrow morning to bring it to the deposition?

A. If it's up there. There is a lot of files. If it's where it's supposed to be, sure.

Q. I will ask for it tomorrow morning, and we can talk about it, if you have it or don't have it. Now, do you recall your notes regarding the market survey? Any specific good points, bad points, problems, anything with this space?

A. It was the typical kind of wide open space. The gist of the SSA requirement again was to find something that could be utilized quickly. There are minor requirements they have to try to keep the public separated from their employees for safety reasons. So there is kind of a sitting area versus a work area and there is an interview area.

The original site was looked at. It

already had a drop ceiling with recessed lighting in it. It was pretty much long and narrow. It wasn't an ideal situation that SSA likes, but it was the only thing that seemed to work, with maybe the addition of a few dividing walls, improvements to existing bathrooms.

There were a few rooms that could be utilized that were already there. So we thought the improvements, starting from scratch, the improvements weren't that extensive, that they could get in there as quickly as they can.

Q. It had HVAC?

A. The lease agent said it had HVAC. However, Fashion Bug, or the previous tenant was complaining that it wasn't that good, operable, and said that whatever our -- because I brought that up about the HVAC.

And I was told that the owner was going to put new units on the roof anyway for this site regardless of what tenant was going to come in.

Q. Who told you that?

A. Eric Olsen, the leasing agent for the center.

Q. You said it had several rooms in it. Do

you recall how many rooms it had, and what was your requirement for the number of rooms?

A. There was a room off to the side that we wound up using as a computer room because it was small and kind of off to the side. There was a storeroom in the back. There was like an unfinished storage area in the back, way in the back that could be used for storage.

There was, I think, a changing room. This was a women's clothing store, that the walls could stay up, and I believe it was converted into a missing employee bathroom, because there was a bathroom right next door to it, so the plumbing wouldn't have had to go that far, things like that.

Q. Do you recall any other rooms that were in there?

A. No. I think that was it.

Q. It was pretty wide open?

A. Yes. There was another room that contained a small bathroom and contained electric panels, and that was off a hall that was going to the rear door of the space.

Q. How was the security on the building? Did you make note of it?

A. It was kind of typical. For that area, there was a few places -- I noticed there was a liquor store down the run that had bars on its windows. But I didn't notice any graffiti or anything like that. It was pretty good.

Q. Now, at this location, do you recall what the requirements would have been for additional -- you said it had to have a couple more dividing walls. How many more offices needed to be built?

A. Actually, other than redoing the bathrooms in the back for the employees, the SSA has unions involved here. So they have to go out of their way to make sure that certain facilities, even though it's a short-term lease, are met.

So the bathrooms had to be redone in the back of the space. SSA does not want to share restrooms with the public, so it was noted right off the bat that a public bathroom up in the public area would have to be produced.

There would be a separation wall between where they interview the public and where the employees sit to do their normal, whatever they do, where the employee actually comes into this room and sits down at a table, I believe.

It's not the way SSA set it up, but for temporary purposes this worked, where the employee came out from behind a wall and interviewed the claimants. So one wall down the middle, kind of straight down the middle, separating an employee interview area with the public.

And late in the process, it was determined that two offices had to be made for the SSA managers. So utilizing a couple niches, if you would, on existing walls, they put up two walls each to make two separate offices with walls that didn't even go to the ceiling just to give them a little privacy in case they needed to do employee interviews and things like that.

Q. What about the sitting area or vestibule area? Did you have to put up any dividing walls for that?

A. It was decided that SSA wanted a wind-break vestibule in the front for the public. I think it turned out to be a glass vestibule in the front. And it was mostly with the idea that wind would not come flying in there every time they opened the double glass door, typical storefront situation.

Q. You mentioned a couple times that this was a temporary facility. What was the intention of the SSA when they leased this facility?

A. To be in there for as short a term as possible while they went ahead on a procurement for a more permanent situation.

Q. There is a permanent building that has been built?

A. Not yet, to my knowledge. It's not my State responsibility. I think there is a procurement ongoing for a new site, but I'm not sure.

Q. So you had to put up a few walls, redo some bathrooms. What other items did you notice that had to be redone?

A. There were mirrors all over the place on the walls that had to be redone, that had to be re-painted. There was a question on whether SSA wanted to use an existing carpet or whether they wanted to go with new carpet.

The ultimate decision was to go with new carpet. But instead of carpet squares like they usually did, they went to a more inexpensive roll type of carpeting situation because they knew they

weren't going to be there that long.

Q. They are still there, though?

A. They are still there after two years now. Even if they awarded a lease yesterday for a new site, they will be there for another year.

Q. Other things? I am sorry. I interrupted you.

A. I think that was about it. Again, the idea was to try to -- as compared to typical procurements, where it could be even a built-to-suit building for them, this had a lot less to do to get it in shape and get them in there and service the public as fast as they could rather than build a new building somewhere, for example.

Q. Did it have a fire suppression system?

A. Sprinklers? No, I don't think so.

Q. So the area when you looked at it was not sprinkled. There was no fire sprinkler there?

A. I don't think so. Sprinklers are not a requirement for us.

Q. Is there a requirement for -- there is an alarm system that has to be put in place. Is that correct?

A. Yes. The solicitation for offers has what

is to be a part of the initial bid as far as alarms to local fire.

Q. A fire alarm system similar to a burglar alarm system. Is that what we are talking about?

A. SSA has a separate security system that is paid for and operated separately. All Federal space has got glass break protections, whatever. It goes to a mega-center for Federal Protective Service.

But the SFO has something in there about how all government space should be hooked up to a fire alarm so the local fire department gets word of a fire, I guess.

Q. The fire alarm system we are talking about is simply an alarm system. It's not a suppression system that is going to put out a fire. Correct?

A. Correct. It's just an alarm.

Q. Did you have an opportunity to inspect or look at the HVAC duct system or heating system throughout the building?

A. No. It was on the opposite side of a dropped ceiling.

Q. What kind of state of repair or disrepair was the dropped ceiling in?

A. The dropped ceiling was actually fairly good. And I was told by the leasing agent for the center that it was a two-by-four grid system and it was fairly clean. And I even said that if possible, they could reuse as much of the grid and ceiling tiles as they could.

That being said, the SFO requires as part of the original offer that that ceiling is part of the original bid.

Q. Right. That it's there.

A. Yes.

Q. How big is this center?

A. It's a couple blocks by a block. It's big.

Q. I know the center is big. I am talking about the Social Security Administration, what was leased.

A. I think it's about 9500 feet.

Q. Did you make any notation or have any memory of what the air conditioning system -- or the duct work put out into the space, meaning how many vents or any of that type of stuff?

A. No. And I don't have any expertise as far as air conditioning. The SFO is pretty much a

performance SFO that says -- it has to provide a temperature range of between I think 68 and 75 and maintain that. I don't know how that happens. But that is what has to be done.

Q. Did you ever have any conversation with the owner, Mr. Kashat, regarding the HVAC system?

A. I believe he told me at one point that he had to add air conditioning because of the difference between what it took to cool a retail space versus an office space. But other than that, that is all I knew. I knew he had to add air conditioning. I knew going into this that the space needed air conditioning.

Q. So it had an air conditioner?

A. It had several units on the roof, I understand, that were broke or needed upgrading or what not.

Q. And that was told to you by the leasing agent?

A. Yes.

Q. Did you test the HVAC system at all to see if it was operable or not?

A. No. When I was there, the electricity wasn't there, I don't think.

Q. Are there any special requirements, you said between 65 and 75 degrees, for the HVAC system?

A. There is something in there that basically says the office space has to be cooled to certain levels.

Q. Is there any one area in particular that needs any type of specific cooling?

A. Yes.

Q. What is that area?

A. There is a data computer room, not in the sense where it needs raised floors and anything else, but SSA has a data center called an IWS land rack that is about the size of a big stereo rack that does generate some heat, but not any more than your normal copying machine.

But that data collector, that is the life blood of their system. So they have a requirement that that goes into a certain room that has its own unit, cooling it 24-7 so that it never has the chance of going down because of overheating in the area or something like that.

Q. When you say, "Own unit," you are talking about its own HVAC system. Correct?

A. Yes, because we needed to cool in the winter too.

Q. So that was something that needed to be added. Is that correct?

A. Yes; that little room that existed off to the side.

Q. Let me back up. The solicitation for offers, you said -- I have in my hand a document that is about 38 pages long. You said there are other attachments to this solicitation. Is that correct?

A. Yes.

Q. Can you tell us what other attachments there are to this solicitation?

A. That is the major part of it. Then there is attachments to it that have -- it's kind of a dynamic thing where it could be different numbers. But that is an attachment, say number 1. It breaks down the total rent offered.

There is an attachment number 2 that has kind of a thumbnail sketch of what is considered tenant improvements versus shell space requirements. And that is part of this SFO package, in that you lease the shell and then pay

for the tenant improvements later.

Q. Attachment 3?

A. Attachment 3 is, that is the general requirements that basically takes your boiler plate SFO and it more or less puts it -- makes it standard for SSA offices. It just adds things to it that are expected to be with the space in there at no extra cost in the initial bid, things like SSA being able to put a satellite dish on the roof and things like that.

Q. So it's an addendum to the SFO?

A. Yes.

Q. SFO, specific for the SSA.

A. Yes.

Q. We have attachment 4?

A. Yes. Attachment 4 is just for security purposes, and that tells everybody that after 9/11, we don't want any floor plans for a Federal space to be put out on the Internet, either to general contractors or things like that.

General requirements, form number 3517, this is your legalese jargon for all leases in the government. That is boiler plate. And it has to do with quite a few, 26 pages or so, of standard

clauses in every Federal lease.

Q. Are there any other attachments that you are aware of that I haven't thrown out here?

A. Yes. There is one attachment. It's called a certifications and representations form. It's a couple pages. And basically that is signed by the offering party saying if he is a large business or small business, whether or not it's a female-owned business, whether or not it's a minority-owned business, for Department of Labor purposes.

He would have to claim on here whether or not he has been debarred before for government contracts, whether he is on record with the Labor Board as far as if he has a minority --

Q. Is a minority contractor or --

A. Yes. Large businesses have to show that they have a minority business plan. If the offerer is a small business himself, he doesn't have to do that. Again, that goes out with every government lease.

Q. Anything else that you are aware of that would have been part of the SFO package?

A. There is also something called

solicitation instructions or something. I forget the number. It states things like how you would make a claim, for example, how he makes his offer, general instructions that aren't necessarily part of the lease itself, but that we provide as instructions. I think it's just basically instructions on how to make an offer.

Q. Anything else?

A. I think that is all that is in the package. There was a cover letter, of course, that asks for other things like proof of ownership and things like that.

Q. All these documents should be contained in that lease folder?

A. I'm sorry. There is one more called a 1217 that kind of outlines how much the operating costs would be, that component of the rent that would be operating costs. And of course there is a form called a 1364, which is your actual piece of paper you make your bid with. I think that is it.

Q. That is it?

A. I think so. Every solicitation is different, but I think that is pretty standard attachments.

Q. And all of that information would be in that lease folder. Is that correct?

A. Yes.

Q. Instead of marking these, if we could get that tomorrow, I will mark the original documents instead of copies, if that is all right with you.

MS. STENTIFORD: I think it's unnecessary.

THE WITNESS: They would not differ from that one you have right there.

MR. MIZEROWSKI: I want to make sure that we have all the pages. I would like to get the lease folder and see what else is in there. I think I have mostly everything I need. I want to compare all the documents I have to what that lease folder is.

MS. STENTIFORD: If it's locatable, if it's where it belongs, where Mr. Kosman thinks it belongs, I will review it and make sure there are no privileged documents in there, and then you are welcome to look at it.

BY MR. MIZEROWSKI:

Q. Do you recall when Hallwood Plaza got back their bid to you?

A. I don't understand.

Q. After you send out the solicitation for offers, they have so long to send it back to you. Is that correct?

A. Yes.

Q. In this case, it wasn't much of a bid process because they were the only one.

A. They didn't know that.

Q. What was the turnaround time that it had to be done?

A. I typically put four to six weeks on that turnaround time. I believe if you look at the letter that says you have until this date to get it back, I believe the initial offer came in a little late, but I let it slide because it was my only offer. That date was basically for my own convenience anyway.

Q. I guess it's fair to say that they were the low bidder?

A. Yes; doesn't automatically make them a winner, though.

Q. But in this case, you didn't have much to choose from.

A. Correct.

Q. Once you get a bid back, how long is the

bid? How many pages is the bid generally?

A. The 1364 form itself is only two pages long.

Q. I want to talk about attachment 2. Attachment 2 to the SFO, it has the typical tenant improvements on the first page, and on the second page is what the building shell would be. Is that correct?

A. It's not an all-inclusive form. It's more designed to explain to SSA what a TI cost to them would be versus a shell cost. It works nice as an exhibit for the offerer, so he gets a better idea of what could fall under what category.

Of course there are always -- they can always ask if they are unsure which is which. But we put it as an exhibit. And Region 5, everybody in Region 5 usually adds that as an exhibit to help the offerer out.

Q. When you say "TI costs," you are talking about tenant improvement costs?

A. Tenant improvement costs.

Q. The building shell costs, these are the costs that -- or not even costs. This is the base requirement of the building. Correct?

A. Yes.

Q. This is what the owner, the landlord, the lessor needs to have in the building even before anyone comes in. Correct?

A. Government, yes. Basically you are using the SFO as standard requirements for a -- in the private sector it would be called a vanilla space or whatever.

In government it means the outside walls, a finished ceiling with a grid and ceiling tiles, one light fixture per every 80 feet, 80 usable feet, all the mechanicals for the building except those needed because of design changes, full service leases.

And that is basically what comes with that initial offer. That is included in that.

MS. STENTIFORD: If you are going to have him testify about that, I think it should be marked as an exhibit. When you compare it to the other file we are going to look for in storage and you think it's different, then you would make the other one an exhibit as well.

But if he is going to talk about this, I think it needs to be made an exhibit.

MR. MIZEROWSKI: Sure. We'll mark all these then.

(Whereupon, Kosmon Deposition Exhibit Nos. 1 through 8 were marked for identification.)

BY MR. MIZEROWSKI:

Q. I am going to show you what we have marked as Kosman Exhibits 1 through 8 and just ask you if you could identify them for the record. Exhibit 1, what is that?

A. Exhibit 1 is the solicitation for offers.

Q. That is what we have been referring to as the SFO?

A. SFO GS05B 17564, dated 10/13 of '04.

Q. What were you looking at, Mr. Kosman? Is there extra pages? What were you doing?

A. I was just -- like I said, these are kind of dynamic. I am just looking to see, kind of get an idea. I know it should end at around 9. I am trying to find out if the last page looks familiar to me, see if there is anything missing at the end.

Exhibit 2 is general clauses, GSA form 3517 B, consisting of 26 pages. Exhibit 3 is GSA

form 3518, representations and certifications, consisting of four pages. Exhibit 4 is the attachment to SFO, GSO 5B 17564, lease cost breakdown summary page.

Exhibit No. 5, attachment to the SFO, number 2. And that is typical tenant improvements versus typical shell aspects of the lease, filled out. Attachment number 3 to the SFO, it's called "General requirements." And this is page 1 through 8.

Attachment number 4 to the SFO is the document security form, consisting of four pages. And Exhibit No. 8 is a standard form number 2, lease for real property, U.S. Government, standard form number 2, consisting of -- I think there might be some missing there.

Q. How many pages would it --

A. According to this, paragraphs 12 through 5 on pages 3 through 4 is missing. And that is part of this Exhibit 8.

Q. We were talking about Exhibit 5, which is the attachment No. 2 to the SFO when we started numbering these. Just so I can -- it's my understanding that page 2 relates to what the shell

building should be. Is that correct? That is what we were discussing.

A. It's examples of what shell building aspects would be, yes.

Q. Those aspects of the building shell are contained in detail in the SFO, which is Exhibit 1. Is that correct?

A. Yes.

Q. So this attachment 2 is simply a summary or clarification of the SFO?

A. It's just an exhibit to better explain it in one spot.

Q. The typical tenant improvements on the first page of Exhibit 5, these are what? Tell me what these are examples of.

A. Those are items that may be needed by the tenant agency that will be paid for as part of the tenant improvement portion of the rent.

Q. And the tenant improvement portion of the rent is something that is negotiated after an offer or a bid is made. Is that correct?

A. Yes. It's after award.

Q. It's after an award. Right?

A. Yes.

Q. The award is made based on what?
A. The award in this case is the low cost technically acceptable, meaning everything in the solicitation package, all aspects have to be met. And if that is the case, low cost wins, is awarded the lease.
Q. When you say, "Low cost," what low cost are we talking about? Are we talking about monthly rent? Are we talking about improvements? What does low cost include?
A. There is an explanation in there that basically it's based on the present value of money. And it is explained in there. It's not just your low rent. It's how much rent is worth over time.
Q. And that is in the SFO?
A. Yes.
Q. How do you know if you are the low bid? If you are just the person that bids the lowest, ten bucks a square foot -- say it's a thousand dollars month and I'm the low bid. That is what it really relates to? It's just simply the monthly rent?
A. Based on present value of money, yes.

Q. There is no other numbers taken into consideration when the bid is awarded?

A. Everything is in that PVA, present value analysis. There could be free rent. There could be step rent. In this case, the tenant improvement portion is only done over the first two years of the lease. So there would be a rent drop-off in the second two years of the rent.

And everybody is done on a present value analysis rather than just what the first month's rent would be.

Q. The tenant improvement costs, those aren't known when the bid is made?

A. There is an estimate that is in the SFO for every offerer to use. So the tenant improvement portion of the rent is standard from offer to offer.

Q. What would standard be in this case?

A. In this case it was $19 a foot.

Q. For tenant improvements?

A. Yes.

Q. Is there a standard lease amount too?

A. No. There shouldn't be one.

MR. MIZEROWSKI: Let's go off the record for a

second.

(Discussion off the record.)

MR. MIZEROWSKI: Now is a good time to stop.

(FURTHER DEPONENT SAITH NAUGHT.)

(Time noted: 5:10 p.m.)

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, Randall J. Young, a notary public within and for the County of Cook County and State of Illinois, do hereby certify that heretofore, to-wit, on the 25th day of July, 2007, personally appeared before me, at 230 South Dearborn Street, Chicago, Illinois, GERALD KOSMAN, in a cause now pending and undetermined in the United States Court of Federal Claims, wherein Hallwood Plaza, Inc. is the Plaintiff, and The United States of America is the Defendant.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the

foregoing deposition was waived by counsel for the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 17th day of August, 2007.

______________________________________

NOTARY PUBLIC, COOK COUNTY, ILLINOIS