IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

HALLWOOD PLAZA, INC., )
)
Plaintiff, )
)
vs. ) No. 06-589-C
)
THE UNITED STATES, )
)
Defendant. )

VOLUME II - (Pages 45 to 116)

The deposition of GERALD K. KOSMAN called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Anna Maria Castle, a Notary Public within and for the County of Will and State of Illinois, at 230 South Dearborn Street, Room 3570, Chicago, Illinois, on the 26th day of July, 2007, at the hour of 8:47 a.m.

REPORTED BY: ANNA MARIA CASTLE, CSR

LICENSE NO.: 084-004148

APPEARANCES:

MIZEROWSKI & ASSOCIATES, P.C.,
BY: MR. TIMOTHY W. MIZEROWSKI
131 Ferland Street
Walled Lake, Michigan 48390
(248) 926-9205
Representing the Plaintiff;

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION,
BY: JOAN M. STENTIFORD
1100 L. Street, Room 12038
Washington, D.C. 20530
(202) 616-0341
Representing the Defendant;

MR. ROBERT M. NOTIGAN
ASSISTANT GENERAL COUNSEL
GSA OFFICE OF GENERAL COUNSEL
U.S. GENERAL SERVICE ADMINISTRATION
1800 F. Street, N.W., Room 4B1
Washington, D.C. 20405
(202) 501-0500
Representing GSA.

# I N D E X


| WITNESS | EXAMINATION |
|---|---|
| GERALD KOSMAN | |
| By Mr. Mizerowski | 48 |
| By Ms. Stentiford | 109 |


# E X H I B I T S


| NUMBER | MARKED FOR ID |
|---|---|
| Kosman Deposition Exhibit | |
| No. 9-13 | 48 |

(Whereupon, Kosman Deposition
Exhibits Nos. 9-13 were marked
for identification.)
(Witness sworn.)
GERALD KOSMAN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. MIZEROWSKI:

Q. Mr. Kosman, we spent some time yesterday talking about a number of items. I want to ask you a couple of follow-up questions and try to move forward quickly this morning.

What documents did you review for your deposition? I know you brought in a file today. Did you go through that file or what documents did you review prior to your deposition yesterday?

A. I just reviewed the lease. I reviewed my original contracting officer's decision letter on the claim just to review the background, and there was -- to get an idea of chronologically how things happened, about what time frames, and things like that, for example, monies involved.

Q. When you say the original decision letter,

is this the letter, the October 13th letter?
A. Yes.
Q. And we've had that marked as Deposition Exhibit 13?
A. (Nodding head.)
Q. Yes?
A. Yes.
Q. Any other documents that you reviewed?
A. Like I said, the lease.
Q. Right. And its attachments.
A. And that's basically it.
Q. Okay. After the bid was awarded, the next step in that process is what, if you could tell us?
A. At that point GSA hires a contractor to help SSA design the space.
Q. Okay.
A. In this case we had started it a little earlier due to the emergency of trying to get them in as fast as possible. So we worked with the leasing agent for the center to get a hard copy of the outside dimensions of the space so that they could be put on CAD and work with whatever improvements that SSA needed to make the place operational for them to facilitate their operation.

So the first thing we do is make sure we have what's a government drawing. And a government drawing is also known as a design intent drawing. It's not a construction drawing. It's basically just a drawing that shows how we want the lessor to improve the inside of the space.

Q. And the design intent drawing, is that provided; is that correct?

A. To the lessor, and we basically say how much does it cost to build this out like this.

Q. And then do you know if the lessor in this case, if Hallwood Plaza, came back to you and told you how much it would cost to build that space out?

A. Yes.

Q. And do you recall what they came back to you with?

A. I don't know the number offhand. I think it was 240.

Q. Is it in your Notice to Proceed?

A. The Notice to Proceed is a little bit higher because originally the landlord forgot his own interest rates. So his original bid was about 7 percent less than that.

Q. Okay. And you're referring to a letter

dated February 28, 2005, a Notice to Proceed, and that's Deposition Exhibit 9; is that correct?
A. That's correct.
Q. And you signed that as the contracting officer?
A. Yes, I did.
Q. And prior to this letter being issued, you asked the -- or working drawings have to be produced, correct, by the lessor, construction documents?
A. If he wants -- I would assume -- we assume he's going to need those documents to put out to his contractors to find out how much it's going to cost.
Q. And so between the design intent and then your Notice to Proceed, it's really up to the lessor to get all those numbers, correct?
A. Correct.
Q. You issue the Notice to Proceed which you did on February 28th, and up to that point you had only been out to the space that one time before the bid was even awarded, correct?
A. That's true.
Q. Have you had any contact with your field

officer who was Dan Fenner prior to the Notice to Proceed being issued?

A. I don't believe so, no. I don't think there's any reason for Dan Fenner to even visit the space before, you know, the Notice to Proceed for the improvements are done.

Q. After the Notice to Proceed is issued, it's my understanding that a -- well, strike that.

Is there any negotiation that goes on with the bid that is given to the government by the lessor to come up with this 232 number?

A. Yes. The 232 number is checked against an independent government estimate where we get a ballpark figure for what an estimate would be for the same project. Those numbers coincided fairly closely with the estimate.

Q. Okay. Now -- go ahead.

A. We look at different levels to see if there is anything way out of line as far as -- we usually ask for bids to come in for lessors in what's known as a CSI format. I think that's the requirement.

In this case George submitted his bids, electrical, plumbing, things like that. It puts it

in levels so that you could see if anything is a little out of whack with the government estimate.

Q. And the bid appeared reasonable?

A. Yes.

Q. In reading the SFO, it was $19 a square in tenant improvements, correct, is what the SFO requested?

A. The SFO gives an estimate that all offers used as that portion of the total rent to be offered. That is just an estimate to be adjusted towards an actual number after the fact, after the award.

Q. Okay.

A. It could be higher; it could be lower.

Q. In the lease for real property which is Exhibit 8 it provides that $186,599 will be included in the rent as tenant improvements.

And I guess my question is, that's the amount that is going to be prorated over 24 months, correct?

A. Correct.

Q. That estimate contemplates $19 a square foot?

A. No. That's whatever $186,000 comes out to

be. That $19 a foot disappears after an award is made. That's just purely an estimate to level the plainfield for tenant improvements. It's a number that can be run into the rent as far as GSA to SSA as far as doing improvements into their rent with us.

Q. Where does the $186,000 number come from then? How does that number get calculated?

A. From the lessor's bid.

Q. Okay. So but the lessor's bid in the Notice to Proceed is about --

A. There's a subsequent increase in the -- this SF 2 form, this is written and goes out with the award letter. The number that appears on here -- the number that does appear on here -- you're right, you're more right than I am. The number that appears on here does represent that $19. I stand corrected. Because at this point I don't have any numbers from George as far as what his TI cost.

Subsequent to that then when we had an SLA, changing that number twice, SLA 1 and SLA 2, both adjusted that number up; and that number eventually became the $330,000 worth of TI's.

Q. So the tenant improvements increased by $120,000, $140,000 up to 320?

A. 336.81.

Q. You and I can figure out the exact numbers later, but this is just the initial estimate at $19 a square foot?

A. Yes.

Q. Then the bid came in initially at 232; is that correct?

A. A little less than that, yeah.

Q. Then you added the 7 percent?

A. Right.

Q. And then you issued the Notice to Proceed letter, correct?

A. Correct.

Q. And at that point in time construction commenced?

A. Yes.

Q. I have read in the SFO the -- I guess the term I want to make sure, best and final offer.

What does best and final relate to?

A. In any government procurement for office lease, you get to a point where you negotiate for a period of time with all offers and then you have to

close negotiations at some point in time.

You give all offers a designated chance to make their best and final offer which is basically sharpen your pencil. This is your last chance to change your numbers. And, you know, knowing that low costs, technically acceptable winds, you basically say negotiations will close on this date at this time and that date is fixed, and basically nothing changes after that point.

Q. Okay.

A. Other than the contracting officer can go down from that number for the betterment of the taxpayers. However, it can't go up from the lessor's side.

Q. So the best and final offer, does that occur before or after the Notice to Proceed?

A. Before, before the award.

Q. Before the award?

A. Before the award, before the SF 2, before the Notice to Proceed.

Q. Okay. After the Notice to Proceed, we have SLA 1 and SLA 2 which are Supplemental Lease Agreements 1 and 2, correct?

A. Yes, that's correct.

Q. It looks like you had made a copy of Supplemental Lease Agreement 2?

MR. MIZEROWSKI: We can go off the record.

(Discussion off the record.)

(Whereupon, Kosman Deposition Exhibit No. 10 was remarked for identification.)

BY MR. MIZEROWSKI:

Q. After the Notice to Proceed which was issued on February 28, 2005, it appears that there was an SLA 1 and SLA 2 issued, or actually, I should say, not issued, but agreed to. What are the SLA's?

A. SLA 1 is made to establish the correct address for the premises. So one of these three points that are on here has to do with the -- making the exact address of 4909 Clio Road, Flint, Michigan. Apparently, that was in question before that time.

It also establishes the rent resulting from the final tenant improvement cost to be amortized over the term. That amount went from 232 in the Notice to Proceed prior to 279 -- take it back. No. That just documents that the 232 in the

Notice to Proceed is now the amount of the tenant improvements to be amortized into rent at his 10 percent amortization rate.

Q. And that's what I was confused about. And the annual rent is the 279 --

A. 279 is the total rent, including the tenant improvements.

Q. And so there were no changes or any real additions. It was simply clarification. That's why SLA 1 was issued?

A. Right. It documents the new tenant improvement amount.

Q. And we noted that as Exhibit 10?

A. Yes.

Q. And then SLA 2 which is dated April 20 of 2005 which is Deposition 11; is that correct?

A. That's true.

Q. And what does this document represent?

A. This establishes the correct rent amount as a result of final tenant improvement costs to be amortized into the rent. That amount now went up to 330,681.05. That is the result of changes made during the buildout phase and additions that SSA wanted to be built out and the space has changes.

Q. Anything else?
A. No.
Q. With respect to the changes --
A. It added a couple handicapped spaces and that's the only other change.
Q. With respect to the changes, those are on the attached -- the second page of Exhibit 11, correct?
A. Yeah, that breaks down how we got to the 98,228 that was added to the tenant improvements at that point.
Q. The construction project didn't begin until after February 28, 2005 approximately, correct?
A. Correct.
Q. And then two months later or a little less than two months later changes were agreed to be made?
A. Yes.
Q. In that two-month period of time, what transpired? Were there meetings, progress report notes? What transpired to lead us to start making changes to the best and final offer that was obviously provided in the Notice to Proceed?

A. There was a meeting, what's known as a preconstruction meeting. I believe the date was March 16th, 2005, where all interested parties basically sit around a table and make sure that the design intent drawings of the government and the wishes of the government match what the lessor needs to buildout, his construction drawings.

The government never approves construction drawings per se but obviously we check them to make sure.

At that meeting it was found out that there were some items that needed to be changed as a matter of course to the shell that weren't addressed to this point. For example, the rear door of the space was not up to the standards of the SFO requirement. So there were items that should have been addressed as part of the shell, and there were new items that SSA requested that were later approved and funded for that were added into the TI amount. Items such as a vestibule at the entry door for the public, a couple extra -- two extra offices for management with walls, not going to the top, not going to the drop ceiling.

I don't know if there's -- SSA took on the

cost of putting in an extra bathroom for the public that was required by the city, apparently, because of the volume of people that were visiting the space. We couldn't get by with the original design to put in one little public bathroom in the public seating area. That had to be added and the trenching to that and the plumbing, et cetera. So there was an expense that was added as part of the TI's for that.

And there was a -- at that point I guess we -- well, bollards out in front to make sure that nobody would mistakenly drive their car through the front window, a separate, small, $4600 for an HVAC stand-alone in the computer room, an HVAC unit to keep that 24/7 constant temperature, a couple outlets here, things like that.

Q. And you're basically referring to the second page of Exhibit 11?

A. Yes.

Q. Who was involved in this meeting on March 16th?

A. Myself, GSA project manager, property managers.

Q. Who is the GSA manager, was that

Dan Fenner?

A. Dan Fenner was there from the field office. My counterpart with SSA regional office, Chris Coleman is her name. I remember her first name now.

Q. Okay.

A. The manager and assistant manager and their computer setup person for SSA. There's various three or four people from the local SSA office there, quite a few. There was George Kashat, his wife, his son. It was done at his offices in Fairfield.

Q. Southfield.

A. Southfield, Michigan. Representatives of Federal Protective Service were there to go over, you know, the security aspects of the project which is a side issue to everything. That's done separately. George Kashat's general contractor, electrician, plumber, several tradesmen there from his end of it. So there were quite a few people involved.

Q. Is this a typical meeting?

A. Yes.

Q. So it didn't surprise you by the number of

people or anything along those lines?

A. No. You know, these typically run anywhere from 5 to 15 people depending upon who wants to put their nose in the door and find out what's going on.

Q. Now, the list of expenses here, the cost, how were those arrived at?

A. After we have a list -- every time we do a preconstruction meeting, the first and foremost thing that happens in that meeting is myself or any other realty specialists makes the point clear that all tenant improvements to be paid by the government from this point forward are considered changes and those changes must be agreed to, not only in theory, but the costs have to be approved or else there's a deficiency. It's called The Anti-Deficiency Act which means any contracting officer that agrees to spending money by the government without it being funded can go to jail basically.

So it's -- that's the first thing that happens during that meeting. Everyone knows who's responsible for making those decisions on what's approved and what's not and what has to take place

before those approvals before additional costs can be done.

During that process we said we need 12 bollards out in front, we need an air-conditioner. Later on George submitted those numbers to me and that's how -- these are his numbers.

Q. And those came to you and you approved those numbers based upon the government's request?

A. Yes.

Q. And those requests came at the -- at that preconstruction meeting?

A. Yes.

Q. After this preconstruction meeting, were there any other meetings that you attended?

A. No.

Q. Did you have any other contact with Mr. Kashat?

A. Various phone calls, I believe. I assume there was some phone calls made.

Q. Any correspondence with him?

A. No.

Q. Any correspondence or any discussions with Mr. Kashat regarding any additional costs or changes that may be made during the construction of

the building?

A. He had -- other than the ones approved on the attachment of SLA No. 2, there were several other items that come up to -- I believe that included these, what was on here, Exhibit No. 12.

Q. Right.

A. That were put in at the same time and those were denied right off the -- so these were originally part of a listing that included the approved and not approved list of improvements.

Q. So the -- really the --

A. I should say funded. Let me correct that. We still needed the work to be done as part of the SFO requirement or whatever. I'm just saying we weren't going to fund them again or pay for them again.

Q. So what we're looking at is Exhibit 12 just so that I'm clear then.

The total cost of items in Exhibit 12 is 165,138.86, correct?

A. That's what it says.

Q. That's what it says. And I know you didn't provide that, but assuming that's the right number.

And then Exhibit 11 provides for 98,228.90, correct?

A. This 165 is in addition to the 98,000.

Q. That's what I was going to ask you.

So after the March 16th meeting Mr. Kashat -- and it was his understanding that based on everything that had to be done to make this space substantially compliant with the SFO, approximately $263,000 more worth of improvements had to be made?

MS. STENTIFORD: I would object to the form of that question. I don't know if he can testify what Mr. Kashat understood. He can testify about the documents.

And you can answer his question.

THE WITNESS: Yes, I assume so.

BY MR. MIZEROWSKI:

Q. I mean, that's what was submitted to you?

A. Of the larger amount, I only approved the $98,000 as being change order items.

Q. And I'm just trying to -- what was submitted to you was a number of change order items which approximated almost $263,000, correct?

A. In his mind they were change order items, but yes, yes. He wanted the government to pay the

total amount. And we agreed to only 98,000 as being those items that weren't already addressed.

Q. So what we're left with then are what I have here in Exhibit 12 is a list of items here and let's just go through them.

The rear entrance door replacement, you had made a statement before that that door was not compliant with the SFO?

A. Correct.

Q. And what portion -- why was that not -- was there a rear door there?

A. It was a rear door, but apparently, it wasn't the type designated in Section 5.10 of the SFO. And that was pointed out at that meeting by Federal Protective Service.

Q. 5.10.

In particular what was wrong with that door; do you know?

A. I don't know if it was the type of door, the thickness of the door, I'm not sure. In essence, it wasn't secure enough. It went to a back alleyway and it wasn't -- maybe it wasn't hinged. I'm not sure. Maybe it wasn't strong enough.

Q. I'm showing you 5.10 from Exhibit 1, which is the SFO, and we're talking about the exterior door. It says, "Exterior doors shall be provided at lessor's expense unless explicitly requested by the government in addition to those provided by the lessor. Exterior doors shall be weather-type and shall open outward. Hinges, pivots, and pins shall be installed in a manner which prevents removal when the door is closed and locked."

What portion of the door that was replaced by Mr. Kashat didn't comply with that?

A. I'm not sure.

Q. The decision was ultimately made that that door didn't meet that criteria?

A. Correct.

Q. But who made that decision that it didn't meet that criteria?

A. Whoever noticed that it didn't. Either it was the field office or it was FPS itself. I don't know.

Q. But you don't know what was wrong with that door, why it didn't meet SFO, the SFO 510?

A. I just assume it had to be replaced because it wasn't strong enough at that point.

Q. Is there anything in the SFO that requires that there be any type of strength or security of the door?
A. 16-gauge hollow steel door.
Q. Other than that, do you know if it was a 16-gauge hollow steel door?
A. The original door?
Q. Yeah.
A. I have no idea. But the lessor was told to make it compliant with the SFO. And that's what he apparently did at a cost of $1200.
Q. Right. And I guess the question that I'm getting at is -- well, strike that.
Next, the ceiling demolition work and installing a new ceiling, and there's $22,000; is that correct?
A. That's correct.
Q. Yesterday you said that the ceiling grid that was there was good and you thought it could be used, correct?
A. If he could use it, he could use it.
Q. And you're aware that six zones were put into the building, six heating and cooling zones with the HVAC?

A. I am not aware that it was six or five or four. I just knew he had to upgrade his HVAC to be compliant with the SFO.

Q. Okay. And nowhere in the bid is there any indication that the HVAC that you said yesterday was not working properly was paid for by the government; that was paid for by Mr. Kashat, correct, as far as you know?

A. We didn't pay for it. Other than the auxiliary special unit for --

Q. Right. It was the $4600 or 4680?

A. Right.

Q. You were aware that this was an open space; is that correct?

A. Yes.

Q. You were aware at the time when the design intent was provided Mr. Kashat -- it would be fair to say that Mr. Kashat had no idea how many offices would be included until he received your design intent, correct?

A. Right.

Q. And then it's my understanding, too, that at the March 16th meeting you added two rooms; is that correct?

A. Those rooms were purposely designed with walls not even going to the ceiling, so he didn't have to worry about venting.

Q. There was the vestibule and then the meeting room and then the work areas, correct? I mean, those were the three big spaces in that building?

A. The public area and the interview area and the employee area, I guess you could say.

Q. Right. Then we got a couple of smaller rooms, bathrooms and that, correct?

A. And those didn't change from the original layout.

Q. I understand. And if those areas had to be vented and duct work had to be changed to put the ventilation in there, isn't that a tenant improvement that is paid for as set forth in Attachment 2?

A. Yes. Any changes based on design changes of the space by the tenant agency is a tenant improvement cost, yes.

Q. Okay. And --

A. To be addressed and agreed to in the -- when we alter it from the original amount -- when

that $19 first changes.

Q. And it talks about repositioning -- strike that.

It talks about supplemental power, cooling, heating, the higher rates. That's that other HVAC that we were talking about, that specific one for the computer room. But if there's any changes or additions to the open plan, lighting, open plan which would include duct work or ceiling diffusers, those would be to accommodate the layout, those would have to be agreed to as well as a tenant improvement, correct?

A. Right. And that was done in the original amount that the Notice to Proceed was given for.

Q. Okay.

A. I assume.

Q. All right. It appears that an additional $15,600 was paid for after the SLA 2 was provided, correct?

A. No. I don't know where that $15,000 came from on this piece of paper. I don't know where the $6,000 came from.

Q. Okay. After the $98,000 was paid or agreed to by the government, was there any

additional changes or change orders that you agreed to to pay Mr. Kashat?

A. No.

Q. Are you certain?

A. Not to my knowledge.

Q. Okay. If there were any additional monies paid to Mr. Kashat, would it have been put into another SLA 3?

A. Yes. Let me say that I believe if there was like an outlet needed for $40, I think the field office, meaning Dan Fenner at the field office, has authority to do that with payment of minimal amounts or something. So I'm not sure if something like that might have happened.

Q. Okay. After they get into a project -- after their preconstruction meeting and they're out there and they're working and they're constructing, you would agree that things come up on construction projects all the time that are unanticipated; you would agree with that?

A. Yes.

Q. If there are unanticipated changes that occur after the preconstruction meeting, do you review those additional changes and potential

expenditures on construction projects?
A. Yes. Those changes have to be agreed to in theory, not only by GSA, but SSA. And SSA had to give a funding document for those changes before they can be approved. And typically, what we do is write a change order. And the contracting officer signs it, sends it to the lessor so he knows he has authority because -- in this case they were under an allowance amount that could be run into the rent for all these tenant improvements. Typically, we're working over an allowance amount that is a lump sum payment for those additional tenant improvements.
Q. And as I understand it, that total amount of the tenant improvements was $417,000?
A. No, actually an amount -- that $19 a foot is an amount less than the actual allowance that SSA is allowed to run into their rent. That amount is just the amount that GSA -- GSA is in the middle. SSA pays GSA. GSA pays the lessor. So that amount of -- there's an allowance amount that GSA allows SSA to run into their rent. Other than that, they have to pay GSA a lump sum payment and in turn GSA pays the lessor a lump sum payment.

Q. Okay.

A. In this particular case it wasn't $19 that was their allowance. It's typically like $40 a foot. But because of the amount of money anticipated to put this place together, $19 was just put in there as half of the allowance.

That just said that if we went over the $19, we could run another 10 or $15 worth of that into the amount of rent, which George agreed to, rather than pay a lump sum payment for anything over that.

Q. Do you know how much more over this -- the total of the $333,612 could be change orders, if you will, and run into the rent for the first two years?

A. 330,000 worth of tenant improvements amounts to $18.64 a foot per year only. So I would have to get a calculator and try to figure it out.

Q. Okay.

A. Was there more money to play with there, it didn't make any difference because -- it's not like you could only go up to a ceiling and stop. It just makes a difference if you could put it in the rent, amortize, or pay a lump sum.

Q. I'm just trying to understand that.
So now these amounts, we're talking about -- we were talking about the reworking of the heating -- the HVAC system, the duct work, that there's an outstanding invoice that was sent to you for $59,363. If that's what the evidence suggests, you have no way to dispute it or agree or deny with that, do you?
A. That's not my number, so I don't know. I can only assume that's what George's contractor told him it's going to cost him.
Q. Do you have any documents or anything that indicate the amount you denied Mr. Kashat additional payment for?
A. Anything I have would amount to the same, 142,926.
Q. Okay. And if you look at this list of items here, do those appear to be the items that you denied payment on?
A. Yes.
Q. And we've talked about -- and that was all based on in your denial letter which is Exhibit 13, correct?
A. Correct.

Q. Now, with respect to the ceiling tiles, okay, $22,000 for demolition and new ceiling tiles were put in there, why was that denied?

A. The SFO is very clear as saying any demolition work in order to put the space into a new clean, vanilla shell space is to be included in the shell rent of the offer and is not a tenant improvement.

Q. There's nothing in here that's a tenant improvement regarding the ceiling tiles?

Aren't upgrading ceiling tiles part of tenant improvements?

A. If they're requested as an upgrade, yeah. The ceiling tile and the ceiling grid and one light fixture per every 80 square feet is considered shell and to be in the original offer of the shell space.

Q. And if the heating and cooling, the HVAC, had to be changed and when the ceiling tiles are removed and cannot be replaced, is there a way for the lessor to make a request to change order to have the ceiling tile be part of the tenant improvement amount?

A. He would have to analyze all that before

he made his initial offer. So he adjusts the shell rent of his initial offer to reflect that anticipated cost.

Q. What about the fact that after a computer -- this additional computer room was added and additional duct work had to be added for that, is that something that should have been calculated back when the tenant improvements occurred?

A. That was a stand-alone item. That was paid for totally in TI's. It had nothing to do with the shell.

Q. What about the other two offices you said that were put in there, I mean, is there --

A. To my knowledge, they were designed so that they didn't even include any duct work to the existing air-conditioning that was cooling and heating the main room.

Q. What about when the ceiling tiles -- strike that.

It says replacement of electrical -- of light fixtures.

Do you know whether or not additional light fixtures were placed into that space?

A. No, I don't. The original shell rent

includes, like I said, 80 -- one fixture for 80 square feet. I think in this case it's 123 light fixtures comes free in our rent. Anything over that is determined when we display the government drawings and say give me the cost for your tenant improvements.

If at that point his construction drawings show that we needed 124 light fixtures to get to our required 50 foot candles on each desk in that area, then he would have a legitimate argument to charge us for one extra light fixture. And I assume that was done in the process where we paid the additional tenant improvements over that 19,000.

Q. With respect to the SLA 2 where you added -- where we've got a second public restroom, we have an -- we have the two offices. In those areas is there any indication that the electrical was included or additional lighting was included for those areas?

A. It was -- because that was George's number, to me I assume that was all furnished and -- yeah.

Q. Let me ask you this, what happens if I

make a mistake when I give you these numbers, okay, if I give you a number to put a room to add the -- add a public bathroom, okay, and I tell you how much to put the public bathroom in but I forgot to add into that price the electrical, the electrician comes in and puts a light in there, okay, how do I get paid to do that?

A. My argument would be a bathroom should have a light in it. I'm not going to consider an extra cost for installing a light that should have been there in the first place.

You're talking about a legitimate reason. It can always be considered I guess. But typically, you know, we have to assume that you can't just keep adding things after the fact. Once you agree on a number, you know, you say how much will it be to provide this item and you have to assume that item not only has all the components of the item but his costs in overhead that produce it and his cost included in any construction drawings he may have, if he needs it for the city, whatever. We ask for a total cost to produce an item.

Q. What about the fire alarm system, do you know if wiring was provided to the core of the

building?

A. I don't know.

Q. You don't know if there was any wiring provided from the core of the building into the tenant space?

A. I don't know.

Q. If there was wiring that had to be provided from the core into the tenant space, would that be an acceptable tenant improvement cost?

A. No. I believe the SFO says that the space has to be alarmed to the fire department.

All we're worried about is that the fire alarms exist and they're per local codes or national codes, whatever is more stringent.

Q. In Attachment No. 2 it says, Fire alarm wiring from building core to tenant space and then within tenant, full station strokes, annunciators, and exit signage within the demised premises.

So the wiring from the building core into the tenant space is something that would be paid as a tenant improvement by GSA?

A. According to that, yes.

Q. And according to the SFO?

A. Well, the SFO says it has to be there. It

doesn't say how it has to be there. I think the SFO, if you want to read -- I think it's on here, 8.4.

Section 8.4 of the SFO says, fire alarm systems shall be provided in accordance with the requirements of the NFPA standard, NFPA standard No. 72, current as of the date of this SFO or to be in compliance with the local building and fire codes, the local ordinances adopted by the jurisdiction in which the offered space is located.

In other words, if a local ordinance is more stringent than the national ordinance fire standards, then the lessor is required to do whatever it is per code.

The fire alarm shall be maintained by the lessor in accordance with the national standard. The fire alarm system wiring and equipment must be electrically supervised and automatically notify the local fire department or provide central or approved central station. Emergency power must be provided in accordance with standard 70 and 72 for backup power in case of outages I guess that means.

Q. Okay.

A. So if there's an exit sign that needs to

be put in because we put up a hallway, yes, that's an extra cost.

Q. Okay.

A. And that would have been included in his bid when we gave him the design intent drawings to say tell me how much it's going to cost to put this space together like this.

Q. Any indication that there was no fire alarm system in place that satisfied the SFO into that space?

A. To my knowledge, it was a national code, so the previous tenant would have had the fire alarm system set up before me.

Q. And then do you know why -- I guess it says in your denial letter, Exhibit 13, it says fire alarm requirements as stated in SFO 8.4. What --

A. It basically says the fire alarm should be there. It should exist.

Q. And if there was additional wiring that had to be done over and above what was already there, additional signages for exits or whatever, that would be properly a tenant improvement and paid for by the GSA?

A. Yes.
Q. If that number was not initially included in the tenant improvements, can he come back as the building is going on and submit that for approval?
A. How would I know it's not in his original bid for tenant improvement? I have to assume I know what makes up his original 170,000 or whatever it was.
Q. Do you know if this was in there or not?
A. No.
Q. Before you sent out this denial letter and you denied these certain items here like the door, like the fire alarm system, like the duct work, did you see whether or not or compared whether or not in his original bid those items were listed in there or not?
A. I don't think he gave me -- he did not provide his tenant improvements in a CSI format where it broke down in detail every tenant improvement he was installing. I was looking basically at total numbers.
Q. Did you ask him for a CSI breakdown?
A. Yes. It asked for that in the solicitation.

Q. Did you ask him for it?
A. I believe we asked him for it, yes.
Q. Did you ask him personally?
A. No.
Q. You didn't ask him to break down all the numbers that you were looking at, the total numbers in the CSI format as requested by the SFO?
A. It was requested by the SFO. I did not ask him again, no.
Q. Okay.
A. But what I got from him I thought was good enough to approve because the total numbers came out fine.
Q. Okay. That being said, you have no way to know, as you sit here today, whether or not the fire alarm system, whatever may be entailed in this fire alarm system notice, was ever included in the TI, the initial TI, or in the SLA 2?
A. If he missed it, I wouldn't have known it, yes.
Q. Okay. If he missed it and it was not there, that is something that GSA would pay for according to the SFO?
A. He should -- theoretically, he should have

called and clarified on whether or not -- if he missed it, he missed it. There would have to be a lot of discussion on whether or not there would be any kind of an additional cost.

Typically, my answer to that, my default answer to that would be if he missed it, he missed it, he's not getting paid for it.

Q. Is that the same thing with reconstructing the duct work?

A. If he had duct work that he had to add due to the design intent drawing, I'm assuming it's in the amount of tenant improvements he gave me for approval in the first place which I did.

Q. Do you know --

A. I have to assume that he and his contractors are producing the space that we're asking for.

Q. I understand.

But after your meeting, this March 16th meeting, there were several areas added, correct?

A. Areas within, yes.

Q. Areas within.

And whether or not it needed additional duct work added, do you have any idea whether or

not it needed -- the duct work needed to be changed?

A. I don't know. Like I said, the only two things that were added were two interior rooms that did not need duct work, as far as I would know, and a vestibule. And if there was duct work needed there, I have to assume that the heat, vent, or whatever that he had to put in that vestibule was included in the cost to produce the vestibule.

Q. I guess then what we're talking about here is you got a vestibule of $21,000?

A. Um-hmm.

Q. Then we have a separate cost for duct work, okay. I guess I'm trying to figure out if he is trying to break it down and whether or not it doesn't appear at all in the vestibule or in the -- this separate -- these other offices that that duct work is broken down, that it's a separate line item.

A. It is my assumption that the duct work that he refers to on Exhibit 12 was duct work that had to do with the mechanical system that should have -- that was covered by the original requirement of the SFO. He changed

air-conditioning units on the roof that needed different duct work, and I'm assuming that's what that duct work entailed.

Q. Did you have any specific conversation with Mr. Kashat about that?

A. No. Because, again, it's a performance lease. And the only thing I had ever told him was each part of that office had to maintain a temperature control, you know, a range of comfortable office temperature.

Q. Now, if there is -- are there changes to the HVAC area, that would be -- or the HVAC network -- that is a tenant improvement cost; is that correct?

A. Yes.

Q. And if he had to change the duct work -- let's back up.

The duct work was there, we know that, right?

A. I assume so.

Q. Well, I mean, when you went and looked at the space --

A. It was behind a false ceiling.

Q. I mean, let's assume that it was there. I

mean, this isn't brand new stuff he's putting in. This had been a retail space; the duct work had been there.

A. I understand he had an upgraded office space for the retail space.

Q. I don't think anyone is disagreeing with that.

Now, once it gets upgraded, if you will, by putting in a new HVAC unit and if there is duct work that has to be done to branch from a main duct from a big open area to the smaller rooms, that is an amount that would be part of the tenant improvements; is that correct?

A. Yes.

Q. All right. And you don't know as today, as we're sitting here, whether or not the amount that we have here on Exhibit 12 that relates to duct work is an amount that was not initially included on the first TI or in the SLA 2?

A. I can only assume it's in the amount of his original TI bid.

Q. Do --

A. If -- okay. In this particular instance that extra duct work to a mechanical system for a

space shouldn't be any more than 5 percent of the mechanicals to heat and air space.

In this case, because we've used the existing office, demising walls, interior walls even, the only thing we built was one right down the middle. So there may have been a small duct work branch needed on either side of a wall maybe. I don't know. But it wasn't anticipated that any changes in duct work were going to be substantial for this -- it's still an open floor plan basically.

Q. In the construction -- at the preconstruction meeting, you would have examined the construction documents that Mr. Kashat produced, correct, or had someone produce for him?

A. To be honest, I don't know if he gave me one.

Q. Did you ask for one?

A. We asked for one. We don't always get them.

Q. Okay. Do you know if you got it in this case?

A. I'm not -- I don't think I did.

Q. Okay. So do you have any -- you have no

idea what the duct work then entailed?

A. No.

Q. If there were six zones, six heating and cooling zones put into this unit and the duct work was changed for that so that you had six zones; is that a tenant improvement cost that would be paid by GSA?

A. Not if it requires -- not if he's putting in six zones to fulfill the original requirement of the SFO, no.

Q. I understand.

But if he is putting in those six zones based upon the design intent drawings you provided him and then his construction diagram for the heating and cooling of this space needed six zones, that was a tenant improvement that would be paid by the GSA?

A. I'm not a heating and air-conditioning guy. I don't know what six zones means. I don't know if he had six zones to begin with. I don't know if he had two.

Q. Okay.

A. Six zones means nothing to me other than the fact he had to obviously -- somebody sold him a

six-zone unit to do the basic requirement of the SFO.

Q. Okay.

A. The only tenant improvement are changes based on the design intent drawing.

Q. If based upon the design intent drawing duct work had to be modified and changed, that would be a GSA tenant improvement that they would pay?

A. Yes. At this point I can only assume that that was included in his original TI bid.

Q. But you don't know for certain whether it is or not?

A. No.

Q. Okay. We've talked about that smaller HVAC unit had to be installed for the computer room, correct?

A. Yes.

Q. And there was -- again, you're assuming --

MR. NOTIGAN: Can we go off the record?

MR. MIZEROWSKI: Sure.

(Discussion off the record.)

BY MR. MIZEROWSKI:

Q. We were talking about that HVAC unit that

had to be added. That HVAC unit was added to the roof, to the best of your knowledge?

A. Sometimes they're roof units; sometimes they're vented out to another space; sometimes they're in the wall.

Q. In this case you have no idea?

A. No.

Q. Do you have any idea as to whether or not the cost approved here of this $4600 related to just the cost of the unit, the cost of the wiring of the unit, the cost of the duct work was included in this amount; do you have any idea?

A. It was the cost to furnish and install. That's the language we always use to ask for things. So I assume that's a full-encompassing amount that he gave me to produce that.

Q. Okay. It's my understanding that these costs in Exhibit 12 -- pardon me -- Exhibit 11 which is the SLA 2 were provided to you at the same time that the costs that we're looking at on Exhibit 12 were provided to you; is that correct?

A. Yes.

Q. And there's a separate line item here that talks about roofing new electrical to HVAC unit at

front of building which is a $7800 item, okay.
Are you telling me then what the numbers should have been given to you, when it says HVAC for computer room, that if Mr. Kashat would have simply put in the number -- added these two numbers together, the $7800 and the $4600 number, that would have been approved because that would have been a complete HVAC system?
A. No, I have no idea that this $7800 is in regard to the separate unit or to his new rooftop unit.
Q. Did you ask Mr. Kashat to clarify that?
A. It says roofing for -- in the front of the building. The computer room is in the back of the building.
Q. Roofing, new electrical to HVAC unit at front of building.
Do you know where the new HVAC unit was installed in this building?
A. His new six-unit one, no.
Q. No, I'm talking about the one for the computer room. Do you have any idea where that HVAC unit was installed?
A. No. Typically, they're in proximity to

the room.

Q. I understand that.

My point is this, did you question Mr. Kashat as to whether or not this expense related to the new HVAC unit or not?

A. No. I assumed it was part of the mechanicals for the other HVAC.

Q. If it related to the new HVAC unit for the computer room, is that a cost that should be paid properly by the GSA?

A. My answer at this point is, it should have been included in the number we agreed to.

Q. So if he would have simply included -- added these two numbers together, this $7800 number and this $4600 number as they all related to the new HVAC unit, that's what would have been paid by the GSA?

A. If it was a legitimate cost for that separate unit, yes.

Q. Okay. And you haven't questioned Mr. Kashat about that?

A. No.

Q. There's an amount here, extra work requested by inspector Dan Fenner, the $10,000

number; do you know what that relates to at all?
A. No.
Q. Okay. I can ask Dan.
There are two other numbers in here. There's additional work for city requirement as a result of changes requested by GSA of $18,000; do you know what that relates to?
A. I believe the city had him do something with demising walls, separating tenants, fire codes between tenant space. Maybe that had something to do with that, I don't know.
Q. Did you ask Mr. Kashat what that number related to?
A. No, because anything that he has to do regarding codes and city and getting permits, the SFO is clear in saying that's not a tenant improvement.
Q. Okay. I understand that.
I guess my question though is if it was a city requirement that work that was performed that's a tenant expense for the GSA had to be somehow changed or modified to comply with the city ordinance, is that something that would properly be paid by the GSA?

A. I don't understand the question. If it's a city ordinance, it wouldn't be paid by the GSA.
Q. Okay. But you don't -- we don't know, as we're sitting here today, what that relates to, whether or not it's some type of city ordinance or really what that number relates to?
A. Right.
Q. Did you ask Mr. Kashat about that?
A. No.
Q. Okay. Did he submit any documentation to support that --
A. No.
Q. -- total amount?
Can he submit any documentation tomorrow that the GSA would consider regarding the payment of that?
A. We can take it under review certainly at any time there's hardship cause for anything.
Q. Okay. Last thing here is the city -- well, you said hardship cause. Is that contained in the SFO?
A. I'm not sure. It comes up every once in a while with spiraling utility rates for people, things like that. I know there's a clause where

something can be reviewed. The government is not as crass as you think. The chances of getting it approved are one in a thousand, but, you know, we're open to suggestion and we will review any legitimate cases, I guess.

Q. With respect to the city requirement of additional drawings due to the changes by the GSA, it appears -- do you know if after the meeting of March 16th additional drawings were required?

A. I believe so, yes.

Q. Okay.

A. In fact, I know there was a couple different revisions of drawings done by his architect people in the city back and forth. I don't know what they pertain to exactly. But I know he had a hard time getting permitting from the city based on drawing.

Q. The drawings, as I understand it, are part of the SFO, that's a number that should be included in the total amount, correct, the bid that's provided by Mr. Kashat?

A. Actually, just -- yes. Yes, in the overall TI bid?

Q. In the overall TI bid. I mean, there's

not a separate line item. There's nothing that -- well, strike that.

Do you know whether or not you paid for any additional drawings that were done?

A. Only if a certain percentage of this $98,000 additional funding included an allocation for contingency.

Q. Okay. Again --

A. There is a 10 percent administrative cost included in there for things like that. I don't know.

Q. Okay. And I guess that goes back to all -- both of these lists were provided to you at the same time it was requested, and these drawings apparently, you denied, denied any payment for the drawings.

A. Typically, we deny any cost to produce construction drawings as a standard procedure for SFO requirements.

Q. Did you talk to Mr. Kashat about it in regards to whether or not he simply listed it as a line item?

A. I can't recall. I don't know.

Q. Again, what I'm getting it is if he would

have added these construction drawings to his overall administration and made that number, you know, $28,000 which would have included the drawings, the GSA may have simply paid that as a cost?

A. Ten percent administration fee is kind of typical.

Q. I understand.

A. 30 percent wouldn't be, no.

Q. Well, I guess my question though is that if there are, as a result of this preconstruction meeting, additional construction diagram documents that needed to be paid for, should that be listed as a separate line item or should that be included as an administrative fee?

A. It was my understanding that he had to do drawings whether or not there were changes at that point or not. I don't think he did construction drawings up to that point.

So whatever changes were made were included in his first draft or whatever before he even went to the city.

Q. If after this meeting of March 16th new construction documents had to be produced because

of the changes that were requested and he had to go to the city with those new documents, those construction documents would have been a tenant improvement cost that would have been properly payable by the GSA?

A. Only if the drawings were specifically related to the change based on a change order item, yes.

Q. And in this case, you don't know what this $19,000 in additional changes related to?

A. As far as I know, the changes in drawings had to do with the culmination of all kinds of things that had to do with code items, what the city inspector wanted, not GSA.

Q. Do you know who the city inspector was?

A. No.

Q. All of the work that we have here in Exhibit 12 and I'm going to list it off, the rear entrance door, that was completed, a new door put on?

A. To my knowledge.

Q. To your knowledge.

The ceiling demolition work and the new ceiling was installed, that was also done?

A. To my knowledge.
Q. Is the cost -- the $1200 cost for this rear entrance door, is that a reasonable amount?
A. The hardware for that door is a tenant improvement that has been paid for separately. So we're talking specifically about the door per se. A metal door, it sounds legitimate.
Q. What about the ceiling demolition work, is that a reasonable cost?
A. I would not know.
Q. Do you know as to whether or not the electrical light fixtures were replaced?
A. I don't know.
Q. There's lighting in the building?
A. Yes.
Q. In the facility?
A. Yes.
Q. And there's no lighting issues; I mean, it complies with the SFO?
A. I haven't heard any complaints about lighting, no. The field office might have some information on that.
Q. You don't know anything about the duct work, whether or not it was changed or modified in

any way?

A. No.

Q. Do you know if this number to change the duct work is a reasonable amount?

A. I wouldn't know.

Q. Fire alarm system, again, is that a reasonable cost or expense for the wiring of the fire alarm system from the core of the building into the tenant premises?

A. I wouldn't know what's involved with that, so...

Q. The HVAC roofing, electrical, and the repair of the roof, do you have any idea whether or not that's a reasonable cost?

A. I wouldn't know.

Q. You're aware that there is a separate HVAC unit in the building for the computer room?

A. Yes.

Q. Did you ever issue a notice to Mr. Kashat not to proceed any further with any items that he was contemplating?

A. No.

Q. Okay. And do you recall when you received this list of change items with the costs?

A. No, not specifically, but I imagine it would be shortly prior to the SLA No. 2 being written.
Q. And it's dated April 20th, 2005?
A. Right.
Q. Although you were aware that all of this work was being performed, the ceiling demolition, the replacement of the light fixtures, the roofing, the duct work was all being performed sometime around April 20th or prior to April 20th of 2005, you ultimately sent your denial letter of these items on October 13th, 2005?
A. Correct, after the claim.
Q. And you never prior to -- strike that.
Well, wasn't the claim really made or wasn't the request made for these tenant improvements back before April 20th of 2005?
A. No.
Q. Well, didn't he detail out the cost of all of the tenant improvements?
A. The list that was on his 12 plus this, yes.
Q. Okay. So at this time, April 20th, is when you just approved the $98,000, correct?

A. Right.
Q. And then the other $142,000, you in essence didn't approve?
A. Right.
Q. But you didn't sent out a notice not to proceed to him with all this other work, correct?
A. That's correct. Because those other items still needed to be done to -- the work still needed to be done according to the SFO.
Q. Okay.
A. He couldn't opt not to do that list of things. It's just that I wasn't going to pay him extra.
Q. Some of the stuff had already been -- in your opinion, should have been part of the base building, correct?
A. Yes.
Q. Some of the stuff that was listed you believed had already been listed in the TI improvements?
A. Or should have been, yes.
Q. But you have no way to verify whether or not that is correct?
A. That is correct.

Q. Who made the decision to send out this October 13th letter?
A. It's my letter.
Q. I understand.
Did you have any consultations with anyone regarding this letter?
A. It's a government policy to answer -- the contracting officer has to within 60 days, I believe it is, to make sure they answer any claim in writing.
Q. And when was Mr. Kashat's claim; was it September 15?
A. September 15.
Q. Of 2005?
A. Yes.
Q. And did you discuss with anyone this October 13th, 2005 letter?
A. Yes.
Q. Who did you discuss it with?
A. Regional counsel GSA.
Q. Who was that?
A. I believe it would have been Carl Smith.
Q. Is he in this office?
A. He's in the building here, yes.

Q. Who else?
A. And Paul Schmitt.
Q. And he's your supervisor?
A. Yes.
Q. How many meetings did you have with Mr. Schmitt regarding this premises?
A. I don't recall.
Q. Was it constant; was it once a week?
A. There's nothing formally set up at any time. He's got an open-door policy, go in and out.
Q. Anybody else you discussed the denial with?
A. No.
Q. Did you talk to Dan Fenner about it?
A. I think he's aware there was a claim but not detail-wise.
Q. Was it ultimately your decision to submit the denial letter?
A. Yes. As contracting officer, that's my responsibility.
Q. Did you receive progress reports from Dan Fenner?
A. Phone reports. I believe he called in every once in a while when he visited the site.

Q. Do you recall how many times he phoned in his progress reports?

A. No.

Q. Does FSO require that there be progress reports every 21 days?

A. It probably says that in there, yes, from the lessor.

Q. What about construction inspections?

A. Done by our field office, not any particular schedule.

Q. And is that a formal written document?

A. No.

Q. Did Dan Fenner tell you about any problems during construction?

A. I can't recall specifics but he always seemed to have -- whenever he went out there, he would have problems with the general contractor on site or the -- as far as what was being done and what wasn't being done according to SFO requirements.

Q. Did you get involved in that or was that just something that Dan took care of?

A. I think Dan took care of most of it and corrections were made without me getting involved.

There was no documentation to it because items weren't that major.

Q. The issues that Dan may have been having with construction had nothing -- had no bearing on your decision to deny the additional claim here?

A. No, that's -- no.

MR. MIZEROWSKI: I don't have any other questions.

MS. STENTIFORD: I have a couple.

EXAMINATION

BY MS. STENTIFORD:

Q. You stated a few times that this was a performance lease?

A. Yes.

Q. What does that mean?

A. Performance lease means that instead of giving very detailed specifications, as far as technical specifications, that it just gives things like the space should be normal office climate requirement between 68 and 75 degrees. You know, it basically -- it doesn't go in to say what kind of air-conditioner is going to produce that range. It just says that's the range we want. Again, we -- it calls for foot candles of so much during the

work space. It doesn't say what kind of light fixture it is that's going to produce that. So basically, all we're looking for is a result. If we don't get the result, that we can measure, then we can later on go and try to correct something.

Q. So when you receive bids on -- solicitation for offers for a performance lease, does it matter to you as a matter of contracting how any particular offer intends to meet the performance requirements set out in the solicitation for offers?

A. No. Obviously -- no.

Q. You were asked a series of questions about this six-zone heating and ventilation air-conditioning system, is that -- and I believe you stated in your direct testimony that you didn't know what Mr. Kashat intended to use or whether he used six zones or something else; is that what you stated?

A. Right.

Q. Because it's a performance lease, you don't have to know; am I correct?

A. Right.

Q. I'm going to show you Exhibit No. 1 which

is a solicitation for offer and page 6 of Exhibit 1, Section 1.9 talks about the rental rate determination; do you see that?

A. Yes.

Q. And Subsection A and Subsection B give the requirement, these are the performance requirements that you were referring to, is that correct, for the shell of the building?

A. Yes.

Q. And so anything over and above what's set out in Subsections A and B in Section 1.9 of the lease would constitute tenant improvements; is that correct?

A. The tenant improvements are adjusted to real numbers, yes.

Q. The only other thing, at the bottom of each page of this Exhibit No. 1 we have the initials G.K.; am I correct it's on every page?

A. They're on every page.

Q. It's confusing here because your initials are G.K. and --

A. I noticed that.

MR. MIZEROWSKI: So did I.

BY MS. STENTIFORD:

Q. Whose initials are those?
A. Those are George Kashat's initials.
Q. And what is the significance of his initials appearing on each page of Exhibit 1?
A. I can only assume that means he read every page.
MS. STENTIFORD: I have no other questions.
MR. MIZEROWSKI: I have no other questions. Thank you.
(Off the record at 10:23 a.m.)
FURTHER DEPONENT SAITH NAUGHT

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, ANNA MARIA CASTLE, C.S.R. and Notary Public within and for the County of Will and State of Illinois, do hereby certify that heretofore, to-wit, on the 26th day of July, 2007, personally appeared before me, at 230 South Dearborn Street, Room 3622, Chicago, Illinois, GERALD KOSMAN, in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein HALLWOOD PLAZA, INC., is the Plaintiff, and THE UNITED STATES is the Defendant.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for

the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 13th day of August, 2007.

[signature]

CSR, NOTARY PUBLIC, WILL COUNTY, ILLINOIS