*EXHIBIT V*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

HALLWOOD PLAZA, INC., )
)
Plaintiff, )
)
vs. ) No. 06-589-C
)
THE UNITED STATES, )
)
Defendant. )

The deposition of DAN FENNER called for examination pursuant to Notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Anna Maria Castle, a Notary Public within and for the County of Will and State of Illinois, at 230 South Dearborn Street, Room 3570, Chicago, Illinois, on the 26th day of July, 2007, at the hour of 11:09 a.m.

REPORTED BY: ANNA MARIA CASTLE, CSR

LICENSE NO.: 084-004148

APPEARANCES:

MIZEROWSKI & ASSOCIATES, P.C.,
BY: MR. TIMOTHY W. MIZEROWSKI
131 Ferland Street
Walled Lake, Michigan 48390
(248) 926-9205
Representing the Plaintiff;

U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION,
BY: JOAN M. STENTIFORD
1100 L. Street, Room 12038
Washington, D.C. 20530
(202) 616-0341
Representing the Defendant;

MR. ROBERT M. NOTIGAN
ASSISTANT GENERAL COUNSEL
GSA OFFICE OF GENERAL COUNSEL
U.S. GENERAL SERVICE ADMINISTRATION
1800 F. Street, N.W., Room 4B1
Washington, D.C. 20405
(202) 501-0500
Representing GSA.

# I N D E X


| WITNESS | EXAMINATION |
|---|---|
| DAN FENNER | |
| By Mr. Mizerowski | 4 |


# E X H I B I T S

| NUMBER | MARKED FOR ID |
|---|---|

NO EXHIBITS MARKED

(Witness sworn.)

DAN FENNER,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

MR. MIZEROWSKI: The record should reflect that this is the deposition of Dan Fenner taken pursuant to Notice, used for all purposes under the Federal Court of Claims Rules.

EXAMINATION

BY MR. MIZEROWSKI:

Q. Mr. Fenner, my name is Tim Mizerowski. I'm going to be taking your deposition this afternoon -- or this late morning, early afternoon.

Have you ever had your deposition taken before?

A. No, I have not.

Q. What I'm going to be doing is simply asking you a series of questions. Your job is to answer the best of your knowledge from your personal knowledge. Don't guess or speculate but just based on your personal knowledge, okay?

A. Okay.

Q. Make sure that all of your answers are verbal, oral, out loud. Try not to say "uh-huh,"

"uh-uh," shake your head, because everything you and I say is being transcribed by the court reporter, all right?

A. Okay.

Q. If at any time point in time you don't understand a question I ask, ask me to repeat it or rephrase it. Tell me you don't understand the question, and I will try the best I can to provide you with a question that you do understand, all right?

A. All right.

Q. My job is not here to try to trick you or trip you up or anything like that. I'm just trying to get information out of you, okay?

A. Okay.

Q. Give us your name, please.

A. Dan Fenner.

Q. And by whom are you employed?

A. General Services Administration.

Q. How long have you been employed by the GSA?

A. Since October -- or August 14th, 1989.

Q. Prior to that where were you employed?

A. I just did odd jobs while I was going to

school.

Q. Give me your educational background.

A. I have a bachelor's in business administration degree.

Q. From where?

A. Grand Valley State University.

Q. What year did you graduate?

A. 1988.

Q. What's your job duty with the GSA?

A. I'm assistant property manager.

Q. And how long have you been an assistant property manager?

A. Sorry. I'm thinking. 15, 16 years.

Q. Okay. As an assistant property manager, what does that entail?

A. There's two large facets to it. I'm responsible for all the day-to-day operations of the federally owned facilities that are under my jurisdiction. And by that I mean cleaning, heating, cooling, remodeling, anything along the lines within the federally owned space. The other major part is dealing with leases. I oversee buildouts, and I kind of manage the leases that GSA has. And I have approximately 65 of those.

Q. 65 leases?
A. Yes.
Q. What's your territory?
A. My geographic territory is I guess -- I'm trying to think of the best way to phrase this. In Michigan, the entire upper peninsula, probably the northern two thirds of the lower peninsula.
Q. So not southeastern Michigan?
A. No, and not Battle Creek area. I handle from Ludington, Big Rapids to Warsaw, Flint, and everything north of that.
Q. Okay. You work out of the field office in where?
A. Grand Rapids.
Q. At the field office in Grand Rapids --
A. Technically, it's not a field office.
Q. What is it called?
A. It's the Grand Rapids team of the Michigan Service Center. That's the technical issue that people have asked us.
Q. At your office?
A. Okay.
Q. Do you have a file, a separate file, on the lease projects that you manage?

A. Yes.
Q. How is that file identified or labeled?
A. It has -- generally speaking, it would have the name of the city, the name of the agency, the lease number, the building number, usually a landlord's contact, and then a tenant agency contact.
Q. As I understand it, in talking with Mr. Kosman, the solicitation for offer has a number. It's a GS number?
A. That's correct.
Q. Can we also find your file by using that same number?
A. Yes, but it's filed geographically by city. Then with each city they're all labeled on the outside.
Q. All right. With respect to this property, let's focus in on this property which is in Flint, Michigan. It's the Social Security Administration office in Flint, Michigan; are you familiar with it?
A. Yes.
Q. You were the assistant property manager who oversaw the buildout of that property?

A. That is correct.
Q. Do you have a file at your office for that project?
A. Yes.
Q. If I were to make a request of your attorney to get me that file, would you be able to find it and get it to your attorney?
A. Yes.
MR. MIZEROWSKI: Oh, you have it already.
MS. STENTIFORD: (Nodding head.)
BY MR. MIZEROWSKI:
Q. Okay. What does your file generally contain? It doesn't look like it's the lease or any of the attachments or the SFO for that matter.
A. Generally, my file is a working file. It's not the official lease file. I would have a copy of the lease, generally, and any subsequent modifications to the lease that I received copies of.
Q. Would that be the SLA's?
A. Yes, if I received copies of those. Sometimes I do; sometimes I don't.
Q. Okay.
A. And any notes I would take, any letters I

would write to the landlord. Those kind of items, perhaps some photographs, some drawings. That's generally what's in the lease file. That's kind of what's in this one. I can't tell you exactly everything that's in there but generally speaking.

Q. When did you first have contact regarding this property?

A. I would say I first looked at the property -- I believe it was August of '04.

Q. So you looked at the property prior to -- strike that.

Why were you looking at the property?

A. Because our need of space because our old building burned down.

Q. How did you come across this premises, this space?

A. The first time I looked at it we were driving around after the fire literally looking at what our options were in the general area.

Q. You ended up going and looking at this space?

A. We drove by this space and looked at it and said there's an empty store front.

Q. Have you had contact with the landlord --

A. Yes.
Q. -- George Kashat?
A. Yes.
Q. When was the first contact you had with him; do you recall?
A. I -- no, I don't. I mean, I can guess but I can't recall.
Q. Okay. The solicitation for offers is dated -- it's Kosman Exhibit 1 -- it's dated October 13th of '04?
A. Um-hmm.
Q. Do you recall, other than your drive-by, looking at that, physically going through that space, prior to this date?
A. No, it would have been after that date.
Q. It would have been after that date.
Did you have any participation in accepting the offer on this solicitation for offer?
A. No.
Q. The next time you had contact with this space was when?
A. I can't remember specifically, but generally speaking, that's when we would do a preconstruction meeting.

Q. So if the Notice to Proceed is dated February 28, 2005, you wouldn't have had any contact with this space prior to the Notice to Proceed?
A. No.
Q. No contact with the landlord prior to that?
A. No, not generally. Again, I can't answer specifically.
Q. The preconstruction meeting, as I understand it, was on March 16, 2005; does that sound right?
A. Sometime in the spring of '05 I'm guessing, yes.
Q. That would have been the first contact you would have had then with this space?
A. Probably.
Q. Other than when you drove by and saw it?
A. Yes.
Q. Did you ever look at any of the design-intent drawings?
A. Did I ever look at them? Yes, I did look at them.
Q. When?

A. I don't recall.
Q. Before or after this construction meeting?
A. Probably at that construction meeting or afterwards.
Q. Did you look at any construction drawings?
A. Yes.
Q. Do you recall when you looked at those construction drawings?
A. No.
Q. Is it likely at that preconstruction meeting?
A. Very unlikely. Because he probably would not have had those completed at that preconstruction meeting.
Q. Ultimately though there were construction documents completed?
A. Yes, by the landlord.
Q. Did you get a copy of those?
A. Yes.
Q. Are those in your file?
A. Yes, such as I have them.
Q. Okay. What was your involvement at the preconstruction meeting? What did you do?
A. Going from memory?

Q. Yeah.
A. I probably met the landlord, if he had his general there, I don't recall whether he did or not, we would have went over the basic project parameters. We would have went over what do we actually need to do in this space to make it fit for the agency. We would have basically went over the ground rules for how we're supposed to build it out, items like that.
Q. Do you recall items that had to be changed or modified different than what the SFO requirements would have been?
A. I don't recall.
Q. Did you ever receive a list from Mr. Kashat regarding the change items that came out of that meeting?
A. I don't know. Because I don't know if they came out of that meeting or not.
Q. Did you get a list of items ultimately that had to be -- that were being changed or modified?
A. I don't know if it was a complete list but I did get a list.
Q. Who did you get the list from?

A. Mr. Kashat sent me something in the fall I think of '05.

Q. Do you recall seeing the SLA 2 which we've marked as Kosman Exhibit 11?

A. I don't recall seeing it. I'm sure I did, but I don't recall seeing it.

Q. You know what this document is?

A. Oh, yes, absolutely.

Q. And there's a list on the second page of items that were to be modified or changed from the original TI or the tenant improvement initial list.

A. Okay.

Q. And that's what Mr. Kosman has testified to.

A. Okay.

Q. My question is this, did you participate in creating this list of items?

A. I do not believe so. Again, I'm going by memory here.

Q. Would you ever participate in creating a list of change items?

A. That could happen.

Q. But in this case you don't know whether you did one way or the other?

A. I don't believe so but I don't know.
Q. How often were you out at this construction site?
A. Probably every couple weeks in the beginning, and it probably was every week towards the end.
Q. Did you provide any progress reports?
A. No, I did not.
Q. No written progress reports?
A. I just made a few notes to myself once in a while where they're at.
Q. Did you call Mr. Kosman at all?
A. Probably.
Q. Do you know specifically if you did?
A. No, I don't.
Q. Can you tell me about this project, I mean, the first time you went out there. I guess I'm trying to get a sense of what was going on out there.
A. I can't specifically give you any like the first time I went out there this is what I saw. I just don't have that.
In general, we generally look at projects from the beginning, not so much in the beginning

because they're starting to get stuff worked out. We kind of inspect and make sure they're on the right path, if they have any questions about, well, what do you guys mean by this. And if it's something simple, I could answer. If it's something more major, it would have to go back to the contracting officer.

In this particular one I know we had some issues going through the process. There were some things that just wasn't acceptable. I do know that when we came to do the file acceptance, we rejected it because he had a laundry list of items that needed to be corrected.

Q. Do you have a list of what those items?
A. I do. I don't have it with me but I do.
Q. Is it contained in your file?
A. Yes.
Q. Can you tell me what those are?
A. Specifically, no. Generally, yes.
Q. Did you bring your file with you today?
A. I do not have it with me today.
Q. Tell me generally what the items were.
A. Generally, they had to do with finishes. Paints were poor condition. I believe there was

some issues with some of the plumbing in the restrooms. They had -- there was no place for them to -- at some point there was no place for them to do cleaning. They had no janitorial area whatsoever within their space so they can do cleaning, no place to get water, no place to store janitorial supplies.

Q. That's supposed to be in the space?

A. Well, they have to provide that, according to the terms of the lease. They had nothing in there whatsoever. And I asked him how he was going to do that and he had no answer.

There was -- I'm thinking that there were some concerns with the ceiling tiles being discolored. Again, without my list I can't tell you specifically. Those are generally the type of items.

Q. Did you talk to him about a rear door that had to be replaced?

A. I believe I probably did.

Q. Do you recall why?

A. The rear door was in really bad shape.

Q. When you say "really bad shape," what was wrong with it?

A. If my memory serves me correct, it was rusted out along the bottom, and I believe it was actually pealing out slightly.

Q. Was that door replaced?

A. I believe it was.

Q. What about the ceiling tiles, you said that some of them were discolored?

A. Um-hmm.

Q. Yes?

A. Yes. Oh, I'm sorry, yes.

Q. No, that's all right.

Were there any other items regarding the ceiling tiling that you can recall?

A. I don't recall.

Q. Were those ceiling tiles replaced?

A. I don't recall.

Q. There's an issue as to whether or not the ceiling needed to be demolished and new ceiling tiles and grids put up. Do you know whether or not that occurred?

A. I do not believe it was. I do not believe they replaced the entire grid.

Q. Did they replace part of it?

A. They may have. I don't know.

Q. Did you tell them that it had to be changed?
A. I just don't recall.
Q. What about any issues regarding electrical light fixtures?
A. I don't recall.
Q. What about the duct work, was there issues regarding the duct work and the HVAC?
A. There was issues with the HVAC. Again, off the top of my head, I don't recall specifically what they were initially. And I know the -- I believe he put in at least one new packaging on the roof and had that re-ducted into the space.
Q. And do you know what that was for; was that for the computer room?
A. No, that was a separate one. I'm talking just general HVAC. I believe it was done because it just didn't work. I don't know. I don't remember.
Q. Do you know if there was another HVAC unit installed for the computer room?
A. Yes, I believe there was.
Q. There was a separate one installed?
A. Yeah, I believe there is.

Q. What about the fire alarm system, do you recall whether or not there was a fire alarm system wired to the core of the building?

A. I don't understand your question.

Q. Do you know if the space had already had a fire alarm in it?

A. I don't know if it already had one or not.

Q. Do you know if there was additional wiring that needed to go from the core of the building, wiring for the fire alarm system into your space, into the Social Security Administration space?

A. I don't know.

Q. It says here that there was extra work that was requested by inspector Dan Fenner and the work totaled about $10,000. Do you recall what that relates to, what extra work had to be -- what you didn't like or what you asked him to do?

A. I do know -- the thing I do remember is the janitorial issue because he had no way -- he had no place for janitorial supplies. He had no plan of action to take care of that. I told him he needed to do something. And I believe he said what do you normally do? I said, well, we usually put a sink in here. And I said, we need one in here

because you're going to have to do that. And he said okay. And then I said I want walls around it. They don't have to go to the ceiling, but I don't want your stuff impinging on the space we rent. And I specifically said to him, this I remember, is I'm not paying you for it either. That's something you have to provide because you have to provide custodial services for the building.

Q. Anything else?

A. There may have been other issues of things that I told him he had to do under the terms of the lease, but I don't remember specifically.

Q. Did you make notes of that?

A. I have some notes of some of that stuff in my file.

Q. Other items that you found were not in compliance with the lease?

A. The file acceptance inspection, yes.

Q. Such as what?

A. Those are the items I went over with you previously, the ceiling items. I had like two or three pages of items. Again, I don't remember all what they were.

Q. A punchlist of items?

A. Yes.
Q. And those issues were remedied?
A. We ended up accepting them. They were not all remedied.
Q. Do you do any continued follow-up out at the lease premises?
A. Yes.
Q. You're in charge of the ongoing maintenance at the facility?
A. No. I am in charge of making sure they perform the requirements per their lease. It's the landlord's responsibility.
Q. And are they performing to the lease?
A. I would say they're minimally meeting the lease, yes.
Q. Did you have any discussions with Mr. Kosman about any items that were not being complied with by the landlord per the lease?
A. During construction?
Q. During construction.
A. I believe I did. I can't tell you specifically, but I believe we had conversations, just telephone conversations.
Q. What about after?

A. After the lease?
Q. After the lease.
A. After the lease was all done, we moved in. I don't believe so.
Q. Did you participate with Mr. Kosman in denying a claim made by the landlord regarding certain costs?
A. Yes, we did have a discussion about that.
Q. Do you recall when that was?
A. After they moved in sometime. I'm guessing it was after in the fall when we had gotten this letter from the landlord requesting some additional money.
Q. And the landlord's request was dated September 15th of '05, and Mr. Kosman issued a denial letter on October 13th, 2005. It's Exhibit 13.
Did you ever see this denial letter before it went out?
A. I don't think I saw it before it went out.
Q. Did you see a draft of that letter and participate in drafting it at all?
A. No. Jerry and I verbally discussed these items, but I didn't see any copy of this, as I

recall.

Q. You discussed with Mr. Kosman the rear door replacement?

A. I discussed the items that he had asked me about.

Q. Okay.

A. I don't recall exactly what they were.

Q. I'm going to go through these to see if it jogs your memory.

A. That's fine.

Q. I'm not trying to harass you. I'm just going to go through to see if it jogs your memory.

What about the ceiling tile demolition and new ceiling; do you recall discussing with him?

A. I recall discussing something about the ceiling tile, but I didn't think it should be accepted but I don't remember what the outcome was.

Q. Did you ask Mr. Kashat to make changes to the ceiling tile at all?

A. I don't recall one way or the other.

Q. Do you know if the ceiling grid and the tiles changed as a result of the duct work being modified or altered in the space?

A. I don't recall.

Q. Do you recall the duct work being modified in the space?
A. I recall conversations about the duct work being modified, but off the top of my head, I do not remember what the final outcome was.
Q. Do you know how many zones may have been put in there with the duct work, whether there were five or six zones?
A. I would not recall that.
Q. Do you know anything about the construction diagrams and construction drawings?
A. A little bit.
Q. Apparently, there were some changes made to the construction drawings; are you aware of that?
A. I don't recall. There may have been, but I don't recall at this point.
Q. There is a note in here at Paragraph H on page 2 of Exhibit 13 where it talks about -- it appears that Mr. Kosman has specifically talked with you. It says, items noted, conduit to bring phone service to the space is responsibility of lessor. There is no added cost to improve the janitorial room because this room is not part of

the lease space under contract but needed to supply janitorial service for the lease.

That's the one item we're discussing.

A. Yeah, that I do recall having a discussion with.

Q. What about the phone -- the conduit for phone service; do you recall --

A. No. I mean, I don't doubt that, but I don't recall that.

Q. Do you recall specifically that there not being conduit to allow phone service into the space?

A. No, I do not recall specifically.

Q. It talks about data wiring, electrical wiring, and door hardware are all tenant improvements that were included in the special requirements and noted on the government drawing that the lessor gave a cost for and agreed to in the government's Notice to Proceed.

Do you recall whether or not there was data wiring, electrical wiring, and door hardware issues that you discussed with Mr. Kosman?

A. I believe there was some issues, particularly with the front door with the employee

entrance. I can't recall what those issues were, but I believe there was an issue with how that was working. I believe it was a wiring issue. I don't recall what point in the process it came in.

Q. That electrical wiring, that's a tenant improvement, correct?

A. I would have to confirm with the lease. I don't remember.

Q. Did you specifically go through and ever look at the numbers presented by Mr. Kashat for work that was performed there?

A. I don't -- a lot of times I don't get involved with the specific cost.

Q. With respect to denial of the claim made by Mr. Kashat, did you have any role in deciding to deny those costs?

A. I gave my opinion to Jerry that some of these costs should be denied. I don't know if that's considered a role or not. I told Jerry that, particularly the janitorial thing, that I didn't think it was our responsibility.

Q. Anything else in particular that you recall off the top of your head?

A. Not off the top of my head.

Q. Are there any notes that you have in your file that specifically relate to things that it was your opinion that shouldn't be paid and you provided that to Mr. Kosman?
A. I don't think so.
Q. The ultimate decision-maker then in denying or accepting any of the claim is with the contracting officer?
A. That is correct.
Q. Do you have the ability as the assistant property manager to allow or acquiesce to certain changes being made to the building premises?
A. Only -- the short answer is no, but if it's a minor change that needs to happen that the agency would agree to, we could verbally do so in the field. It has to be extremely small and the agency has to agree to fund it at that point in time.
Q. Was there anything out at this project that you agreed orally while you were out there to -- agreed to and that the agency was going to fund?
A. The only thing I can recall is they did I believe another work station that would have required another data line and another additional

outlet. That's going by memory.

Q. And you provided your authority to have that done?

A. I believe I directed them to do that.

Q. And are there any notes in your file that relate to that?

A. Not that I could find.

Q. Did you review your notes before you testified today?

A. I did go through them the other day, yes, just to kind of read through real quick.

Q. Do you have any knowledge or any paperwork in your file relating to the initial bid from Mr. Kashat relating to tenant improvements?

A. No, I generally don't get that.

Q. So you have no idea whether or not some of these items were in that initial bid or were not in that initial bid?

A. No, I would not have no idea.

MR. MIZEROWSKI: I don't have any other questions.

MS. STENTIFORD: I don't have any questions for you either.

MR. MIZEROWSKI: I'd just ask I get a copy of

his file.

MS. STENTIFORD: I'll have a copy sent to you.

MR. MIZEROWSKI: Okay.

(Off the record at 11:41 a.m.)

FURTHER DEPONENT SAITH NAUGHT

STATE OF ILLINOIS )
) SS:
COUNTY OF C O O K )

I, ANNA MARIA CASTLE, C.S.R. and Notary Public within and for the County of Will and State of Illinois, do hereby certify that heretofore, to-wit, on the 26th day of July, 2007, personally appeared before me, at 230 South Dearborn Street, Room 3622, Chicago, Illinois, DAN FENNER, in a cause now pending and undetermined in the Circuit Court of Cook County, Illinois, wherein HALLWOOD PLAZA, INC., is the Plaintiff, and THE UNITED STATES is the Defendant.

I further certify that the said witness was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness as aforesaid.

I further certify that the signature to the foregoing deposition was reserved by counsel for

the respective parties.

I further certify that the taking of this deposition was pursuant to Notice, and that there were present at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my notarial seal this 13th day of August, 2007.

CSR, NOTARY PUBLIC, WILL COUNTY, ILLINOIS