# *EXHIBIT W*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HALLWOOD PLAZA, INC.,

Plaintiff,

Case No. 06-589-C

vs.

Hon. Christine O.C. Miller

THE UNITED STATES,

Defendant.

_______________________________/

DEPONENT: GEORGE KASHAT

DATE: September 21, 2007

TIME: 1:22 p.m.

LOCATION: 131 Ferland Street
Walled Lake, Michigan 48390

REPORTER: Julia A. Bammel CSR(7742)

APPEARANCES

TIMOTHY W. MIZEROWSKI (P43772)
Mizerowski & Associates, PC
131 Ferland Street
Walled Lake, Michigan 48390
(248) 926-9205
Appearing on behalf of the Plaintiff

JOAN M. STENTIFORD
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street NW
8th Floor
Washington, DC 20530
(202) 616-0341
Appearing on behalf of the Defendant

# I N D E X


| WITNESS: | PAGE: |
|---|---|
| GEORGE KASHAT | |
| Examination by Ms. Stentiford | 5 |
| Examination by Mr. Mizerowski | 45 |


## E X H I B I T S


| | |
|---|---|
| Exhibit 14 (1/14/05 Best and Final Offer) | 11 |
| Exhibit 15 (letter of 1/27/04) | 13 |
| Exhibit 16 (building plans) | 14 |
| Exhibit 17 (Proposal for SSA Office) | 16 |
| Exhibit 18 (Lease for Real Property) | 19 |
| Exhibit 19 (SSA Special Requirements) | 19 |
| Exhibit 20 (letter of 2/24) | 23 |
| Exhibit 21 (letter of 2/28/05) | 23 |
| Exhibit 22 (3/29/05 Work Proposal) | 26 |
| Exhibit 23 (Flint North Build Out e-mail thread) | 30 |
| Exhibit 24 (letter of 4/5/04 to J. Kosman) | 33 |
| Exhibit 25 (letter to P. Schmitt and J. Kosman) | 40 |


(Exhibits retained by Mr. Mizerowski)

September 21, 2007
Walled Lake, Michigan
1:22 p.m.

** ** ** ** **

G E O R G E K A S H A T,

after having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified upon his oath as follows:

MS. STENTIFORD: Good afternoon, Mr. Kashat.

THE WITNESS: Good afternoon.

MS. STENTIFORD: My name is Joan Stentiford. As you probably know, I'm representing the United States in this litigation, *Hallwood Plaza v. United States*.

There are a couple of, just, preliminary things that we should talk about. One is, you -- it's important, because -- everything that both of us say is being taken down by the court reporter here, so it's important that you make verbal answers and not just nod or shake your head.

THE WITNESS: I'm aware of that.

MS. STENTIFORD: Okay. Have you ever had your deposition taken before?

THE WITNESS: A deposition?

MS. STENTIFORD: Yes.

THE WITNESS: Yes.

MS. STENTIFORD: How many times?

THE WITNESS: A few times.

MS. STENTIFORD: For business?

THE WITNESS: Business.

E X A M I N A T I O N

BY MS. STENTIFORD:

Q Please state your full name for the record.

A Pardon me?

Q Please state your full name for the record.

A My full name is George Kashat.

Q And what is your educational background?

A I have a law degree from the University of Baghdad. I graduated in 1948, and I practiced as an attorney there until 1951, and then I came to the United States.

Q Okay. Who is your employer, currently?

A Kashat Accounting, which, I am Kashat Accounting.

Q What is your relationship to Hallwood Plaza?

A I'm the president of Hallwood Plaza, Inc., and my wife and -- we both own it, myself and my wife. And it's a corporation, S corporation.

Q And do you have duties with respect to Hallwood Plaza as well as Kashat Accounting?

A I own both of them.

Q Tell me, please, what are your specific duties for Hallwood Plaza. First, start with -- what is your

title?

A President.

Q And what are your specific duties for the company, for Hallwood Plaza?

A I receive the revenue and I disburse the expenses. I make the CAM reconciliation. And everybody, when they call me, they are complaining about this not working, this not working. I go to the proper -- what do you call it -- trade to fix it.

Q Would it be fair to characterize that you're a commercial landlord?

A You could say that, yes.

Q Okay. Are you familiar with the subject matter of this lawsuit?

A Yes, very well.

Q So you're aware, obviously, that it concerns some space leased from Hallwood Plaza by the Social Security Administration --

A Yes, I do.

Q -- for a -- basically, for a retail operation.

A For office operation.

Q Office. Well, for people --

A Yeah. Yeah.

Q -- claimants, what have you, to come --

A Yeah. Yeah.

Q -- for the public to come in.
A Public to come in.
MR. MIZEROWSKI: George, so that the record is clear, let her finish her question before you say yes. Even though you know what the question might be, it will make the record clear.
THE WITNESS: Okay. I shall do that; I apologize.
(Off-the-record discussion)
Q (By Ms. Stentiford) How long have you been president of Hallwood Plaza?
A November 19, 2004; since we bought the plaza.
Q And did you have experience with commercial leasing prior to that?
A Yes.
Q Can you tell me --
A I have a property in Arizona. I bought -- I had five or six. I sold them, and currently I have only one left.
Q And properties, were they also --
A Commercial.
Q -- shopping centers or --
A Shopping centers.
Q How did you first come to hear that the Social Security Administration was looking for space to lease?
A When I bought the property, I understood that they were

dealing with the previous landlord, KIMCO. They were in the process, like, of negotiating, so I -- that's how I became aware of it.
Q And you elected to continue those -- the negotiations with the --
A Correct.
Q -- Social Security --
A Yes.
Q -- so that they would be a tenant in the Hallwood Plaza shopping center.
A Correct.
Q Have you ever rented to the Social Security Administration before?
A No.
Q Have you ever rented to any government agency before?
A No.
Q How about any banks?
A Yes.
Q Any other office tenants as opposed to retail tenants?
A I think -- I don't think so. Mostly retail.
Q Can you tell me how many leases you've negotiated throughout your career?
A I would say at least a hundred.
Q And how many of those have included tenant improvements?
A All.

Q Did you actually -- you said you came into the negotiations -- you took over from the previous landlord negotiating with the Social Security Administration. Did I understand you correctly?

A Yes.

Q So did you actually conclude the negotiations, you personally?

A With my broker.

Q Who is your broker?

A Olson Realty.

Q So that's Eric Olson?

A Eric Olson.

Q I'm going to show you what's been marked previously as Deposition Exhibit No. 1 and ask you to look at it.

A What would you like to know.

Q Can you identify the document?

A Yes.

Q What is it?

A Solicitation for Offers and with my initial on every page.

Q So this is the solicitation --

A Yes.

Q -- for the Social Security property at issue in this lawsuit.

A Yes.

Q And you already identified that those are your initials at the bottom of each page.

MR. MIZEROWSKI: No, this is the same one.

THE WITNESS: Okay.

Q (By Ms. Stentiford) So your attorney could see what you were looking at?

MR. MIZEROWSKI: I'm sorry. I'm well aware of --

THE WITNESS: I'm very familiar with this. This is my initial.

Q (By Ms. Stentiford) Are you the only one at Hallwood who reviewed this document?

A Pardon me?

Q Are you the only one at Hallwood Plaza who reviewed Deposition Exhibit 1, the Solicitation for Offers?

A Yes.

MR. MIZEROWSKI: At what time?

MS. STENTIFORD: At -- well, when it was issued in October of 2004.

THE WITNESS: Not October. I came into the picture in January of 2005.

Q (By Ms. Stentiford) 2005. Okay.

A So all these prior to -- to 2004, I -- it was done through Eric Olson, that he was for KIMCO. He was appointed or representing KIMCO.

Q I see.
A Then he came to represent me.
Q So Mr. Olson was KIMCO's agent --
A Yes.
Q -- prior to you buying Hallwood Plaza?
A Yes.
Q And then you retained him --
A Yes.
Q -- to do the -- to continue -- to finish the negotiations.
A Correct.
Q So the first time you saw this Solicitation, Exhibit No. 1, was in January of 2005; is that correct?
A I believe so. I mean, I could be positive -- probably I've noticed it in December, but for all the practical purposes, I would say January.
Q Okay. And in January of 2005 did anyone else at Hallwood review this Exhibit No. 1, the Solicitation?
A Only me.
(Deposition Exhibit No. 14 marked for identification.)
Q (By Ms. Stentiford) Mr. Kashat, I'm going to show you what's marked as Exhibit No. 14. Can you identify that document.
A Yeah. My initial is there.

Q What is this -- what is Exhibit No. 14, which is three pages long?
A I think it was a continuation of what Eric Olson was doing, you know, Best and Final Offer. I recognize it, and it is my initial, and I signed it.
Q It says you -- well, you see on the -- near the top of the first page it says, Best and Final Offer. Does that -- can you tell me what that means, why you would have signed a document that says Best and Final Offer?
A Well, because, based on the recommendation of the broker, my broker, he said sign it, and I did.
Q Okay. And you sent it to the Social Security Administration?
A Yeah, Gerald Kosman.
Q So was this Hallwood Plaza's response, best and final response, to the Solicitation for Offers that we had previously identified as Exhibit No. 1?
A Yes.
Q Can you describe for me the steps that you took to prepare this document; not to actually type it, but to come up with the terms of your best and final offer.
A That was with the help of the broker.
Q Mr. Olson?
A Olson. He gave me all the -- what do you call it -- the breakdown, and he said they look okay to him.

Q At the time you signed this document, and on the third page of it, it's dated January 18, 2005; do you see that?
A Yes.
Q Can you tell me whether you had worked out the tenant improvement costs?
A Tenant improvement cost was not in here.
Q Okay.
A This does not include tenant's improvement.
Q Okay.
(Off-the-record discussion)
(Deposition Exhibit No. 15 marked for identification.)
Q (By Ms. Stentiford) Mr. Kashat, I'm going to show you what's been marked as Exhibit 15. Can you identify this document for me, please.
A Yes.
Q What is it?
A It was an acceptance of our offer.
Q And that's the offer we just looked at as Exhibit 14, is that --
A Acceptance of the offer, that's before any improvements or modifications.
Q I understand.
A Yeah.

Q And you said -- your earlier testimony was that Exhibit 14 was done without the tenant improvements?
A Without, yes.
MR. MIZEROWSKI: That one's marked.
MS. STENTIFORD: That one's marked?
MR. MIZEROWSKI: Yeah.
(Off-the-record discussion)
(Deposition Exhibit No. 16 marked for identification.)
Q (By Ms. Stentiford) I'm going to show you, Mr. Kashat, what's marked as Exhibit 16 and ask you if you can identify that document or that series of documents.
A It's the Social Security Administration, Flint, Michigan. I think this is probably -- this is one of the documents probably prepared by the engineering company. It was one of the -- their drawings.
Q So it's a Social Security Administration drawing?
A Yes.
Q If I describe that as a design intent drawing, would I be correct in using that term?
A What did you call it?
Q Design intent drawing.
A I'm not -- what do you call it -- very qualified to -- but this is the design. I mean, by what -- whoever prepared it, I don't know whether it was us, the

engineering -- Design Engineering Company, that was prepared by them. Let me see.

Q I believe there was previous testimony that those were prepared at the request of the government.

A I just want to see who did it exactly.

MR. MIZEROWSKI: I think it's up here, George. Right-hand corner, right there.

THE WITNESS: This is Chicago, Illinois. 401 Suite, Chicago, Illinois. I know it's for the Social Security office, but I'm, more or less -- it was probably one of the documents.

Q (By Ms. Stentiford) Do you have any recollection of reviewing -- do you remember that you looked at this document back in early 2005 when the lease negotiations were going on?

A Well, these -- whoever was -- anything that was relating to engineering and design we referred to the -- to our design company --

Q Okay.

A -- then she answered through Eric Olson.

Q I see. So would you have had occasion -- do you think you would have had occasion to review them at the time?

A I'm not qualified to review them.

Q Okay.

A I'll be very honest with you. I'm not qualified to do

that.

Q But it's your understanding that they would have been provided to your designer; is that your testimony?

A My designer would be able to answer that, because I -- I'm an accountant.

Q Okay.

A And this is not my field.

(Brief interruption)

(Deposition Exhibit No. 17 marked for identification.)

Q (By Ms. Stentiford) Mr. Kashat, here's Exhibit -- what's been marked as Deposition Exhibit 17. Can you review that document --

A Yes.

Q -- and identify it for me.

A Yeah.

Q What is that document, Exhibit 17?

A Well, that document is from my contractor telling me about the cost of certain items --

Q Are these --

A -- that are mentioned here.

Q All right. Is this the entity that you described as your designer before?

A That's a general contractor, not the designer.

Q Okay. So --

A The Design Engineering is the engineering company that makes the specification or -- and generates the stuff. This one here is the contractor that he was overseeing -- or we're paying the contractor to do the work.

Q Okay. And this is --

A This is Excel, Excel Construction. This is my contractor.

Q For the Social Security --

A For the Social Security Administration.

Q And are these the tenant improvement costs for the Social Security building at Hallwood Plaza?

A What date is this here? February 20th. No. This is prior to the improvement. The improvement did not start, only after March 19. This one's dated February 20 of 2005.

Q So what was --

A These are prior to the improvement.

Q But why would Excel Construction have prepared this document?

A So to give it to me to give them some money to start the work.

Q All right. On the third page of Exhibit 17 there's a signature from -- it's not legible -- but from someone at Excel Construction, and it's dated February 21, 2005. Do you see that?

A Well, that's the -- that's the owner of construction.
Q And then below it --
A Below it is my signature.
Q So why did you sign this document on February 21, 2005?
A Because the contractor submitted this to me.
Q And why did the contractor submit this to you?
A Because we have to do some modification before -- for the building before we give it to the government.
(Off-the-record discussion)
THE WITNESS: I misunderstood you.
Q (By Ms. Stentiford) Perhaps I wasn't clear. Was this -- what's been marked as Exhibit 17, was this document provided to the Social Security Administration as part of your bid for the lease of the Social Security office space?
A I would say yes, but I'm not -- I mean, there was lot of documents going back and forth, and if I have it, it means the Social Security Administration has a copy of it.
Q And the items set forth on the pages here -- and they're all -- they're titled site preparation, concrete work, woodwork, et cetera. This was work that Excel Construction was proposing to do on your behalf at the Hallwood -- at the Social Security Administration site?
A Yes.

(Deposition Exhibit No. 18
marked for identification.)

Q (By Ms. Stentiford) Take a minute, please, and review Exhibit No. 18.

A What would you like to know?

Q Can you tell me what that document is.

A It's a lease and how much we are -- we're going to get paid.

Q So that's the actual lease for the --

A Yes, but this was modified afterward, you know. This was one of the initial leases.

Q Okay.

(Deposition Exhibit No. 19
marked for identification.)

Q (By Ms. Stentiford) And now I'm going to show you Exhibit No. 19 and ask you to -- if you've ever seen that document before.

A I think so.

Q And what is it?

A SSA Special Requirements, and I initialed every page.

Q All right. And --

A This is my initial.

Q What is your understanding of the purpose of that document? Well, what was your understanding of the purpose of that document when you initialed it?

A There was some work to be done on the part of the lessor, which is us, and we were under -- what do you call it -- in the process of complying with it.
Q Was that document provided to you by the Social Security Administration?
A Yes.
Q Did you provide it to your general contractor?
A Now, I don't know whether I -- he gave it to me, went to him, or I gave it to him, but I -- but for all practical purposes, I'm familiar with it.
Q Is it your understanding that it was, at some point, given to Excel Construction?
A If it was not given to them, I gave it to them, to Excel Construction.
Q Okay. And if you can tell me, would Excel Construction have been provided the --
A I think it was -- my understanding, this was not provided to them until afterwards.
Q Until after they prepared --
A Yes.
Q -- what we marked as Exhibit 17?
A Yes.
Q Do you know why that was?
A No.
Q Is that unusual, that a general contractor wouldn't have

all of the requirements before -- when it prepared the --

A It is very unusual, but this is what happened.

Q Mr. Kashat, I'm going to show you what was previously marked as Deposition Exhibit No. 4. Can you identify that document for me.

A Yes.

Q What is that document?

A It's a breakdown of the -- how much they paid for rent per square foot and tenant improvements and operating costs and the total.

Q Did you prepare this document?

A No.

Q Who did?

A Probably the government or Eric Olson. I don't know, but it's -- I know I have a copy of it.

Q Okay. If you look -- well, let me start with -- there's -- section A, it says, warm lit shell, slash, base rent. Do you see that on the first page of the document?

A Is that warm lit shell?

Q Yes?

A Yes.

Q What does the --

A Base rent.

Q What does the term "warm lit shell" mean to you?
A White box. What do you call it? The walls are okay. The ceiling is okay. I mean, the existing ceiling. The thing, like, it is, like, acceptable to the -- what do you call it -- to the tenant.
Q So it says "warm and lit," so it would be -- the white box, as you called it, would be provided with heat?
A Yes.
Q And electricity for lighting?
A Yes.
Q And light fixtures?
A There is no light -- light fixtures, yes. Yes.
Q Okay.
A Oh, yes. I was misunderstanding you. Okay. Yeah.
Q And so is the warm lit shell, that's what you start with and then you get to the tenant improvements? Is that -- am I understanding that correctly?
A Yes. This is -- it's an order and then the improvement.
Q Okay.
A This is before the improvement. This is what the thing is.
Q Okay.
A And because B, this will tell you tenant improvement, and this is where all the other cost comes in.
Q And all those other costs, are those the costs we looked

at in Exhibit 17?
A These will be included with this prior to the changes that they were made afterward in March 16.
Q But Exhibit 17 would have been --
A Includes some of them.
Q Okay.
A Not all of them.
(Deposition Exhibit Nos. 20-21 marked for identification.)
Q (By Ms. Stentiford) Can you tell me what that document is.
A Yes.
Q What is that?
A That's my document adding 7 percent as administrative costs to the proposal.
Q And what did that -- what was the total of your proposal?
A It was 237,245 multiplied by 7 percent, which is equal to 15,207.15 *[sic]*. It's explained right in the paragraph itself.
Q Okay. Thank you.
A If you just read it, it's self-explanatory.
Q Thank you. Can you please look at Exhibit No. 21 and tell me what that document is.
A Yes. The government accepts your proposal of 232,452.15

to provide the improvements specified in the design intent drawing dated 11/19/04 and detailed further in the SSA Special Requirement dated 12/7/04.

Q So this was a document that you received from the government accepting your offer to lease the --

A Yes. That was before the changes.

Q I understand.

A I just want to make sure.

Do you want me to put it here?

Q Yes.

A Okay.

Q All right. You've referred to the changes. Can you tell me what you mean by that. You've referred several times to -- this is -- that these documents were before the changes. Can you explain what you mean by that.

A Yes. The changes when we had a meeting in my office on March 16 --

Q Okay.

A -- with all the government -- what do you call it -- staff from Chicago and from here, from Grand Rapids, and my contractor and myself and some security staff from the Homeland Security. I think I have a -- there's a -- I think that you have a copy of it, what the meeting is and the people that were involved. If you don't have it, I'll give you a copy of it.

Q You mean the sign-in sheet?
A Yes.
Q Yes, I do have it.
A Okay.
Q I wasn't going to make it any --
A No. This was the March 16. There were about, I don't know, probably 17 people there.
Q And --
A And the thing lasted about three, four hours; about four hours. And there was a lot of changes made that changed the concept of the -- what do you call it -- the improvements. The improvements, the improvements that we originally understood, they were specified in their specifications, but when they came up with these other modifications, that changed the concept of the improvement.
Q Okay. You say -- can you tell me how it changed the concept of the improvement?
A Well, they have requested so many things that were not in the original proposal or specifications. There were so many things that they were just known -- new to all of us, to -- what do you call it -- our contractor, to our engineering. Everything.
Everything was brand new. Like you were doing this, and all of a sudden come and just demolish

everything and do it all over again. That's how it was.
Q Okay. So it's your -- it's your understanding that what was -- the requirements that were set out in the original solicitation, which we marked as Exhibit 1, and the special requirements that we marked as Exhibit 19 were changed?
A Yes.
Q At this -- at the March 16th meeting?
A At the meeting of March 16 changes everything.
Q Okay.
A It was a brand new -- what do you call it -- improvement, not originally compensated.

(Deposition Exhibit No. 22 marked for identification.)

Q (By Ms. Stentiford) I'm going to ask you to look at Exhibit 22, which was just marked.
A 31st.
Q Did you review this document?
A Yeah.
Q Tell me what it is.
A Well, we sent the contracting officer a detailed -- what do you call it -- estimate of costs to complete the improvement, the new improvement. Yeah.
Q Okay. So this was also prepared by Excel Construction; is that correct?

A Yes. By Excel Construction, yes.
Q And so these are the -- is this a complete statement of the tenant improvement costs as they were -- as they were known following the March 16, 2005, meeting?
A March 16? After March 16?
Q March 16, yes.
A This is what I got from the Excel Construction. Probably, there were additional costs afterward, but I -- unless you show me something else, I mean -- but these are --
Q But what I'm trying to find out is when this document, Exhibit 22 -- not the first -- well, the first page is a fax cover sheet from you; am I right about that?
A Correct.
Q Why did you send this? What was the -- it says, "Detailed Estimate of Proposed Additional Cost."
A This is what Excel, my contractor, told me. This is what would it cost.
Q And are these different and in addition to the costs that were outlined in Exhibit 17, or does Exhibit 22 replace Exhibit 17?
A Boy, that's a hard question to answer. Wow. Wow. I think this is -- it's over and above that, because here there's a -- this one here, there is a second bathroom.
Site preparation. I think this is over and

above the other one. It's different than -- from the other one. That's over and above the other one.

Q Okay.

(Brief interruption)

THE WITNESS: I'd like to add, when we submitted these things here to the government, the government okayed some of them, and we have some additional approved costs of -- what do you call -- improvement; however, the government did not approve all the costs that's included, and this is -- what do you call -- the essence of the dispute.

Q (By Ms. Stentiford) Right. So on Exhibit 22, what we've just been -- you've -- there is the -- well, there are several handwritten notations. Is that what you're referring to?

A Yes. That probably was okayed by the contracting officer. This is not our -- this is not my hand -- my writing.

Q Okay. Until, really, it looks like the last page of the Exhibit, which is page 4.

A Yes. It was not approved. From No. 12 through 21, it was not approved. This is the essence of the dispute.

MR. MIZEROWSKI: It appears, though, that No. 13 was approved.

THE WITNESS: Yes. Number 13 was approved,

yes. Yeah. Up to No. 11, and then they did not approve No. 12, and they approved No. 13 afterwards, and from 14 to 21 was not approved. And actually, this is the basis of our claim.
Q (By Ms. Stentiford) Okay. If you could look -- if I could direct your attention back to that page 4.
A Okay.
Q There are a couple of places on the right-hand margin in this handwriting where it says no, and then it says SFO. Do you see what -- do you see that?
A Yeah.
Q Do you know what the SFO -- do you know what that refers to?
A Probably the contracting officer or somebody. This is not --
Q No. I understand that's not your writing. Would that be the Solicitation --
A SFO?
Q -- the Solicitation for Offers --
A Probably.
Q -- that we've marked as Exhibit 1?
A Yeah, because I -- I'm not familiar with this here. I'm only familiar with the contents of it, and whatever on the side is somebody else's notation; probably is Jerry Kosman's notations.

Q I'm going to show you two exhibits previously marked as Exhibits 5 and 6. Can you identify those documents.
A I have seen them and initialed them.
Q So both of Exhibits 5 and 6 have your initials on the bottom?
A Yes. They're my initials, yeah.
Q Do you recall seeing them at the time you were reviewing the Solicitation for Offers?
A It's very hard to recall all these papers. I don't know what to tell you. I mean, I know I initialed them. When you initial them, it means you've seen them.
Q Okay.
A Is that satisfactory?
Q That's fine.
THE WITNESS: Can I make a statement?
MR. MIZEROWSKI: There's no question.
THE WITNESS: No question. Okay. All right.
Q (By Ms. Stentiford) All right. Let's look at --
(Deposition Exhibit No. 23 marked for identification.)
Q (By Ms. Stentiford) Can you identify Exhibit 23.
A Yes.
Q What is it?
A It's the approval of certain items that was presented in previous exhibition *[sic]*.

Q So if we look back at Exhibit -- I think it was 22 --
A 22.
Q -- that last page we were looking at, the --
A Last page, yeah. This is the -- they refer to these items, that they were approved --
Q Okay.
A -- by the contracting officer. And this was one of the -- their approval. That was not the final one.
Q Okay. And so is this -- this is consistent -- you said -- you identified previously 1 through --
A Yeah, 1 through --
Q -- 1 through 12 that were approved.
A And then 13.
Q And 13.
A Yeah.
Q But not -- actually, not 12.
MR. MIZEROWSKI: Right, 1 through 11.
Q (By Ms. Stentiford) 1 through 11 and 13, and not 12 --
A Not 12.
Q -- or 14 through 20.
And so --
A This is -- yes, it's -- I'm familiar with it.
Q All right. So this was the -- this is the GSA informing you --
A Yes, that they approved these items.

Q Did you disagree with the government's conclusion to disapprove items --
A That's why -- the basis of our case.
Q And --
A Yes, I did. I disagreed. I disagreed with them.
Q And what was the basis of your disagreement?
A They are costs incurred in good faith, and the government is not approving them.
Q So it's --
A Based on the -- what do you call it -- the changes that were made, drastic changes, major changes that were made, we have to have these other costs which we incurred, and we asked for fair reimbursement.
Q All right. And at the March 16 meeting, or sometime thereafter, were there new specifications written by the government? Did they --
A No.
Q Did they --
A Not to my knowledge.
Q Now --
A They were just there meeting, and each one took notes, and this is how it came out to.
Q So what did -- were you provided a document that informed you that -- that you needed to -- well, of all of the items that are listed in Exhibit 22?

A On Exhibit 22, after the meeting, our engineering department and the contractor, they got together and we submitted the Exhibit 22. And we thought this is -- we didn't think that the government is going to disagree with us.

Even when I went to Chicago myself with my wife, you know, and we have a meeting with the -- with Kosman and Paul Schmitt -- I don't want to go through it after you -- you probably have a question to ask afterward.

Q (By Ms. Stentiford) If you could focus on -- well, I guess we'll mark one more exhibit here.

(Deposition Exhibit No. 24
marked for identification.)

Q (By Ms. Stentiford) Okay. Can you tell me what that document is.

A Yes. I sent this to Mr. Kosman.

Q And is this identifying the same --

A Identifying the same thing that he rejected before.

Q Okay. So that's -- those are the items from that Exhibit --

A Yes.

Q -- 22 that we talked about before.

A Exactly.

Q And this is -- those items there in -- is that -- that's

your letter?
A That's my letter.
Q Dated April 5th.
A This is my letter and my signature.
Q Okay. And that's the basis of the dispute here, those items there?
A Yes.
Q Okay.
MR. MIZEROWSKI: And that's Exhibit 23?
THE WITNESS: Exhibit 24.
MS. STENTIFORD: 24, yeah.
THE WITNESS: Well, they are -- we are asking for, actually, more than that. We said here, for Item No. 16, 55,000, and we paid 58,000.
Q (By Ms. Stentiford) The first item -- I'd like to go through each item --
A Oh, okay.
Q -- and discuss them.
A Uh-huh.
Q I'm going to ask you to turn to page 25 of Exhibit No. 1, which is the original Solicitation for Offers.
A Page 25.
MR. MIZEROWSKI: Here. (Handing document) What paragraph?
Q (By Ms. Stentiford) And I'd like to direct your

attention to Paragraph 5.10.
A 5.10, doors, exterior. Okay.
Q The first item on -- that you identified in your letter that we marked as Exhibit 24 is the rear door replacement.
A It was not approved by the --
MR. MIZEROWSKI: Let her ask her question.
THE WITNESS: Go ahead. I'm sorry.
Q (By Ms. Stentiford) And you're claiming additional expenses for that.
A Uh-huh.
Q And what I want to know is, it appears that the Solicitation for Offers provides that -- requires that there be an exterior rear door. What I want to know is why -- why isn't the requirement in the Solicitation for Offers -- why doesn't that -- why isn't that your obligation to provide the door? Why are you entitled for additional money for an exterior rear door?
A Homeland Security wanted a different door.
Q And the Homeland Security-required door has different --
A Different door from that.
Q Okay. On page 25 of Exhibit 1, there's -- Paragraph 2 under Subsection 5.10 gives some fairly specific -- I would characterize them as fairly specific -- specifications or description of the door that's

required. Do you see that?

A Yes. The door that we had meet all these specifications, except when the Homeland Security came in, they said, "We don't like the door."

Q And did they provide a different -- how did they convey to you the difference in the door between the door that they wanted you to install and the door that was there?

A They talked to the contractor. They talked to the contractor, tell him, "We don't like this door. Replace the door."

Q So they talked to someone at Excel Construction?

A Yes.

Q Not to you.

A No.

Q And did you ever clarify the distinction in the doors yourself with your contractor, Excel Construction?

A My contractor, he said, whatever they're asking -- the door that we have, it's in accordance with their specification, but the door they want is -- they want it for their own special requirements.

Q Did you ever personally see the door that you say Homeland Security wanted replaced? Did you actually physically look at that door before it was replaced?

A No. My contractor did that.

(Off-the-record discussion)

Q (By Ms. Stentiford) Mr. Kashat, are you familiar with the term "performance lease"?
A Performance lease? What do you mean by performance lease?
Q There was earlier testimony from Mr. Kosman that the lease at issue in this case was a performance lease; in other words, it didn't specify exactly what -- or how the requirements were to be met, it just -- it specified that there had to be climate control to within a certain range, there had to be so much electrical lighting provided --
A But this is -- I don't know what is his intention. Whatever it was in the specification, we complied with it. And then when they came up with the changes, this -- whatever he calls a performance lease is -- has changed drastically or basically. Then the performance lease become a different -- what do you call it -- upgraded to their, you know, changes.
Q And I believe you testified before, these changes were never put in writing to you from the Social Security Administration?
A No.
Q It's your understanding they were conveyed orally to your contractor, Excel Construction?
A That was done in all of the meetings. They were not put

in writings. I'm positive.
Q Okay. Item No. 14, referring you back to your --
A Okay.
Q Can you tell me why the ceiling had to be demolished? Do you have any knowledge of that?
A No.
Q So that was your contractor's conclusion?
A After the meeting.
MR. MIZEROWSKI: I don't know if he -- if you understood --
THE WITNESS: After March 16.
MR. MIZEROWSKI: Did you understand?
I'll just place an objection. I don't know that the question, form and foundation, that it was clear to the deponent, or the witness.
Q (By Ms. Stentiford) Let me ask you a general question about items 14, 15, 16, 17, 18, 19 and 20.
A Okay.
Q Those were the items that were -- that the government didn't agree were additional costs.
A Yes.
Q Do you have any knowledge of the original -- the specific, original requirement and the changed requirement? I mean, would you be able to describe what was originally required and how the changes you've

described created additional --
A I'm not qualified --
Q -- requirements?
A -- to. Only my contractor and the engineering people can determine, you know, the additional costs for the changes. I, myself, I am not qualified to, but these estimates, made by qualified people.
Q So you rely --
A Their business is to do these things.
Q Right. And you relied on the estimates --
A I relied on their estimates.
Q Did you have any involvement personally in dealing with the City of Flint with No. 18, the city requirement of additional drawings? Do you have any personal knowledge about that?
A Yes. I talked to the inspector a few times, and he said, "Whatever these new changes that you're making requires that the city" --
According to -- with this new requirement, the city required more drawings, because this was not part of the original -- what do you call it -- offer. These are all because of the additional improvement the government requested, and we have to have these additional drawings.
That's why we contacted our engineering to

come up with a new drawing, and there is a lot of correspondence of that between Mr. Kosman and Design Engineering, lot of pages, at least 20 or 25 correspondence between Design Engineering and Jerry Kosman. And, probably, you have copies of them.

THE WITNESS: Can I add something, you know, here?

MR. MIZEROWSKI: Regarding the last question or --

THE WITNESS: Yeah. Okay. The cost -- okay. Okay. Never mind.

(Off-the-record discussion)

(Deposition Exhibit No. 25 marked for identification.)

MS. STENTIFORD: Here. (Handing document)

MR. MIZEROWSKI: I'm well aware of that letter.

THE WITNESS: That's my letter.

MR. MIZEROWSKI: That's Exhibit 25?

THE WITNESS: I have it in front of me.

MS. STENTIFORD: Yeah, 25.

THE WITNESS: That's my letter.

Q (By Ms. Stentiford) Why did you write that letter?

A Because I want the additional costs, that it was not my understanding -- it was complete understanding after I

met with Jerry Kosman and Paul Schmitt in April that they said they going to go along and they going to pay a lump sum for the additional costs that I requested. And if you read this one very carefully, it will state my position in it.

Because when I -- when I -- I spent about 15 minutes over there. I was there with my wife. And Paul Schmitt agreed with me. He said, "Well, you have cost overruns."

And I asked Mr. Kosman, "Are you familiar with the principal of cost overrun?"

He said, "No." He said, "That's strange."

Cost overrun; this is a basic principle. He said, "You should have known that when there is a cost overrun, the less" -- us, the lessor -- "should be reimbursed by any cost overrun based on the principle of reasonableness, fair, and the extra cost."

And this was in the meeting that we had, the meeting with them. And after I left they said, "We going to pay that in lump sum."

After I send this, I received their answer that they have refused in its entirety. This is definitely -- I was hundred percent sure that they were paying this. And this was my understanding when I was there with my wife.

Q When you say "paying this," you mean the cost --
A 142, the extra cost. He said, "You should know" --
He should have known that there is a cost overrun. That you should have known that the lessor cannot, you know, meet your requirements or improvement with the thing that he -- the thing that he had submitted. He should have known.
And when we asked for these additional costs, I thought that they are reasonable. Not only reasonable, I underestimated, you know, my case. There was so many other costs that I had not included.
And one example is our operating cost, and also, the administrative cost that I put down, 7 percent. They are minimum of 15 percent. I mean, I'm not counting my time. I'm spending hundreds of hours. I don't know whether they are negligible or these are not counted.
I mean, whatever we're asking for, 142, it is negligible. It is a very small amount, and the government is occupying the premises rent free, because when they are paying us six dollars and a half per square foot instead of $19 per square foot and they are refusing to pay the 142, they are occupying the premises rent free.
Q I understand that's your position, Mr. Kosman.

MR. MIZEROWSKI: Kashat.
Q (By Ms. Stentiford) I'm sorry, Mr. Kashat, I'm looking at --
A Thank you.
Q I understand that's your position.
A Okay.
Q What I was curious about is, on the first page of Exhibit 25 there's your statement. Well, it's your letter. And there's a sentence --
A Which page?
Q The first page.
A Huh?
Q The first page.
A Okay.
Q It's the second and third sentences of this letter, which I'll just -- which I'll just read.
(As read) There were a number of items contained within the SFO Lease Agreement -- and SFO, we'll agree, is the Solicitation for Offers Lease Agreement -- which were uncharacteristic of a retail tenant space, of which we are used to dealing with in our daily activities. As such, certain features required by the lease were not interpreted by us and, therefore, not included in the contractor's original cost estimate.

Is that -- do you see those sentences?
A Yes, I see those.
Q Well, so what did you mean by that? I mean, did -- so you misunderstood -- do I take it that you misunderstood what was in the Solicitation for Offers and the Lease Agreement?
A Well, we understood the solicitation; however, when these drastic changes were made to the specifications, it changed the whole thing. I mean, we're -- yes, whatever the specifications were, it was understood by my engineering company and my contractor, but when they made the changes, that changes the whole thing. It was not the original specification or offer. It was an entirely different offer.
Q But there weren't ever -- there weren't -- there were -- there was not a time when different specifications were issued.
A No.
Q So you're -- so it's still the same -- the same lease documents.
A They did give us new specifications, and that -- when they make the changes, the old specifications are no longer valid.
Q Well --
A No, not valid. I don't know how to phrase it or do it.

It's -- it is just, they changed the whole concept. They wanted this, and all of a sudden they want the whole thing changed differently.

Q Is it possible, Mr. Kashat, that what you thought were -- was a total change in the scope of the specifications was not a change but merely a new understanding on your part of what the original specifications required?

A We knew what the original specification required. When they came up with their changes, they came up with major changes. And when these major changes comes, the other specifications they had previously, they don't apply. Or they apply; they apply very -- in a small measure.

(Off-the-record discussion)

MS. STENTIFORD: I don't have any more questions for you, Mr. Kashat.

THE WITNESS: Thank you.

(Off-the-record discussion)

(Break in proceeding)

E X A M I N A T I O N

BY MR. MIZEROWSKI:

Q Mr. Kashat, you answered some questions about your background a little bit. Tell me about -- what did you do when you came to the United States? You said you had a law degree in your -- and you have your Kashat

Accounting. What other employment have you had?

A I worked for Wayne State University for five-and-a-half years; I was internal auditor.

From that, I was recruited by the Defense Contract Audit Agency. It was located in downtown Detroit, and I worked for them for eleven-and-a-half years. And when I left, I was GS-12 and I was auditor in charge, and my job responsibilities was to do cost overrun and evaluate the reasonableness of the contracts that we were awarding contractors.

My job was the one that I'm asking for now, and it comes right to me. So I was an auditor in charge, and I don't want to brag, but I have a superior performance. When I left, when I resigned, I opened my accounting office, and that was in 1971.

Q You also testified that -- I think a question was asked, "Would it be fair to say that you were a commercial landlord?"

Correct? She asked that question and you said yes?

A Well, commercial --

Q You answered --

A Yes, I said yes.

Q Okay. The question is -- when we're talking about commercial, there's -- in my mind, there's two ideas to

commercial. There's both retail and office commercial space, correct?
A Yes.
Q Your experience, and I think you testified, is primarily with retail, correct?
A Retail; 100 percent retail.
Q 100 percent retail.
Have you -- do you -- have you had any experience with office commercial leases?
A No.
Q Okay. The bank that is a tenant of yours --
A Okay.
Q -- was that a lease that you negotiated or not?
A No.
Q Who negotiated it?
A KIMCO. It's -- what do you call it -- a ground lease.
Q Ground lease. And that was already in place when you purchased the strip center, correct?
A Correct.
Q The Hallwood Plaza strip center.
A Yes.
Q So it would be -- it would be fair to say that the first commercial office lease that you entered into was this lease with the government.
A I inherited it from KIMCO. They're my lessees, you

know, the bank now.
Q Right. No. I'm talking about the Social Security Administration lease.
A Oh, Social Security Administration.
Q That would have been your first --
A The first one.
Q The first office commercial --
A Lease.
Q -- lease that you've entered into.
A Yes.
Q And you had stated a couple of times your engineering firm -- that you relied upon your engineering firm; is that correct?
A Yes. That's Design Engineering --
Q Is that --
A -- the one that -- they submit -- they made all the drawings, and we pay them $20,000.
Q Okay. And the name of that company is?
A Is Design Engineering.
Q And you relied upon them to help you understand the Solicitation for Offer?
A Yes, on them and -- I relied on them and my broker. That's the two that I relied on.
Q Okay. Did you participate at all in the creation of the bid that had been -- we marked as an exhibit this bid,

which is Exhibit 17, from Excel Construction. Was -- did you participate in the creation of that bid at all?
A No.
Q You relied upon Excel Construction?
A Yes.
Q And then with respect to Exhibit 22, which was the -- after the meeting. This was another bid relating to the items that had to be changed, in your opinion, based upon the meeting of March 16th, correct?
A Yes.
Q And that was -- that information contained in there was prepared by Excel Construction as well?
A Correct.
Q And did Design Engineering --
A Design Engineering.
Q Also helped?
A Also helped, yes.
Q Okay. And it would be fair to say that Items No. 1 through 11 and 13, which were paid for by the government, were changes that came out of that March 16th meeting but they were never documented in another Solicitation for Offer or an amendment to the Solicitation for Offer.
A Correct.
MR. MIZEROWSKI: Okay. I have nothing

further. Thank you.

MS. STENTIFORD: No redirect.

(Deposition concluded at 3:48 p.m.)