IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HALLWOOD PLAZA, INC. , | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-589C |
| | ) | (Judge Christine O.C. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h) of the Rules of the Court of Federal Claims ("RCFC"), Plaintiff submits its response to Defendants proposed findings of uncontroverted facts:

1. Plaintiff, Hallwood Plaza ("Hallwood") is the owner of the retail shopping center commonly known as Hallwood Plaza, located in Flint, Michigan.

RESPONSE: Admit.

2. On November 1, 2004, the General Services Administration ("GSA") issued Solicitation For Offers No. GS-05B-17564 ("SFO") for a four year/two year firm term lease, for commercial office space to serve as a Social Security office. Appendix ("App.") 1. The SFO request package included all general and shell space requirements of both GSA and SSA including, "Attachment No. 2 to SFO," which was a chart specifying the requirements of the building shell, both for the base building and the tenant areas. App. 6-7, 41; 145-146.

RESPONSE: Admit.

3. Section 1.9 of the SFO stated that the Government intended "to lease a full serviced "warm lit shell" with a tenant improvement allowance for the specified lease term. . ." App. 6. In the context of this lease, "warm lit shell" meant a weatherproof, enclosed building supplied with heating, air conditioning, and ventilation, as well as electric wiring and lighting, meeting the standards for base building and tenant areas as set out in the SFO. App. 6-7, 145-146.

RESPONSE: Admit. In further answer, Section 6.7 (B)(1) of the SFO specifically lists as a Tenant Improvement the zone control HVAC system. The Heating and Air Conditioning (SEP 2000) tenant improvement information is as follows:

> Zone Control. Individual thermostat shall be provided for office space with control areas not to exceed 2,000 ANSI/BOMA Office Area square feet. Areas which routinely have extended hours of

> operation shall be environmentally controlled through dedicated heating and air conditioning equipment. Special purpose areas (such as photocopy centers, large conference rooms, computer rooms, etc.) with an internal cooling load in excess of 5 tons shall be independently controlled. Concealed package air conditioning equipment shall be provided to meet localized spot cooling of tenant special equipment. Portable space heaters are prohibited from use. (SFO, Exhibit A, p. 29).

4. The shell rental rate was to include "all basic building systems and common area build out including: base building lobbies, common areas, and core areas, etc exclusive of the BOMA Office Usable space offered as required in this solicitation." Id.

RESPONSE: Admit. In further response, section 5.1 of the SFO states that building shell exterior doors shall be "hollow steel construction and shall be fully insulated, flush #16-gauge hollow steel" and that the costs of hardware are tenant improvement costs pursuant to section 5.13 of the SFO. (SFO, Exhibit A, p. 25). An 18 gauge door was requested by the Department of Homeland Security and was installed by Hallwood.

5. SFO Section 1.9(B)(1)(b) provided, "Demolition of any existing conditions in the proposed Government demised space or any common core areas will be done as part of the shell base rate." Id.

RESPONSE: Admit. Additionally, section 1.9(B)(2)(e) 'Rental Rate Determination' 'Tenant Improvement Allowance' of the SFO provides, "Payment will not be made by the Government in instances where the Government accepts fixtures and/or other tenant improvements already in place. However, the Lessor will be reimbursed for costs to repair or improve the fixtures(s) and/or any other improvements already in place." (SFO, Exhibit A, p. 7).

6. The SFO required the lessor to provide a "base building structure and building enclosure components (windows, with exterior finishes) are complete. (No window treatments, i.e. blinds, draperies, etc.). Id.

RESPONSE: Admit.

7. SFO section 1.9(B)(1)(c) provided that "The base building electrical and mechanical systems are complete and functional (central fire alarm, chiller plant, cooling towers, etc.)." Id.

RESPONSE: Admit. Additionally, Attachment No. 2 to the SFO provides that typical tenant improvements include "[f]ire alarm wiring from building core to tenant space and then within tenant space; pull stations; strobes; annunciators; and exit signage within the demised premises." (SFO, Exhibit A, Attachment No. 2).

8. SFO Section 1.9(B)(1)(c) required "a designated connection point to the central fire alarm system, for extension to tenant demised area(s). Id.

RESPONSE: Admit.

9. Among other requirements, the tenant areas section of the warm lit shell required a full installed 2x2 foot suspended acoustical ceiling, with 2x2 parabolic fluorescent (or other building standard such as 2'0" x 4'0") fixtures installed in the ceiling grid for an open office plan at the rate of 1 fixture per 80 BOMA office usable (100 rentable) square feet, is provided. And, Central heating, ventilation and air conditioning systems are installed and operational, including as appropriate, main and branch lines, VAV boxes, dampers, flex ducts and diffusers, for an open office layout. Conditioned air through medium pressure ductwork at a rate of.75 cfm/square foot of BOMA office area is provided. App. 7.

RESPONSE: Admit. Additionally, Attachment No. 2 to the SFO additionally provides additional tenant improvement information: "[s]upplemental power, cooling, heating (above the open office plan layout capacities provided in the base building) higher rates of air exchanges – (if it entails additional or upgraded air handling equipment); pathogen control system; and all other special HVAC components required by specific tenant needs." Further that "[c]hanges (moves) or additions to the open plan lighting pattern, or to the open plan HVAC distribution network (e.g. additional ductwork, ceiling diffuser, etc. to accommodate individual office layout)" are tenant improvements. Additionally, that "[u]pgrades or changes to building standard items, such as plaster or vaulted ceilings, specialty lighting, and upgraded ceiling tile."

10. As part of providing the warm lit shell, SFO Section 1.9(B)(1)(d) stated: all Offeror's administrative, overhead, design costs, and other associated project fees necessary to prepare construction documents to complete all tenant improvements contemplated by the Government shall be included as part of the shell base rental rate. It is the successful Offeror's responsibility to prepare all documentation (working drawings, etc.) required to receive construction permits. Id.

RESPONSE: Admit. Additionally, Section 1.10 (B) Tenant Improvements (SEP 2000) of the SFO provides, "The Tenant Improvement Allowance shall include all the Offeror's administrative costs, general contractor fees, subcontractor's profit and overhead costs, Offeror's profit and overhead, design costs, and other associated project fees necessary to prepare construction documents and to complete the Tenant Improvements." (SFO, Exhibit A, p. 7).

11. The Tenant Improvement Allowance was defined in section 1.09(B)(2)(a) of the SFO as "all alterations for the Government demised area over and above the warm lit shell build out." Id.

RESPONSE: Admit.

12. Section 1.10(B) of the SFO, The Tenant Improvement Allowance shall include all the Offeror's administrative costs, general contractor fees, subcontractor's profits and overhead costs, Offeror's profit and overhead, design costs, and other associated project fees necessary to prepare construction documents to complete the Tenant Improvements. It is the successful Offeror's responsibility to prepare all documentation (working drawings, etc.) required to receive construction permits. NO COSTS ASSOCIATED WITH THE BUILDING SHELL SHALL BE INCLUDED IN THE TENANT IMPROVEMENT PRICING. Id. (emphasis in original).

RESPONSE: Admit.

13. Hallwood Plaza submitted its final offer on January 18, 2005. App. 90.

RESPONSE: Admit that a final offer was submitted which did not include all tenant improvement costs, as they may not have been known or discoverable.

14. On or about January 24, 2005, the General Services Administration ("GSA") awarded a lease for 9,821 square feet to Hallwood for commercial space located on the southeast corner of Pierson Road and Clio Road, ("the premises"), to be used by GSA for a Social Security Administration office for the city of Flint and surrounding community. App. 91. This location was later clarified as 4909 Clio Road, Flint, Michigan. App. 124.

RESPONSE: Admit.

15. GSA considered this a "performance lease" which meant that the lease specified the result that the GSA wanted in terms of building systems such as climate control, lighting, electrical capacity, and the like, but did not provide detailed technical specifications as to how to achieve those results. App. 147-149.

RESPONSE: Admit.

16. GSA provided Hallwood with Design Intent Drawings ("DI") dated November 19, 2004, and a narrative document, dated December 7, 2004, setting forth GSA's "Special Requirements" for the leased space. App. 95-111, 150.

RESPONSE: Admit.

17. In response, Hallwood submitted a cost listing from its contractor, Excel Construction, dated February 20, 2005. App. 112-114. Hallwood's total bid for TI costs was $217,245.00. Id. After review by the contracting officer, GSA determined that Hallwood had not included the 7 percent interest rate of the final offer to amortize the TI's, and afforded Hallwood the opportunity to correct its TI bid which Hallwood did in a letter dated February 24, 2004. App. 115.

RESPONSE: Admit.

18. On February 23, 2005, the parties executed Lease No. GS-05B-17564 for the premises. Hallwood's final bid for actual TI's was $232,452.15, as reflected in the Notice to proceed issued on February 28, 2005. App. 116.

RESPONSE: Admit.

19. A pre-construction meeting was held at Hallwood's offices on March 16, 2005. App. 150. Representatives from Hallwood, Hallwood's construction team, GSA, SSA, and FPS were present. Id.

RESPONSE: Admit. Additionally, members from the Department of Homeland Security were present.

20. As a result of the meeting, GSA clarified and added to its requirements for the premises and consequently issued a revised DI drawing. App. 150-154, 163-164. The changes included adding a vestibule at the front entrance, adding a second public restroom near the public waiting area, adding ballards to the sidewalk in front of the premises, adding two offices for managers, and minor changes to the electrical system and the heating, ventilation, air conditioning system to the computer room. Id.

RESPONSE: Admit.

21. On March 31, 2005, Hallwood submitted its proposed additional TI costs through a cost list from its contractor, Excel Construction. App. 117-120. Excel's cost list stated that it was proposing additional costs that were discussed at the March 16, 1995 pre-construction meeting, as well as "more additional cost items based on SSA special requirements, and the Solicitation for offers." Id.

RESPONSE: Admit.

22. In all, the cost list contained the following 21 items totaling $227,199.00:
1. $21,550 Vestibule, including a set of power assist double doors with push button;
2. $10,659 Second public bathroom (at front space);
3. $ 3,440 Privacy wall in front of the public bathrooms;
4. $ 5,680 Ballards installed on the sidewalk in front of lease premises to prevent vehicles from crashing into the storefront;
5. $ 4,260 Wire mesh installation: wall in corridor at back of the leased space leading to the real emergency/delivery exit;
6. $ 9,380 Two (2) offices for manager and assistant manager;
7. $ 3,400 Storefront sign work;
8. $ 240 Extra electrical outlets; rear break room/multi purpose room;
9. $ 4,680 HVAC system for computer room temperatures;
10. $ 1,490 Push button door opener;
11. $ 480 Handicap sign on parking space;
12. $ 1,200 Rear entrance door replacement;

13. $24,040 Install submersible sewage pump system;
14. $22,700 Ceiling demolition work and installation of new drop ceiling;
15. $ 6,400 Replace electrical light fixtures;
16. $55,000 Complete new duct work for individual zone control system;
17. $ 4,000 Fire alarm system, including pull stations and strobes;
18. $20,000 Additional drawings required by the city of Flint government for permits;
19. $ 7,600 Roofing, new electrical supply to HVAC unit at front of building;
20. $11,000 Electrical system deficiencies, moving transformer;
21. $10,000 Contingency.

Id.

RESPONSE: Admit.

23. On April 5, 2005, Hallwood submitted a letter to GSA requesting approval of certain items on the cost list items submitted by Excel Construction, totaling $140,106.00. App. at 121-122.

RESPONSE: Admit.

24. Gerald Kosman, GSA contracting officer, responded to Hallwood via electronic mail, explaining that only some of the items for which Hallwood sought additional compensation were legitimate additional TI costs resulting from GSA changes. The rest reflected work required by the SFO that Hallwood should have accounted for in its initial TI cost proposal, and GSA could not agree that additional compensation was appropriate for work clearly required by the SFO for the shell building. App. 123.

RESPONSE: Admit.

25. Of the items listed in paragraph 22, GSA ultimately approved item numbers 1-11 and number 13 as legitimate costs for additional tenant improvements totaling $98,228.90. This additional work was formally incorporated into the lease terms in Supplemental Lease Agreement number 2 which was executed and agreed to by both parties on April 20, 2005. App. 125-126.

RESPONSE: Admit.

26. On September 15, 2005, Hallwood submitted a certified claim for $142,926.86, to the contracting officer, requesting payment for items 12, and items 14- 19 from paragraph 22, and including three additional items as follows:

> 21. $10,000.26 Extra work requested by GSA Inspector Dan Fenner;
> 22. $18,340.00 Additional work for city requirement as a result of changes requested by GSA;
> 23. $15,069.60 Contract administration costs at 10 percent of costs of work. App. 128-141.

RESPONSE: Admit.

27. In its certified claim letter, Hallwood explained that “[t]here were a number of items contained within the SFO Lease Agreement which were uncharacteristic of a retail tenant space of which we are used to dealing with in our daily activities. As such certain features required by the lease were not interpreted by us and therefore not included in the contractor’s original cost estimates.” App. 128 emphasis in original).

RESPONSE: Admit.

28. In support of its claim, Hallwood attached a letter from the City of Flint, supporting the requirement that additional drawings were necessary to meet city building code requirements. App. at 133.

RESPONSE: Admit.

29. Hallwood also attached a letter from Design Engineering Group, Hallwood’s architectural designer, stating that the Hallwood Plaza building was a retail sales building and therefore was designed to meet typical retail space needs. Hallwood should have realized that the SSA premises were office space, not retail space, and as such, the SFO issued by the SSA required different standards for lighting, electrical, heating and cooling, and primary and emergency access/egress systems. App. 134.

RESPONSE: Denied.

30. In support of its claim for increased permit costs, Hallwood submitted an invoice from Design Engineering in the amount of $19,875.00 to “Provide additional services to comply with City of Flint building official’s request for complete design documentation for the renovation of existing retail space.” App. 139.

RESPONSE: Admit.

31. In support of its claim for increased HVAC costs, Hallwood submitted a copy of the proposal from its HVAC subcontractor, Liberty Total Comfort (“Liberty”). In the proposal, Liberty stated that the existing HVAC system at the SSA premises was adequate for a retail environment, but not for the office environment required by the SFO issued by GSA. App. 135-137. Liberty stated that in order to meet the Government’s standards it would be necessary to install three roof top units, two of which would replace the existing units in the premises, and one entirely new unit. Id. This would allow for temperature control in multiple zones in the space, including a dedicated cooling zone for the space specified to be the LAN computer room. Id. Liberty further stated that the new HVAC units would require new ductwork to distribute the air. Id.

RESPONSE: Admit.

32. In support of its claim for increased HVAC costs, Hallwood submitted a cost list from its general contractor, Excel Construction as follows:

$1,000 Roof curb work for two new roof top HVAC units;
$ 680 Glass replacement work;
$6,891 Electrical work associated with the three roof top HVAC units;
$ 250 Drainage sewer line clean up to connect to the main sewer line. App. 138.

RESPONSE: Admit.

33. On October 13, 2005, GSA's contracting officer, Gerald Kosman, issued his final decision rejecting Hallwood's claim in its entirety. App. 142-144.

RESPONSE: Admit.

34. The following chart sets out, item by item, Hallwood's claim and rationale, and GSA's rejection and the Government's rationale for rejecting each part of Hallwood's claim. App. 128-144.

RESPONSE: Denied. Hallwood relies on its response to Defendant's Motion for Summary Judgment, including all attached documents.

Respectfully submitted,

/s/ TIMOTHY W. MIZEROWSKI
MIZEROWSKI & ASSOCIATES, P.C.
131 Ferland Street
Walled Lake, MI 48390
(248) 926-9205
Attorneys for Plaintiff

January 4, 2008

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this ___ day of January, 2008, the foregoing "PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS", was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Timothy W. Mizerowski
TIMOTHY W. MIZEROWSKI