# In the United States Court of Federal Claims

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | * |
| **HALLWOOD PLAZA, INC.,** | * |
| Plaintiff, | * |
| v. | * No. 06-589C |
| **THE UNITED STATES,** | * (Filed May 14, 2008) |
| Defendant. | * |
| * * * * * * * * * * * * * * * * * * * * * * * | * |

**ORDER DENYING SUMMARY JUDGMENT**

This case is before the court on defendant's motion for summary judgment. The lease is a commercial "performance lease" agreement between plaintiff Hallwood Plaza, Inc. ("plaintiff"), and the United States General Services Administration ("GSA"). The issue for decision is whether the Government, as proponent of summary judgment, can show that the landlord cannot establish the required elements of its burden to prove that costs incurred in converting from retail to office space of leased premises were beyond those contemplated within the building shell to be furnished by the lessor, uncompensated tenant improvements required by the agency tenant and not previously covered by final adjustment to the lease rate for such improvements, or extra work ordered by the Government above and beyond what was required for the office space to be furnished or the tenant improvements that were agreed upon. Argument is deemed unnecessary.

The court enters this speaking order as a form of judicial dialogue to be shared with the president of plaintiff, who is the sponsor of the underlying claim and this lawsuit. The court cautions plaintiff that it must weigh carefully the evidentiary burdens and costs associated with proceeding to trial. The parties' respective showings on summary judgment may not have been sufficient to resolve the case, but they indicate the likely resolution.

The court acknowledges that plaintiff did not cross-move for summary judgment, and the record does not have the benefit of all of plaintiff's evidence to support its claim. Moreover, the contract at issue is somewhat unusual in that it calls for an agreement to agree on reasonable terms for making improvements required by the tenant, which is the client of

GSA. This is not a contractual formulation that is conducive to bright-line rights and responsibilities.

Plaintiff has identified deficiencies in defendant's proof: (1) although the solicitation required plaintiff to provide a breakdown for work that it intended to furnish, plaintiff did not do so, and the contracting officer only can assume that amounts now claimed for were included in plaintiff's original bid for tenant improvements; (2) the contracting officer does not recall in what respect certain work required as part of the building shell was deficient, and he admits that some tenant improvements were added after the lease was signed; and (3) the agency's assistant property manager displayed poor recollection of what costs were included for tenant improvements in plaintiff's bid and of the events that transpired on site.
.

The following points, however, emerge from the evidentiary materials: (1) this is a performance lease, *i.e.*, plaintiff knew that it was responsible for a building shell that met contractual requirements for office space and modification to incorporate tenant improvements, and written admissions will show that plaintiff made a mistake of judgment in bidding on this performance lease when it did not fully appreciate the differences between retail space and office space; (2) plaintiff has the burden to prove that the items of extra work for which it seeks compensation were not includible as requirements of the building shell or were not included as tenant improvement costs in plaintiff's original estimate or in the work contemplated by the additional tenant improvements and costs therefor agreed upon to be amortized over the first two years of the lease, and it appears that plaintiff has no original bid documents to substantiate its position; (3) it is not GSA's obligation to verify which items and costs were included in plaintiff's bid for tenant improvements, as long as the contracting officer was satisfied that the amount allowed for tenant improvements appeared reasonable; (4) thus far, the testimony of plaintiff's president is non-specific insofar as what items and costs were included in plaintiff's bid (revised before the lease was signed) as part of the building shell to be furnished and as tenant improvements. In short, this is a case about extra work, and plaintiff must prove what is over and above what plaintiff was required to provide.

The rigorous rules governing the grant of summary judgment prevent the court from weighing evidence on a motion for summary judgment. The following discussion of these rules is offered to explain why this case, in the present posture, is not amenable to summary judgment for technical reasons that plaintiff should take to heart. Because the parties already have given the court a wealth of evidentiary materials, the court has been afforded the opportunity to examine the record developed to date and is confident that the following discussion may assist the parties in resolving this case short of trial. This result, in the court's considered opinion, would best serve the interests of justice. See RCFC 1. The court stands ready to assist the parties in an informal resolution of this dispute.

## FACTS

The following facts are undisputed.

1. Terms of the Solicitation for Offer and lease

GSA's Solicitation for Offers (the "SFO") dated November 1, 2004 set forth GSA's requirements for a performance lease on a new Social Security Administration (the "SSA") office. The Contracting Officer, Gerold K. Kosman, characterized the need for office space as particularly dire, because the SSA's office had "burn[ed] to the ground." Deposition of Gerald K. Kosman, July 27, 2007, at 13 (Pl.'s App. Ex. U). The SFO that ultimately was provided to plaintiff was the only SFO distributed because the contracting officer "determined that there was no other site capable of fulfilling the need as quickly as we could do it." Id. The lease contemplated a term of four years, with two years firm (GSA reserved the right to terminate the lease with sixty days written notice any time after the first two years of the lease). SFO § 1.5. (Def.'s App at 4.) Plaintiff submitted its initial offer on January 4, 2005. (Pl.'s App. Ex. D.) On January 14, 2005, the GSA requested plaintiff submit its "best and final offer." (Def.'s App. at 87.)

Contracting Officer Kosman's Price Negotiation Memorandum dated January 21, 2005, refers to the premises as "temporary space." (Pl.'s App. Ex. D.) The record gives every indication that the SFO process was rushed. See Contracting Officer Kosman's Price Negotiation Memorandum (Jan. 21, 2005) (Pl.'s App. Ex. D) ("SSA was originally prepared to compromise much of their requirements to get operational as soon as possible."). However, GSA was satisfied that the estimated tenant improvement amount of $186,600.00 would satisfy the SFO's minimum requirements and GSA's objectives. See id. On January 24, 2005, GSA accepted plaintiff's Best and Final Offer. (Def.'s App. at 90.)

Section 1.1 of the SFO referred to the demised premises as "Office Area" and "Office Area square feet." (Def.'s App at 1.) The purpose of the SFO was to explain the building requirements that should be reflected in the lessor's bid as cost of initial performance of the lease. The SFO contemplated a "warm lit shell," the term signifying the building shell that was to be furnished to the GSA. SFO § 1.9. (Def.'s App at 6.) The rental rate proposed was to include both the building shell to be provided in conformance with the SFO's requirements, as well as a tenant improvement allowance. SFO § 1.09(B)(1), (2). (Def.'s App at 6-7.) The building shell component of the rental rate specified: "all basic building systems and common area buildout including: base building lobbies, common areas, and core areas, etc." SFO § 1.9(B)(1)(c). (Def.'s App at 6.) The rate included "complete and functional" electrical and mechanical systems. Id. The items required to be furnished in tenant areas within the building shell included heating, ventilation, and air-conditioning

["HVAC"] systems with the capacity suitable for an "open office layout" and capable of providing "[c]onditioned air through medium pressure ductwork at a rate of .75 cfm/square foot of BOMA [Building Officials and Code Administrators National Building Code] office area." Id. (Def.'s App at 7.)

In addition to the requirements for tenant areas, the SFO provided for "tenant improvements," defined as "all alterations for the Government demised area over and above the warm lit shell buildout," to be included in a "tenant improvement allowance rate" at a stipulated amount of $19.00 per square foot, for which the lessor must provide a lender's commitment to finance. SFO § 1.9(B)(2)(a), (d). (Def.'s App at 7.) As part of tenant improvement allowance rate, "the Lessor will be reimbursed for costs to repair or improve the fixture(s) and/or any other improvements already in place." SFO § 1.9(B)(2)(e). (Id.) The tenant improvement allowance must be used "for building out the Government demised area in accordance with the Government-approved design intent drawings." SFO § 1.10(A). (Id.) The tenant improvement allowance included all administrative costs, including any "documentation (working drawings, etc.) required to receive construction permits" beyond those which are required for buildout of the building shell. SFO § 1.10(B). (Id.) All costs related to the buildout of the shell are considered separately from any reimbursement for tenant improvement costs. The SFO emphasizes: "NO COSTS ASSOCIATED WITH THE BUILDING SHELL SHALL BE INCLUDED IN THE TENANT IMPROVEMENT PRICING." Id.

Attachment No. 2 to the SFO contained information in chart format regarding the specifications that must be included in the building shell, as well as "Typical Tenant Improvements." (SFO Attachment No. 2, Def.'s App. at 41-42.)

Additionally, SFO section 5.0, Architectural Finishes, specified the "warm lit shell" buildout for the structure of the building and discussed certain types of tenant improvements that may be requested. (Def.'s App at 23-27) Section 6.0, Mechanical, Electrical, Plumbing, similarly stated the differences between certain requirements under the building shell and possible tenant improvement requests. (Def.'s App at 27-32) SFO Attachment No. 3 – General Requirements – contained some detailed requirements relevant to what constituted a warm lit shell, such as the "Slab Preparation for Carpet and Vinyl Tile" and "Electrical." (SFO, Attachment No. 3, Def.'s App. at 43-45)

SFO section 1.11 provided for a adjustment to the annual rental after contract award through a "tenant improvement allowance cost settlement," whereby the parties were to finalize the amount to be added to the rental and amortized over the first two years that would compensate the lessor for tenant improvements. SFO § 1.11. (Def.'s App at 8.) The agreement was to be embodied in a Supplemental Lease Agreement ("SLA") to adjust the

rental rate by the "actual tenant improvement costs." SFO § 1.11(A)(4). (Def.'s App at 8.) The Disputes Clause is the default if no agreement is reached. SFO § 1.11(A)(5). (Id.) Significantly, the SFO stipulates that the lessor's cost proposals for the final post-award agreed-upon tenant improvements "must contain sufficient detail to allow the government to determine the reasonableness of costs included in the proposals." SFO § 1.11(A). (Id.) Plaintiff appears to regard this crucial provision as hortatory; defendant, through Contractor Officer Kosman, regards it as a final concession by the Government of items that qualify as and costs for tenant improvements, such that the lessor cannot claim additional costs that it should have included in the negotiations leading up to the final SLA.

2. Chronology of post-award events

In response to the Design Intent Drawings dated November 19, 2004, and the SSA Special Requirements dated December 7, 2004 (Def.'s App. at 95), as provided by GSA, plaintiff submitted its estimated proposal, including a cost list prepared by its general contractor, Excel Construction on February 20, 2005. (Def.'s App. at 112–14.) George Kashat, plaintiff's president, a certified accountant who received a law degree from Baghdad University, testified in deposition that the general contractor likely did not have the SSA Special Requirements before the estimate proposal was made and then incorporated into the Best and Final Offer. See Deposition of George Kashat, July 27, 2007, at 19-21 (Pl.'s App. Ex. W). When asked about whether Excel Construction had the SSA Special Requirements during the preparation of the bid and before plaintiff submitted its estimated proposal, Mr. Kashat indicated that "it was – my understanding, this was not provided to them until afterwards." Id. at 20. Mr. Kashat could not recall whether he provided the document to Excel Construction or whether someone at the SSA did. (Id.)

Plaintiff's initial bid on January 21, 2005, for total tenant improvement costs was $217,245.00. (Def.'s App. at 112-14.) After review by Contracting Officer Kosman, GSA determined that plaintiff had not included the seven-percent interest rate to amortize tenant improvement costs in its offer. GSA afforded plaintiff the opportunity to correct its tenant improvement bid, and plaintiff did so in a letter dated February 24, 2005. (Def.'s App. at 115.) The parties executed lease no. GS-05B-17564 for the premises on February 23, 2005. Pl.'s Resp. to Def.'s Prop. Findings of Uncontroverted Facts, filed Jan. 16, 2008, ¶ 18. The GSA sent plaintiff a Notice To Proceed with Construction by letter dated February 28, 2005, that accepted plaintiff's proposal for a total cost of $232,452.15, including the subsequent modification for the seven-percent interest rate. Letter from Gerald K. Kosman to George Kashat (Feb. 28, 2005) (Def.'s App. at 116). SLA No 1, executed on March 15, 2005, embodied this agreement. (Def.'s App. at 124.)

A GSA pre-construction meeting was held on March 16, 2005, with plaintiff, plaintiff's contractors, the SSA, and the Federal Protective Service. According to Contracting Officer Kosman, work that plaintiff had not addressed as part of the building shell was noted, as well as items added to the performance lease that constituted additional tenant improvements. Kosman Dep. at 60-61 (Pl.'s App. Ex. U). It is his position that both parties agreed at that time as to the nature of all final improvements and the costs associated with those items and that these items and costs were subsequently embodied in SLA No. 2. A GSA Assistant Property Manager, Dan Fenner, who supervised both the buildout of the SFO shell and modification to implement the tenant improvements, could give only generalized testimony on whether the parties agreed to tenant improvements and what these improvements were. See Deposition of Dan Fenner, July 26, 2007, at 14-16, 20-22 (Pl.'s App. Ex. V). Mr. Fenner's deposition testimony cannot be the predicate for any findings of fact.

Mr. Kashat submitted to Contracting Officer Kosman on March 31, 2005, a "[d]etailed estimate of proposed additional costs," including a March 29, 2005 proposal from Excel Construction. (Def.'s App. at 117.) Mr. Kashat followed up with a letter misdated April 5, 2004 (intended to read 2005) referring to the "additional items" requested during the March 16, 2005 meeting in accordance with the "new specs" given to plaintiff at that time. (Def.'s App. at. 121.)

These changes, such as adding a public bathroom in the lobby, placing security bollards in front of the premises, miscellaneous outlet connections, an additional HVAC unit for the computer room, new duct work, drop ceiling, and light fixtures, fire alarm system, and extra drawings to comply with local government regulations, were reflected in the Excel Construction Proposal dated March 29, 2005. (Def.'s App. at 118-120.) The Excel proposal stated that some of the items listed were additional requests added at the March 16, 2005 meeting, but others represented "more additional cost items based on SSA special requirements, and Solicitation for offers." Id. (Def.'s App. at 118.) Mr. Kashat testified that the changes requested at the March 16, 2005 meeting were "drastic changes, major changes" that altered the scope of the tenant improvements. Kashat Dep. at 32 (Pl.'s App. Ex. W). Although plaintiff has raised a genuine issue of material fact as to whether additional tenant improvements were ordered that were not embodied in SLA No. 2, the evidence, wholly unspecific, does not prove that extra work was ordered.

Mr. Kashat's April 5, 2005 letter to Contracting Officer Kosman apparently requested authorization for certain items on the cost list that were not approved by GSA. (Def.'s App. at 121-22.) Contracting Officer Kosman responded via email dated April 4, 2004, identifying those "to be included in the shell price" for the SFO buildout. (Def.'s App. at 123.)

SLA No. 2, signed by both Messrs. Kashat and Kosman on April 20, 2005, set forth the "correct rent amount as a result of the final tenant improvement costs to be amortized over the term of the lease." (Def.'s App. at 125.) The "total tenant improvements" to be provided by the lessor were reflected in "the attached list of change orders," initialed by Mr. Kosman, but not by Mr. Kashat. (Id. at 126.) SLA No. 2 included a list of the GSA-approved changes that were to be implemented as tenant improvement costs, including thirteen items from plaintiff's earlier request for additional funding for tenant improvements dated March 31, 2005. (See Def.'s App. at 117–123, 126.)

3. Extra work

Plaintiff's HVAC subcontractor, Liberty Total Comfort, gave plaintiff an initial proposal dated March 9, 2005. (Def.'s App. at 137.) An undated letter from Liberty to plaintiff stated that the specifications as required by GSA in the SFO required an extensive modification to the existing HVAC system in order for the property to be suitable for office space. (Def.'s App. at 135.) The second proposal, dated April 8, 2005, quotes a price of $58,000.00 for the replacement of the two existing rooftop HVAC units with three new units, as well as required ancillary work, such as new a new duct network, replacement of ceiling and light fixtures, roofing work, and wiring for thermostat control. (Def.'s App. at 136.)

In an estimate dated June 7, 2005, Excel advised plaintiff of additional costs stemming from compliance with fire proofing and handicap code as required by Flint, Michigan city code. (Pl.'s App. Ex. K.)

Plaintiff claims for providing a door that was not required by the SFO, whereas defendant contends that plaintiff was correcting a defective door.

Plaintiff received an invoice dated May 6, 2005, from the Design Engineering Group for drawings indicating the renovation of a retail space, changing it to an office environment, reflecting a total amount of $19,875.00. (Def.'s App. at 139.) A letter dated July 25, 2005 from Design Engineering to plaintiff addressed the difficulties in modifying a retail environment to comply with the requirements of an office space and noting that plaintiff had overlooked the extent of the necessary work. (Def.'s App. at 134.) In a letter dated July 29, 2005, the City of Flint, Michigan required additional work and drawings from plaintiff in order to continue work in changing the premises from a retail to an office space. (Def.'s App. at 133.)

4. The claim

In a letter dated September 15, 2005, plaintiff submitted a claim for $142,926.86 in additional costs representing tenant improvements. (Def.'s App. at 128-132.) Plaintiff contended that its initial bid for preparing the "warm lit shell" required by the SFO was mistaken due to the inherent differences in preparing an office workspace, as contrasted with the requirements for retail space. (Def.'s App. at 128.) The proper scope of the requirements of the SFO were "not apparent to [plaintiff] upon first reading of the SFO Lease Agreement," yet "[u]pon a closer review of the documentation [plaintiff] became aware of many items which required inclusion in the construction program." (Id.) This claim also included items that were additional tenant improvements allegedly requested at the March 16, 2005 meeting, but were not memorialized in SLA No. 2. The parties evidently agree that, by SLA No. 2, GSA approved an amount of $98,000.00, which excluded approximately $165,000.00 that plaintiff claimed.

Contracting Officer Kosman denied plaintiff's claim in the amount of $142,926.86 by final decision issued on October 13, 2005. (Def.'s App. at 142–144.) Attributing the claim for additional funding to the tenant improvements captured in the two SLAs, the contracting officer denied the claim in full. (Def.'s App. at 144.) Plaintiff's argument that the mistake in bid amount was due to a misunderstanding of the requirements of an office, rather than retail, space was rejected because "[t]he SFO [was] clear in a request for office space." (Def.'s App. at 144.)

On August 16, 2006, plaintiff filed its action for breach of contract, claiming that GSA had failed to pay for specific improvements under the lease. After the completion of discovery, on November 13, 2007, defendant moved for summary judgment.

## DISCUSSION

1. Summary judgment standards

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See RCFC 56(c). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases the need for a trial is not present, and the motion for summary judgment must be granted. Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); see also Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999).

When resolving a motion for summary judgment, the court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Cf. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are . . . not [functions] of a judge . . . ruling on a motion for summary judgment . . . ."); Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1361 (Fed. Cir. 1998) ("[i]n determining the propriety of summary judgment, credibility determinations may not be made . . . .").

If the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, the motion for summary judgment should be denied. "The moving party in a summary judgment motion has the burden to show 'that there is an absence of evidence to support the non-moving party's case[.]'" Crown Operations Int'l v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir. 2002) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). The benefit of all reasonable presumptions and inferences runs to the party opposing summary judgment. Matsushita Elec. Indus., 475 U.S. at 587-88; Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); H.F. Allen Orchards v. United States, 749 F.2d 1571, 1574 (Fed. Cir. 1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments"). "Summary judgment is appropriate when examined in a light most favorable to the non-movant, the record indicates 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (quoting RCFC 56(c)) (affirming grant of summary judgment when plaintiff did not allege any facts that would support a claim of standing to sue United States as a third party beneficiary)).

In response to a motion for summary judgment, the non-moving party must provide evidence that is more than merely colorable. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986) (noting evidence may be presented in form of affidavits and need not be admissible at trial); SRI Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1116 (Fed. Cir. 1985) (noting that non-movant must demonstrate an evidentiary conflict by more than conclusory statements or mere denials). The types of evidence that can be obtained through discovery are useful. See Southern Rambler Sales, Inc. v. American Motors Corporation, 3775 F.2d 932, 937 (5th Cir. 1967) ("'Meet these affidavit facts or judicially die.'" (citation omitted)). Evidence in support of a motion for summary judgment must be of the sort admissible at trial, but the non-movant may rely on any evidence that raises a material issue of genuine fact; attorney argument in the pleadings does not suffice. Celotex, 477 at 324.

In its analysis the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter. See Anderson, 477 U.S. at 255 ("Neither do we suggest that the trial courts should act other than with caution in granting summary judgment . . . ."). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id.; see H.F. Allen Orchards v. United States, 749 F.2d 1571, 1574 (Fed. Cir. 1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments").

Ambiguous evidence on an issue of material fact supports the denial of summary judgment. C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc., 911 F.2d 670, 675 (Fed. Cir. 1990). Moreover, although summary judgment is designed "'to secure the just, speedy and inexpensive determination of every action,'" Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1, identical to RCFC 1), a trial court has the discretion to deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

The moving party may discharge its burden by establishing that the non-moving party cannot prove a required element of its case. See Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Solutions, P.C., 482 F.3d 1347, 1357 (Fed. Cir. 2007) (citing Celotex, 477 U.S. at 322); see also Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1354 (Fed. Cir. 2001) ("[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." (quoting Celotex, 477 U.S. at 325)).

Contract interpretation is a question of law and thus presents an appropriate question for resolution on summary judgment. See Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002). The court must examine the plain language of a contract to determine whether it is unambiguous; if so the court's inquiry is at an end, and no extrinsic evidence may be considered. See Kerin Motors, Inc. v. United States, 80 Fed. Cl. 679, 684 (2008) (citing Textron Defense Sys. v. Widnall, 143 F.3d 1465, 1468 (Fed. Cir. 1998)). A contract is unambiguous when there is only one reasonable interpretation. Id.

Plaintiff seeks additional payment based on the terms of the contract that provides for an equitable adjustment in certain circumstances. Compl. in Hallwood Plaza, Inc. v. United States, 06-589C (Fed. Cl. Aug. 18, 2006), ¶ 10. Supporting a theory of equitable adjustment "require[s] record evidence that the [agency] demanded work above and beyond that in the contract." Int'l Data Products Corp. v. United States, 492 F.3d 1317, 1325 (Fed. Cir. 2007).

2. Analysis

Defendant argues that the SFO called for an office work space, not a retail space, clearly and unambiguously. See SFO § 1.1. (Def.'s App. at 4.) Moreover, no costs of setting up the SFO building shell can be recovered as tenant improvement adjustments to the contract. See SFO § 1.9(B)(2)(a). (Def.'s App. at 7.) Defendant contends that plaintiff made a mistake in its bid and cannot recover for so-called extra work.

The court has read the deposition transcripts of three key witnesses: the contracting officer, the project manager, and the lessor. Contracting Officer Kosman has a good recollection overall, but is imprecise and somewhat confusing. The case cannot be resolved satisfactorily on the basis of a contract record on summary judgment, but some evidentiary inferences are present. Contracting Officer Kosman testified as to a possible admission chargeable to plaintiff (if plaintiff owned the shopping center at the time) when he states that Eric Olsen, the leasing agent for the shopping center, told him that the owner intended to put new units on the roof for this site, regardless of the type of tenant. See Kosman Dep. at 19, 27 (Pl.'s App. Ex. U). Mr Kosman admits that branch ductwork could be a tenant improvement, but was not involved in evaluating the contractor's bid estimate for tenant improvements and SLA No. 2. See id. at 89-92.

Mr. Kashat himself made a written admission in plaintiff's formal claim to GSA dated September 15, 2005, that acknowledges how plaintiff approached its bid in response to the SFO:

> There were a number of items contained within the SFO Lease Agreement which were uncharacteristic of a retail space of which we are used to dealing with in our daily activities. As such, certain features required by the lease were not interpreted by us and therefore not included in the contractor's original cost estimates.

(Def.'s App. at 128.) In his final decision dated October 15, 2005, contracting Officer Kosman registered the impact of plaintiff's admission:

> In the claim letter, it is apparent that the basis of the claim is not justifiable construction change order items, required by the government, over the original requirements of the SFO or documented Tenant Improvements but that of the lessor's error in making the rent determination in his offer to lease space.

(Def.'s App. at 144.) Some of the items that plaintiff claims as tenant improvements may represent work that the SFO required. See Kosman Dep. at 60-65 (Pl.'s App. Ex. U). It is

defendant's position that SLA No. 2 represented solely tenant improvements and that therefore plaintiff's claims are for work that was required for the building shell.

Plaintiff apparently solicited a letter dated July 25, 2005, from Design Engineering Group to aid its cause before the GSA after the March 16, 2005 meeting. The language of the letter does not appear to help plaintiff:

> Your shopping center, Hallwood Plaza, was constructed as a retail sales building. As such, the design of the building is tailored to meet the general needs of retail sales including lighting, electrical, heating and cooling, primary and emergency access/egress. When the Social Security offices were proposed for the space and the lease agreement was issued, several items which would normally not be included in the lease requirements for a retail space were mandated for the SSA offices. Apparently these items were overlooked by your representative and subsequently not included in the projected cost to complete the work. I am sure you are aware of the number of specific stipulations in the GSA's SFO and how this [a]ffected the ultimate construction budget. The major areas which were not included were zoned heating and cooling and electrical wiring and lighting. Associated costs also included removal and replacement of the acoustical lay-in ceiling and more extensive architectural design work to meet with the City of Flint Building Department's requirements for documentation and plan approval. I am sure had this information been more apparent it would have created a heightened awareness and hence there would not have been nay need to address these matters. I believe you acted in a fashion that was not uncommon given your area of expertise however the anomalies of leasing office space and not retail space came to light during this process. I hope the General Services Administration may see their way toward assisting you to cover the necessary and required additional expenses you incurred during the construction of this project.

(D. App. at 134.)

The court observes that plaintiff may be able to support its claim for extra work/additional tenant improvement costs if 1) the work should have been included as tenant improvements in SFO No. 2, and plaintiff pressed its claim to the GSA for extra work both before SFO No. 2 was executed and thereafter until plaintiff submitted its claim to the contracting officer; and 2) the work was not required as part of the building shell to be furnished to the GSA. Alternatively, plaintiff may attempt to show that the extra work was required during or as a result of the March 16, 2005 preconstruction meeting and did not

constitute either the building shell to be furnished or tenant improvements under the SFO and plaintiff's proposal. Indeed, plaintiff would be required to prove the items and costs that were actually included its Best and Final Offer. See Datalect Computer Servs., Inc. v. United States, 56 Fed. Cl. 178, 195 (2003) (citing Skip Kirchdorfer, Inc. v. United States, 14 Cl. Ct. 594, 607 (1988)) (emphasizing importance of bid notes in providing basis for damages claim) aff'd table, 97 Fed. Appx. 333 (Fed. Cir. 2004).

To the extent that plaintiff's complaint suggests that the contract should be reformed due to a unilateral mistake, plaintiff has put forth no facts that would support the application of the doctrine. See generally C.W. Over & Sons, Inc. v. United States, 44 Fed. Cl. 18, 29-30 (1999). Under the doctrine of unilateral mistake, "a contractor may obtain a remedy from the Government for a mistaken bid . . . only if the contracting officer knew or should have known of the contractor's unilateral mistake at the time the bid was accepted." Bromley Contracting Co. v. United States, 794 F.2d 669, 671-72 (Fed. Cir. 1986) (citing Aydin Corp. v. United States, 669 F.2d 681, 686 (Ct. Cl. 1982); Wender Presses, Inc. v. United States, 343 F.2d 961, 962-63 (Ct. Cl. 1965)). To succeed, plaintiff must satisfy a two-part test. In addition to establishing knowledge on the part of the contracting officer, plaintiff must demonstrate that the error is compensable, *i.e.*, a "'clear cut clerical or arithmetical error, or misreading of the specifications.'" Bromley Contracting Co., 794 F.2d at 672 (quoting Ruggiero v. United States, 420 F.2d 709, 713 (Ct. Cl. 1970)).

Plaintiff has not put forth any evidence to suggest that the contracting officer knew of any alleged mistake. See Def.'s Br. filed Nov. 13, 2007, at 13 ("Hallwood does not even allege that the agency had any reason to know that its bid was based upon a misunderstanding of the differences between providing a shell building for a retail space and providing a shell building for office space."). Nor has plaintiff presented any evidence that the error was a compensable clerical or arithmetical error, or that it was due to a misreading of the specifications. Indeed, plaintiff's president Mr. Kashat admitted that "a number of items contained within the SFO . . . were uncharacteristic of a retail tenant space of which we are used to dealing with in our daily activities. As such, certain features required . . . were not interpreted by us and therefore not included in the contractor's original cost estimates." Letter from George Kashat to Paul M. Schmitt & Gerald K. Kosman (Sept. 15, 2005) (Def.'s App. at 128). While compensation may be had for such errors, errors in judgment are not compensable. Cf. Liebherr Crane Corp. v. United States, 810 F.2d 1153, 1157 (Fed. Cir. 1987) (citing Ruggiero, 420 F.2d at 713) ("[R]elief does not extend, however, to mistakes of judgment on the part of the contractor or its representative" in mistake-in-bid case.); Hamilton Enterprises, Inc. v. United States, 711 F.2d 1038, 1046-47 (Fed. Cir. 1983) (finding error not of compensable type in mistake-in-bid case in absence of work papers showing nature of mistake or what the bid would have been were it not for mistake).

## CONCLUSION

Plaintiff likely will not recover attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 (2000), upon a trial, because trial is necessary to determine whether plaintiff can prove a right to recovery. Moreover, the Government may make an offer of judgment to plaintiff prior to trial pursuant to RCFC 68. The court would not know whether the offer had been made or its amount until after trial. If plaintiff were not to recover more than the amount of the offer after trial, plaintiff would be liable to reimburse defendant for all of the costs allowed by statute that defendant incurred after the date of the offer. Even if, after trial, the court decided not to award costs to either party, the Government could collect its costs under Rule 68 by making such an offer of judgment that exceeded the amount that plaintiff was awarded.

Given the apparent lack of documentation of plaintiff's bid (the items and amounts) and the party admissions discussed above, the court cannot encourage plaintiff that a denial of summary judgment means more than that the contract terms do not preclude recovery. Plaintiff must establish at trial by a preponderance of evidence: 1) that its bid was adequate and informed vis-à-vis the requirements for the building shell; and 2) that all tenant improvements that were not included in SLA No. 2 represent extra work, either as uncompensated tenant improvements or extra work to the building that is beyond what the lease required to be furnished as the building shell. At this point it appears that the amounts claimed are documented adequately. Accordingly,

**IT IS ORDERED**, as follows:

1. Defendant's motion for summary judgment is denied.

2. By June 25, 2008, the parties shall file a proposed schedule for all pretrial proceedings and trial.

s/ Christine O.C. Miller

________________________________

**Christine Odell Cook Miller**
Judge